# Exhibit B
## to
### *Memorandum in Support of Motion for Preliminary Injunction*
## Cawthorn Challenge

STATE OF NORTH CAROLINA BEFORE THE NORTH CAROLINA
STATE BOARD OF ELECTIONS

In re Challenge to )
the constitutional qualifications of ) Notice of
Rep. Madison Cawthorn ) Candidacy Challenge RECEIVED
_____ )

JAN 1 0 REC'D

STATE BOARD OF ELECTIONS

## INTRODUCTION

1.      The Challengers in this action ("Challengers"), registered voters in the

13th Congressional District, have reasonable suspicion, pursuant to N.C. GEN. STAT.

§ 163-127, that Representative Madison Cawthorn, a candidate for North Carolina's

13th Congressional District, does not meet the federal constitutional requirements

for a Member of the U.S. House of Representatives and is therefore ineligible to be a

candidate for such office.

2.      Under North Carolina law, when a challenger provides "reasonable

suspicion or belief" of facts establishing that a candidate "does not meet the

constitutional . . . qualifications for the office," then "[t]he burden of proof shall be

upon the candidate" to "show by a preponderance of the evidence . . . that he or she

is qualified to be a candidate for the office." N.C. GEN. STAT. §§ 163-127.2(b), 163-

127.5(a).

3.      Under Section Three of the Fourteenth Amendment to the U.S.

Constitution, known as the Disqualification Clause, "No Person shall be a . . .

Representative in Congress . . . who, having previously taken an oath, as a member

of Congress . . . to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same."

4.    Persons who trigger this constitutional provision are disqualified from congressional office, just as persons who fail to meet the age, citizenship, and residency requirements of Article I, section 2 of the Constitution are disqualified from congressional office. "The oath to support the Constitution is the test. The idea being that one who had taken an oath to support the Constitution and violated it, ought to be excluded from taking it again, until relieved by Congress." *Worthy v. Barrett*, 63 N.C. 199, 204 (1869). Consequently, such persons "do[] not meet the constitutional . . . qualifications for the office" under N.C. GEN. STAT. § 163-127.2(b).

5.    An "insurrection" or "rebellion" under the Disqualification Clause includes actions against the United States with the intent to overthrow the government of the United States or obstruct an essential constitutional function.

6.    The events of January 6, 2021 amounted to an insurrection or a rebellion under Section Three: a coordinated effort to prevent the Vice President of the United States and the United States Congress from fulfilling their constitutional roles by certifying President Biden's victory, and to illegally extend then-President Trump's tenure in office.

7.    In 1869, the North Carolina Supreme Court issued the leading national precedent on the meaning of "engage" under Section Three. The Court held that a candidate "engages" in a rebellion or insurrection for the purposes of the Disqualification Clause by "[v]oluntarily aiding the rebellion, by personal service, or

by contributions, other than charitable, of any thing that was useful or necessary." *Worthy v. Barrett*, 63 N.C. 199, 203 (1869).

8.     Planning or helping plan an insurrection or rebellion satisfies that definition. So does planning a demonstration or march upon a government building that the planner knows is substantially likely to (and does) result in insurrection or rebellion, as it constitutes taking voluntary steps to contribute, "by personal service," a "thing that was useful or necessary" to the insurrection or rebellion. And knowing that insurrection or rebellion was likely makes that aid voluntary.

9.     As described below, and as set forth in Challengers' affidavits, the demonstration at the Ellipse and related march on the U.S. Capitol, and their endorsement by prominent incumbent House Members (including Representative Cawthorn), Senators, and the incumbent President, led directly, intentionally, and foreseeably to the insurrectionists' violent assault on the Capitol.[1]

10.    Challengers have reasonable suspicion that Representative Cawthorn was involved in efforts to intimidate Congress and the Vice President into rejecting valid electoral votes and subvert the essential constitutional function of an orderly and peaceful transition of power. Challengers have reasonable suspicion that Cawthorn was involved in either planning the attack on January 6, or alternatively the planning of the pre-attack demonstration and/or march on the Capitol with the

---

[1] This notice of candidacy challenge uses the term "insurrectionists" without prejudice as to whether the events of January 6 may also constitute a "rebellion" within the meaning of the Disqualification Clause.

advance knowledge that it was substantially likely to lead to the attack, and otherwise voluntarily aided the insurrection.

11.    Representative Cawthorn promoted the demonstration ahead of time, tweeting, "the future of this Republic hinges on the actions of a solitary few . . . It's time to fight," and he spoke at the demonstration. Furthermore, there are reports that he met with planners of the January 6 demonstration, and possibly of the assault on the Capitol, beforehand. The stated goal of the organizers was to pressure Vice President Pence into disregarding the electoral votes from several states and declaring Trump the winner of the 2020 election. The likelihood of violence during the implementation of this plan was plain to bystanders and probably more so to those intimately involved. Before the demonstration, violent groups announced they were going to attend it. Plans for violence—and specifically occupying the Capitol to prevent the certification vote or violently influence its outcome—were so prevalent that one reporter has remarked that "[a]nyone with a Twitter account and an hour of time to kill could have warned about the potential for violence on Jan. 6—and many did."[2]

12.    Representative Cawthorn has a history, leading up to and continuing after his swearing-in as a Member of the U.S. House of Representatives, of advocating for political violence. He has also made supportive statements about the

_____

[2] Quinta Jurecic, *Why Didn't the FBI Review Social Media Posts Announcing Plans for the Capitol Riot?*, LAWFARE (June 29, 2021), https://www.lawfareblog.com/why-didnt-fbi-review-social-media-posts-announcing-plans-capitol-riot; Martha Mendoza & Juliet Linderman, *Officers maced, trampled: Docs expose depth of Jan. 6 chaos*, AP NEWS (Mar. 10, 2021), https://bit.ly/3F2Hi26.

insurrectionists who stormed the Capitol, describing them as "political hostages" and "political prisoners."

13. Collectively, Cawthorn's actions and the events of January 6 provide reasonable suspicion that, under the Disqualification Clause, he is constitutionally disqualified from running for congressional office.

14. Because Challengers have reasonable suspicion and belief of facts establishing that Representative Cawthorn is disqualified from running for congressional office, Representative Cawthorn has the burden of proving "by a preponderance of the evidence of the evidence of the record as a whole that he [] is qualified to be a candidate for the office." N.C. GEN. STAT. § 163-127.5(a).

15. Therefore, Representative Cawthorn must prove that he was *not* involved in the insurrection of January 6, 2021.

16. In accordance with N.C. GEN. STAT. § 163-127.4(a), Challengers intend to depose Representative Cawthorn before the hearing, and request subpoenas for witnesses and documents, including documents that Representative Cawthorn or his staff may possess involving the planning of the January 6 events that could shed light on his qualification for office under Section Three.

17. If Representative Cawthorn is unable to meet his burden, the panel appointed by the North Carolina State Board of Elections ("State Board") must find him disqualified to be a candidate for the office of U.S. Representative.

5

**FILING AND VENUE**

18.    Representative Cawthorn is running for the House of Representatives in the 13th Congressional District and has accordingly filed his candidacy with the State Board. N.C. GEN. STAT. § 163-106.2(a). Due to the recent North Carolina Supreme Court ruling staying the filing deadline for candidates, this challenge is properly and timely filed with the State Board. *Id.* § 163-127.2(a).

19.    Because the 13th District encompasses multiple counties but not the entire state, the State Board will appoint a panel of five county board members from the counties within the district. N.C. GEN. STAT. § 163-127.3(2).

**STATUTORY BACKGROUND**

20.    Under North Carolina law, "[a]ny qualified voter registered in the same district as the office for which the candidate has filed or petitioned" may file a candidacy challenge by filing an affidavit that they have "reasonable suspicion or belief of the facts stated . . . that the candidate does not meet the constitutional or statutory qualifications for office," and an appropriate panel will be appointed to hear the challenge. N.C. GEN. STAT.  §§ 163-127.1(3), 163-127.2(b), 163-127.3(2).

21.    The burden for establishing "reasonable suspicion" is low. For example, the most recent successful challenge was instituted in part by a challenger who had no evidence whatsoever of the candidate's alleged disqualifications and, in fact, admitted that she hoped to be proven wrong during the hearing. Transcript of Record at 72–73, *In re Bonapart*, N.C. State Bd. of Elections (Jan. 21, 2020) (order). In another challenge that was successful at the panel level, the challenger brought a single piece of evidence that was rejected, but correctly pointed out that "as the

6

ordinance says, I just have to bring suspicion. So that's what I've brought." Transcript of Record at 55, *In re Penland*, N.C. State Bd. of Election (Apr. 4, 2018) (order overturning panel decision on unrelated procedural grounds).

22. The panel "shall . . . [a]llow for depositions prior to the hearings, if requested by the challenger or candidate before the time of the hearing is designated and announced," N.C. GEN. STAT. § 163-127.4(a)(2), and "[i]ssue subpoenas for witnesses or documents, or both, upon requests of the parties or upon its own motion," *id.* § 163-127.4(a)(3). "The parties shall be allowed to issue subpoenas for witnesses or documents, or both, including a subpoena of the candidate." *Id.* § 163-127.4(c)(1). The panel itself may issue subpoenas if any two members or the chair requests them. *Id.*

23. During the panel hearing, "[t]he burden of proof shall be upon the candidate, who must show by a preponderance of the evidence of the record as a whole that he or she is qualified to be a candidate for the office." *Id.* § 163-127.5(a).

24. The panel may hear evidence in the form of affidavits or witnesses; witnesses must testify under oath. *Id.* § 163-127.4(c)(1). The panel may receive evidence "from any person with information concerning the subject of the challenge," consistent with the state's rules of evidence. *Id.* at § 163-127.4(c)(2).

## FACTUAL BACKGROUND

25. Challengers have reasonable suspicion and belief in the following facts, based on public reports and publicly available evidence.

26.     In the days leading up to his swearing-in on January 3, 2021, Representative Cawthorn repeatedly claimed that the 2020 election was "stolen" and marred by massive voter fraud.[3]

27.     These statements were made in support of a larger movement, often using the slogan "Stop the Steal," that advances and promotes the false narrative that Donald Trump won the 2020 election. Beginning in November 2020, various persons associated with the movement attempted to block the certification of President-elect Biden's victory with dozens of lawsuits. None succeeded, and all were found to be baseless.[4]

28.     After litigation failed, some within this larger movement accepted that they had exhausted their legal options for challenging the results of the presidential election.[5]

**The Unconstitutional Scheme to Overturn the 2020 Election Results**

29.     Others, however, turned to extralegal plans. They formulated an unconstitutional scheme to subvert the constitutional process of counting the electoral votes in Congress, preventing President-elect Biden from being sworn in

---

[3] Joel Burgess, *As Biden transition progresses, Cawthorn continues to raise money off resistance*, ASHEVILLE CITIZEN-TIMES (Nov. 25, 2020), https://bit.ly/CawthorneFundraising; Madison Cawthorn (@CawthornforNC), TWITTER (Dec. 31, 2020, 3:21 p.m.), https://bit.ly/CawthorneTweetDec31.
[4] Jacob Shamisian & Sonam Sheth, *Trump and his allies filed more than 40 lawsuits challenging the 2020 election results. All of them failed*, BUSINESS INSIDER (Feb. 22, 2021), https://bit.ly/3mZYfEf.
[5] Colin Dwyer, *After Supreme Court Defeat, Trump's Backers In Congress Are Quiet On What Comes Next*, NPR (Dec. 12, 2020), https://n.pr/32ybK7f; Rep. Bruce Westerman (@RepWesterman), TWITTER (Dec. 11, 2020, 8:49 PM), https://bit.ly/3eFkZ7S.

8

as President. Leaders of this scheme—including then-President Trump, his Chief of Staff Mark Meadows, certain Members of Congress, and others outside government—focused on January 6, the day that Congress counts the presidential electors' votes, as an opportunity to prevent Congress from certifying President-elect Biden's victory.[6]

30. Under the provisions of the Twelfth Amendment to the U.S. Constitution and the Electoral Count Act, 3 U.S.C. §§ 15 et seq., the votes of presidential electors are officially counted as follows. At 1:00 p.m. on January 6 of the year following a presidential election, the U.S. Senate and the U.S. House of Representatives meet jointly in the House Chamber, with the Vice President of the United States (in his capacity as President of the Senate) presiding. Beginning with Alabama, and proceeding alphabetically, the Vice President opens each state's certificate of the votes of its electors, and calls for objections, if any. Any objection must be filed by at least one Senator and at least one Member of the House. These objections are then voted upon separately by the House and Senate.[7]

31. The Electoral Count Act provides that, if a state has submitted only one return of electoral votes, and if the electoral votes were "regularly given by electors whose appointment has been lawfully certified," then Congress *cannot* reject those electoral votes.[8]

---

[6] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[7] 3 U.S.C. § 15; U.S. CONST. amend. XII.
[8] 3 U.S.C. § 15.

32.     The Electoral Count Act provides two scenarios in which, theoretically, Congress can reject electoral votes. First, "the two Houses concurrently" may reject one or more electoral votes from a state when both Houses "agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified." Second, if a state submits *multiple* conflicting returns of its electoral votes, the Act contains procedures for determining which return prevails.[9]

33.     After the 2020 election, no lawful procedure under the Electoral Count Act could prevent the counting of electoral votes from the states where President-elect Biden had won the election. None of those states had submitted multiple competing electoral tallies to Congress. And it was generally understood that there were insufficient votes in the U.S. House of Representatives to reject as not "regularly given" the electoral votes from any state, let alone to reject enough electoral votes to change the outcome to anything other than a Biden victory.[10]

34.     Since no lawful procedure under the Electoral Count Act could prevent the counting of electoral votes from the states where President-elect Biden had won the election, leaders of the scheme to subvert the counting of the votes developed stratagems by which Vice President Pence would refuse to recognize the votes of electors from certain states that Trump had lost, thus leading to a Trump "victory"

---

[9] *Id.*
[10] Joseph Choi, *Pelosi sets up call on election challenge: 'No situation matches Trump presidency,'* THE HILL (Jan. 3, 2021), https://bit.ly/32F5CtP.

in Congress.[11] However, these plans relied on cooperation from sympathetic members of Congress and, crucially, Vice President Pence. The plans centered on Pence abusing the Vice President's ceremonial duty to "open all the certificates" of state electoral votes as a pretext to unilaterally *reject* votes.[12]

35.    Key leaders and participants in the larger scheme developed plans to pressure or intimidate Congress and Pence into cooperating—and, if that failed, to obstruct the electoral count certification.[13]

36.    A key participant in this scheme was Mark Meadows, then-President Trump's Chief of Staff. Before becoming Chief of Staff, Meadows had served as the U.S. Representative for North Carolina's 11th Congressional District (the seat Cawthorn now occupies) from 2013 to 2020. During this time, Cawthorn forged or strengthened connections with Meadows. Cawthorn was nominated by Meadows to

---

[11] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y; *READ: Trump lawyer's full memo on plan for Pence to overturn the election*, CNN (Sept. 21, 2021), https://cnn.it/3qldg4p.

[12] U.S. CONST. amend. XII.

[13] *See, e.g., Trump pressures Pence to throw out election results — even though he can't*, POLITICO (Jan. 5, 2021), https://politi.co/3961iTx; *READ: Trump lawyer's full memo on plan for Pence to overturn the election*, CNN (Sept. 21, 2001), https://cnn.it/3qldg4p; *Ahead of Jan. 6, Willard hotel in downtown D.C. was a Trump team 'command center' for effort to deny Biden the presidency*, WASH. POST (Oct. 23, 2021), https://wapo.st/3pOUPpL; *'A roadmap for a coup': inside Trump's plot to steal the presidency*, THE GUARDIAN (Oct. 30, 2021), https://bit.ly/31q0MjJ; United States v. Greene, No. 21-CR-52, Statement of Offense, ¶¶ 29-31 (D.D.C. Dec. 22, 2021), https://www.justice.gov/usao-dc/press-release/file/1458266/download; *see also infra* note 22.

the Naval Academy in 2014[14] and worked as a staffer in Meadows' North Carolina office in 2015 and 2016.[15]

37.     Meadows was intimately involved in multiple aspects of the effort to overturn the presidential election results, including efforts to pressure state officials to overturn election results in states Biden had won; promoting plans for Pence to unilaterally reject electoral votes; and communicating with organizers of January 6 events in the days leading up to January 6 and as the attack unfolded.[16]

38.     To further their scheme to overturn the presidential election results, in December 2020 and January 2021, organizers planned a "Save America" demonstration in Washington, D.C. on January 6 to coincide with, and seek to block, the certification of electoral votes. At this demonstration, they planned to push false claims of massive voter fraud and to pressure then-Vice President Pence to refuse to count slates of electors from states with close contests.[17]

39.     The organizers of the demonstration were in close contact with several Members of Congress or their staff during this time regarding the details of the

---

[14] *Meadows congratulates Western North Carolina academy nominees*, ASHEVILLE CITIZEN-TIMES (Dec. 22, 2013), https://bit.ly/3eOPBnL.
[15] Michael Kranish, *The making of Madison Cawthorn: How falsehoods helped propel the career of a new pro-Trump star of the far right*, WASH. POST (Feb. 27, 2021), https://wapo.st/3sUewyk.
[16] H.R. REP. NO. 117-216, at 6–12 (2021), https://www.congress.gov/117/crpt/hrpt216/CRPT-117hrpt216.pdf.
[17] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y; *see also supra* note 13.

demonstration, including Representative Cawthorn or his staff.[18] Those same

organizers were also in touch with White House staff about the demonstration,

including Meadows.[19]

40.    Organizers' plans for January 6 also included a march on the U.S.

Capitol while Congress was counting electoral votes.[20]

41.    On December 19, 2020, then-President Trump endorsed the

demonstration, claiming it would be "wild."[21] This was widely understood to be a

coded call for violence by Trump supporters. On social media, they openly called for

weapons to be carried into the District of Columbia, for law enforcement to be

murdered if they interfered, and for supporters to storm the Capitol to prevent the

certification of President-elect Biden's victory.[22]

42.    On December 21, 2020, Representative-elect Cawthorn encouraged

supporters to "call your congressman and feel free—you can lightly threaten them

---

[18] Hunter Walker, *Jan. 6 Protest Organizers Say They Participated in 'Dozens' of Planning Meetings With Members of Congress and White House Staff*, ROLLING STONE (Oct. 24, 2021), https://bit.ly/3HB2Nc4.
[19] *Id.*
[20] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[21] *Id.*
[22] Brandy Zadrozny & Ben Collins, *Violent threats ripple through far-right internet forums ahead of protest*, NBC NEWS (Jan. 5, 2021), https://www.nbcnews.com/tech/internet/vio.lent-threats-ripple-through-far-right-internet-forums-ahead-protest-n1252923; *see also* Dan Barry & Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date*, N.Y. TIMES (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html; Ryan Goodman & Justin Hendrix, *The Absence of "The Donald,"* JUST SECURITY (Dec. 6, 2021), https://bit.ly/3sRenLY.

. . . Say: 'If you don't support election integrity, I'm coming after you. Madison Cawthorn's coming after you. Everybody's coming after you.'"[23]

43.    On December 31, 2020, Cawthorn announced he would oppose the certification of Biden's victory on the basis that the 2020 election was marred by fraud and that state laws were not "followed"; he planned to object to results from Pennsylvania, Georgia, Michigan, Wisconsin, Arizona, and Nevada.[24]

44.    On January 3, 2021, pursuant to Article VI of the U.S. Constitution, Cawthorn swore an oath of office to uphold and protect the Constitution.

45.    On that same day, it was reported that Trump and his associates in the movement to overturn the 2020 election had begun to use extralegal and unlawful tactics, as Trump and Meadows attempted to intimidate Georgia Secretary of State Raffensperger into fabricating votes and declaring Trump the winner of Georgia's presidential election.[25]

46.    On January 4, 2021, Representative Cawthorn promoted the January 6 demonstration, tweeting, "January 6th is fast approaching, the future of this Republic hinges on the actions of a solitary few. Get ready, the fate of a nation

---

[23] Turning Point, *Live! SAS 2020 Day 3! Madison Cawthorn, Allie Stuckey, and More!*, FACEBOOK (Dec. 21, 2020) (at 3:44:00), https://bit.ly/DecemberTurningPointVideo.
[24] Madison Cawthorn (@CawthornforNC), TWITTER (Dec. 31, 2020, 3:21 p.m.), https://bit.ly/CawthorneTweetDec31.
[25] Michael D. Shear & Stephanie Saul, *Trump, in Taped Call, Pressured Georgia Official to 'Find' Votes to Overturn Election*, N.Y. TIMES (Jan. 3, 2021), https://nyti.ms/3mUVQef.

14

rests on our shoulders, yours and mine. Let's show Washington that our backbones are made of steel and titanium. It's time to fight."[26]

47.     On January 5, 2021, Pence informed Trump that he did not have the authority to unilaterally reject electoral votes and consequently would not do so. This was widely and publicly reported that same day.[27]

## The Events of January 6, 2021

48.     On the morning of January 6, Representative Cawthorn spoke at the demonstration, remarking that "this crowd has some fight" and "[t]he Democrats, with all the fraud they have done this election, the Republicans, hiding and not fighting, they are trying to silence your voice."[28]

49.     Other speakers included Trump's lawyer, Rudy Giuliani, who called for "trial by combat,"[29] and Rep. Mo Brooks of Alabama, who urged the crowd to "start taking down names and kicking ass" and be prepared to sacrifice their "blood" and "lives" and "do what it takes to fight for America" by "carry[ing] the message to Capitol Hill," since "the fight begins today."[30]

---

[26] Madison Cawthorn (@CawthornforNC), TWITTER (Jan. 4, 2021, 5:57 p.m.), https://bit.ly/CawthornJan4Tweet.
[27] Kaitlan Collins & Jim Acosta, *Pence informed Trump that he can't block Biden's win*, CNN (Jan. 5, 2021), https://cnn.it/3FH4gx9.
[28] Madison Cawthorn (@CawthornforNC), TWITTER (Jan. 6, 2021, 11:02 a.m.), https://bit.ly/CawthronJan6Tweet1; *Rally on Electoral College Vote Certification*, C-SPAN (Jan. 6, 2021) (2:10 mark), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification; Charles Duncan, *N.C. Rep. Cawthorn Sticks by D.C. Rally Speech, Loses Backing of Key Supporter*, SPECTRUM NEWS 1 (Jan. 12, 2021), https://bit.ly/CawthornJan6SpeechArticle.
[29] Wash. Post, *Trump, Republicans incite crowd before mob storms Capitol*, YOUTUBE (Jan. 6, 2021), https://youtu.be/mh3cbd7niTQ.
[30] The Hill, *Mo Brooks gives FIERY speech against anti-Trump Republicans, socialists*, YOUTUBE (Jan. 6, 2021), https://youtu.be/ZKHwV6sdrMk.

50.     Around 12:00 pm, then-President Trump began speaking about how "we will stop the steal."[31] Seven minutes into his speech, the crowd was chanting "Fight for Trump!". About 16 minutes into his speech, he said, "[a]fter this, we're going to walk down and I'll be there with you. We're going to walk down. We're going to walk down any one you want, but I think right here. We're going walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women. We're probably not going to be cheering so much for some of them because you'll never take back our country with weakness. You have to show strength, and you have to be strong."[32] At about this point, 10,000-15,000 demonstrators began the roughly 30-minute march to the Capitol, where they joined a crowd of 300 members of the violent extremist group "Proud Boys."[33]

51.     Around 1:00 p.m.—just as Congress had begun the process of jointly counting the electoral votes—then-President Trump ordered the remaining crowd to "walk down Pennsylvania Avenue . . . we are going to the Capitol."[34] At around that time, Trump supporters attacked police protecting the barricades surrounding the Capitol.[35] As Trump ended his speech, a large portion of the crowd began their

_____

[31] *Donald Trump Speech "Save America" Rally Transcript January 6*, REV (Jan. 6, 2021), https://bit.ly/3GheZid; Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), https://n.pr/3G1K2ON.
[32] *Id.*
[33] Martha Mendoza & Juliet Linderman, *Officers maced, trampled: Docs expose depth of Jan. 6 chaos*, AP NEWS (Mar. 10, 2021), https://bit.ly/3F2Hi26.
[34] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[35] *Id.*

30-minute march to the Capitol.[36] By 1:30 p.m., law enforcement retreated as insurrectionists scaled the walls of the Capitol. Many were armed with weapons, pepper spray, and tasers. Some wore full body armor; others carried homemade shields. Many used flagpoles, signposts, or other weapons to attack police officers defending the Capitol.[37]

52.     Because certain Members of Congress (including Cawthorn) had filed objections to Arizona's slate of electors, by this time the joint counting session had been suspended and the House and Senate were debating the objections separately.[38] At 1:31 p.m. Representative Cawthorn tweeted, "I'm fighting a battle for our Constitution on the house floor with other patriots. The battle is on the house floor, not in the streets of D.C."[39]

53.     By 2:00 p.m., the Capitol had been breached by insurrectionists, smashing through first-floor windows. Over the next two hours, hundreds of insurrectionists stormed the Capitol, attacking police with weapons and pyrotechnics. One police officer was crushed against a door, screaming in agony as the crowd chanted "Heave, ho!"[40] An attacker ripped off the officer's gas mask, beat

---

[36] Kat Lonsdorft et al., *A timeline of how the Jan. 6 attack unfolded — including who said what and when*, NPR (Jan. 5, 2022), https://n.pr/3ztHpmo.
[37] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[38] *Id.*
[39] Madison Cawthorn (@CawthornforNC), TWITTER (Jan. 6, 2021, 1:31 p.m.), https://bit.ly/CawthornJan6Tweet.
[40] Kelsie Smith & Travis Caldwell, *Disturbing video shows officer crushed against door by mob storming the Capitol*, CNN (Jan. 9, 2021), https://cnn.it/3eAmdSc.

17

his head against the door, took his baton, and hit his head with it.[41] Another officer was pulled into a crowd, beaten and repeatedly Tased by insurrectionists.[42]

54.    The insurrectionists demanded the arrest or murder of various other elected officials who refused to participate in their attempted coup.[43] They chanted "hang Mike Pence" and threatened Speaker Pelosi.[44] They taunted a Black police officer with racial slurs for pointing out that overturning the election would deprive him of *his* vote.[45] Confederate flags and symbols of white supremacist movements were widespread.[46]

55.    At 2:13 p.m., Vice President Pence was removed by the Secret Service; the House adjourned at 2:20 p.m.[47] The insurrectionists had successfully obstructed Congress from certifying the votes, temporarily blocking the peaceful transition of power from one presidential administration to the next.

56.    At 2:44 p.m., insurrectionists attempted to force their way into the Speaker's Lobby (adjacent to the House Chamber) as lightly armed security guards

---

[41] Clare Hymes & Cassidy McDonald, *Capitol riot suspect accused of assaulting cop and burying officer's badge in his backyard*, CBS NEWS (Mar. 13, 2021), https://cbsn.ws/3eFAaxS.
[42] Michael Kaplan & Cassidy McDonald, *At least 17 police officers remain out of work with injuries from the Capitol attack,* CBS NEWS (June 4, 2021), https://cbsn.ws/3eyXZr8.
[43] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[44] H.R. REP. NO. 117-2, at 16, 12–13 (2021), https://www.govinfo.gov/app/details/CRPT-117hrpt2/CRPT-117hrpt2.
[45] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[46] *Id.*; STAFF OF S. COMM. ON RULES & ADMIN., 117TH CONG., A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6, at 28 (June 1, 2021), https://www.rules.senate.gov/download/hsgac-rules-jan-6-report.
[47] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y.

tried to hold the door long enough to evacuate Members of Congress and others.[48]
Senate staffers took the electoral college certificates with them when they were
evacuated, ensuring they did not fall into the hands of the insurrectionists.[49]

57.    Shortly after, the House Chamber and Senate Chamber fell.
Insurrectionists, some carrying zip ties and tactical equipment, overtook the
defenses of the United States government and achieved, through force, effective
control over the seat of the United States Congress.[50] After 3:00 p.m., DHS, ATF,
and FBI agents, and police from Virginia and Maryland, joined Capitol Police to
help regain control of the Capitol.[51] Around 4:30 p.m., insurrectionists attacked
officers guarding the Capitol, beating them with improvised weapons, spraying
them with mace, and beating one so badly he required staples.[52] Around 5:20 p.m.,
the D.C. National Guard began arriving.[53] By 6:00 p.m., the insurrectionists had
been removed from the Capitol, though some committed sporadic acts of violence
through the night.[54]

58.    Vice President Pence was not able to reconvene Congress until 8:06
p.m., nearly six hours after the process had been obstructed.[55] Around 9 p.m.,

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] STAFF OF S. COMM. ON RULES & ADMIN., 117TH CONG., A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6, at 26 (June 1, 2021), https://www.rules.senate.gov/download/hsgac-rules-jan-6-report.
[54] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[55] *Id.*

Trump's counsel John Eastman argued to Pence's counsel via email that Pence should refuse to certify Biden's victory by not counting certain states.[56] Pence's counsel ignored it. Congress was required under the Electoral Count Act to debate the objections filed by Senators and Members of Congress (including Cawthorn) to electoral results from Arizona and Pennsylvania. Despite six Senators and 121 Representatives (including Cawthorn) voting to reject Arizona's electoral results,[57] and seven Senators and 138 Representatives (including Cawthorn) voting to reject Pennsylvania's electoral results,[58] Biden's victory was ultimately certified at 3:14 a.m., January 7.[59]

59.     In total, five people died[60] and over 150 police officers suffered injuries, including broken bones, lacerations, and chemical burns.[61] Four Capitol Police officers on-duty during January 6 have since died by suicide.[62]

---

[56] *Id.*

[57] 167 Cong. Rec. H77 (daily ed. Jan. 6, 2021), http://bit.ly/Jan6CongRec.

[58] *Id.* at H98.

[59] *What Happened on Jan. 6*, WASH. POST (Oct. 31, 2021), https://wapo.st/3eSdf2y; 167 Cong. Rec. H114–15 (daily ed. Jan. 6, 2021), http://bit.ly/Jan6CongRec.

[60] Jack Healy, *These Are the 5 People Who Died in the Capitol Riot*, N.Y. TIMES (Jan. 11, 2021), https://nyti.ms/3pTyN5q.

[61] Michael Kaplan & Cassidy McDonald, *At least 17 police officers remain out of work with injuries from the Capitol attack*, CBS NEWS (June 4, 2021), https://cbsn.ws/3eyXZr8; Michael S. Schmidt & Luke Broadwater, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. TIMES (Feb. 11, 2021), https://nyti.ms/3eN31k2..

[62] Luke Broadwater & Shaila Dewan, *Congress Honors Officers Who Responded to Jan. 6 Riot*, N.Y. TIMES (Aug. 3, 2021), https://nyti.ms/3EURwlp.

## Cawthorn's Statements Since the Insurrection

60.     During the assault on the Capitol, Representative Cawthorn called a radio show hosted by Charlie Kirk, a prominent public figure, and deflected blame onto Democratic and "antifa" infiltrators for the violence.[63]

61.     In a January 7, 2021 interview, Representative Cawthorn admitted that the people who stormed the Capitol were likely people who would have voted for him. But he claimed that he had nothing to do with the attack, and that he was not frightened because he was armed.[64]

62.     On February 5, 2021, he said he did not regret speaking at the demonstration.[65]

63.     On August 29, 2021, Cawthorn said he sympathized with insurrectionists as "political hostages" and "political prisoners," and suggested that, if he knew where they were incarcerated, he would like to "bust them out."[66] When asked when supporters would be "called back to Washington," he replied, "[w]e are actively working on that one."[67] He also advocated for additional political violence, saying that "[t]he second amendment was not written so that we can go hunting or shoot sporting clays. The second amendment was written so that we can

---

[63] *Chaos at the Capitol*, THE CHARLIE KIRK SHOW (Jan. 6, 2021), https://bit.ly/KirkPodcast.
[64] Cory Vaillancourt, *Cawthorn: mob that breached capitol 'disgusting and pathetic'*, SMOKY MOUNTAIN NEWS (Jan. 7, 2021), https://bit.ly/CawthornJan7Interview.
[65] Carlos Watson, *Does Rep. Madison Cawthorn Regret His Speech Before the U.S. Capitol Riots?* YOUTUBE (Feb. 5, 2021), https://bit.ly/CawthornFeb5Interview.
[66] *Madison Cawthorn Macon County Republican Party Appearance 8-29-2021*, YOUTUBE (Aug. 31, 2021), https://youtu.be/2RtsGikgAqA.
[67] *Id.*

fight against tyranny"; "if our election systems continue to be rigged, and continue to be stolen, then it's going to lead to one place, and it's bloodshed"; "[w]hen tyranny becomes law, rebellion becomes your duty," and that, with respect to his political opponents, "we all need to be storing up some ammunition."[68]

64. On or about August 30, 2021, the U.S. House of Representatives' bipartisan Select Committee to Investigate the January 6th Attack on the U.S. Capitol instructed 35 private-sector entities, including telecommunications, email, and social media companies, to preserve records of 11 Members of Congress, including Representative Cawthorn.[69]

65. On November 19, 2021, Representative Cawthorn told his supporters to be "armed, dangerous, and moral."[70]

66. On December 7, 2021, Representative Cawthorn filed for candidacy for the House of Representatives in the 13th District for North Carolina.

67. Representative Cawthorn's occasional criticisms of the Capitol attackers since January 6, 2021[71] do not substantially alter his overall record of support for the insurrection; rather, they suggest a *post hoc* effort to distance

---

[68] *Id.*
[69] Rebecca Shabad et al., *Jan. 6 committee to ask phone companies for Republican lawmakers' records*, NBC NEWS (Aug. 30, 2021), https://nbcnews.to/3pHntJz.
[70] The Lincoln Project (@ProjectLincoln), TWITTER (Nov. 19, 2021, 1:36 p.m.), https://bit.ly/CawthornNov19.
[71] For example, he once described the attackers as "weak-minded men and women who are unable to check their worst impulses and had very little self-control." Carlos Watson, *Does Rep. Madison Cawthorn Regret His Speech Before the U.S. Capitol Riots?* YOUTUBE (Feb. 5, 2021), https://youtu.be/czJXV7Tz8u4.

himself from his past support for and, as alleged herein, engagement in the

insurrection, even as he continues to this day to profess support for its goals.

## INELIGIBILITY ANALYSIS

**The State Board of Elections and its appointed panel must hear candidate challenges based on Section Three, such hearings are consistent with precedent, and North Carolina has a duty to prevent unqualified congressional candidates from appearing on the ballot.**

68.     In general, states can apply ballot eligibility procedures to candidates

for federal office who do not meet the criteria established by the U.S. Constitution.

As then-Judge (now U.S. Supreme Court Justice) Gorsuch held, a state's

"legitimate interest in protecting the integrity and practical functioning of the

political process permits it to exclude from the ballot candidates who are

constitutionally prohibited from assuming office." *Hassan v. Colorado*, 495 F. App'x

947, 948 (10th Cir. 2012); *accord Peace & Freedom Party v. Bowen*, 750 F.3d 1061

(9th Cir. 2014); *see also Burdick v. Takushi*, 504 U.S. 428, 441 (1992) ("the right to

vote is the right to participate in an electoral process that is necessarily structured

to maintain the integrity of the democratic system").

69.     The candidate challenge process in North Carolina is fully competent

to adjudicate questions of ineligibility under the Disqualification Clause of the

Fourteenth Amendment. First, a process for disqualifying candidates ineligible

under Section Three was an express condition of the federal statute that

23

readmitted North Carolina to the Union after the Civil War.[72] Second, as discussed above, the challenge process provides ample process to the challenged candidate, and allows the candidate to present evidence, call witnesses, testify, and appeal any adverse decisions to the North Carolina Court of Appeals and beyond.[73]

70.     North Carolina law specifically authorizes challenges to candidacy on the grounds that "the candidate does not meet the constitutional . . . qualifications for the office." N.C. GEN. STAT. § 163-127.2(b). For example, the general counsel for the State Board of Elections has confirmed that a candidate who is constitutionally ineligible for the presidency "will not qualify as a Presidential Candidate in the State of North Carolina." Letter from Don Wright, General Counsel, N.C. State Bd. of Elections, to Abdul K. Hassan, July 22, 2011.

71.     North Carolina has a history of using state law processes to exclude candidates who are disqualified by Section Three of the Fourteenth Amendment. *See Worthy*, 63 N.C. at 204–05; *In re Tate*, 63 N.C. 308 (1869); *see also* 1868 N.C. Pub. L. ch. 1, § 8 ("no person prohibited from holding office by section 3 of the Amendment to the Constitution of the United States, known as Article XIV, shall qualify under this act or hold office in this State"). Furthermore, these processes

---

[72] 40 Cong. Ch. 70, 15 Stat. 73 (1868) ("no person prohibited from holding office under the United States . . . by section three of the proposed amendment to the Constitution of the United States, known as article fourteen, shall be deemed eligible to any office in [any] of said States, unless relieved from disability as provided by said amendment").

[73] The North Carolina procedures also satisfy Chief Justice Chase's dictum that Section Three requires "proceedings, evidence, decisions, and enforcements of decisions, more or less formal" to determine who is and is not covered. *In re Griffin*, 11 F. Cas. 7, 26–27 (C.C.D. Va. 1869).

have long included initial determinations of qualifications by non-judicial state officials. *See Worthy*, 63 N.C. at 200.

72.    Once a state has determined a candidate is disqualified under Section Three, it has a duty to ensure that the unqualified candidate is not listed on the ballot. Just as North Carolina should exclude an underage candidate from the primary for a congressional race, it should also exclude one who engaged in an insurrection against the United States.

73.    The fact that the U.S. House of Representatives itself has authority to exclude Cawthorn, if re-elected, does not deprive the sovereign state of North Carolina of the power and obligation to protect the integrity of its own ballots.[74]

### January 6 was an insurrection or rebellion within the meaning of Section Three of the Fourteenth Amendment.

74.    The January 6 attack constituted an "insurrection" or "rebellion" under Section Three of the Fourteenth Amendment.

75.    First, the insurrectionists defied the authority of the United States. *See In re Charge to Grand Jury*, 62 F. 828, 830 (N.D. Ill. 1894) (defining insurrection as an uprising "so formidable as for the time being to defy the authority of the United States"); *Insurrection*, WORCESTER'S DICTIONARY (1835) (leading pre-1868 dictionary defining "insurrection" to mean "[a] seditious rising

---

[74] Resolving this issue now, at the primary stage, would ensure that Republican primary voters may choose a constitutionally eligible candidate in the normal election schedule, and would prevent the possible need for a special election.

against government");[75] *see also Allegheny Cty. v. Gibson*, 90 Pa. 397, 417 (1879) (applying a similar definition); 4 WM. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, *81–82 (distinguishing riots from violence against the state). During the attack, insurrectionists were armed, called for the death of elected officials (including the Vice President, the Speaker of the House of Representatives, and other prominent Members of Congress), attacked law enforcement, and forced their way into the building. Five people died and 150 law enforcement officers were injured. It took the combined efforts of the Capitol Police, federal agents, state police, and the National Guard to clear the insurrectionists from the Capitol.[76]

76. Second, the insurrectionists' goal was to overthrow the government or obstruct its core functions. *See Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1005 (2d Cir. 1974) (insurrection requires "an intent to overthrow a lawfully constituted regime"); *Home Ins. Co. of N.Y. v. Davila*, 212

---

[75] Most legal authority defining "insurrection" pertains to insurrections against *any* government. Under Section Three, the violent uprising must be against the United States, rather than state or local government. *See* U.S. CONST. amend. XIV, § 3 (applying to a person who previously swore "to support the Constitution of the United States" but engaged in insurrection "against the same").

[76] The original public understanding of "insurrection" may not have required actual violence. *See In re Charge to Grand Jury*, 62 F. 828, 830 (N.D. Ill. 1894) (insurrection does not require "bloodshed," only that the uprising be "so formidable as for the time being to defy the authority of the United States"). Twentieth-century cases typically define "insurrection" as requiring violence. *See Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1017 (2d Cir. 1974) (defining insurrection to require "a violent uprising"); *Home Ins. Co. of N.Y. v. Davila*, 212 F.2d 731, 736 (1st Cir. 1954) (similar). As set forth above, the facts of January 6 easily satisfy any such requirement.

F.2d 731, 736 (1st Cir. 1954) (insurrectionary action must be "specifically intended to overthrow the constituted government and to take possession of the inherent powers thereof"). Even before the attack, the entire point of the demonstration (at which Cawthorn spoke) was to intimidate Congress and Vice President Pence—in particular, to intimidate Pence into violating the Twelfth Amendment and the Electoral Count Act by ignoring the legal electoral votes for Biden. And the insurrectionists mounted their violent assault on the U.S. Capitol and the government officials within for the purpose of preventing the Vice President of the United States and the United States Congress from fulfilling their constitutional roles in ensuring the peaceful transition of power. As they attacked, the insurrectionists insisted that elected officials anoint their preferred candidate the winner—or be murdered.

77.    This was an attack on the *United States*. The importance of counting the electoral votes in our constitutional system cannot be overstated. It formalizes a deeper, bedrock norm in our democracy: the peaceful transition of power. The Electoral Count Act, as well as the Article II and the Twelfth Amendment, lay out the procedures for counting votes; together with the Twentieth Amendment, they ensure that transition is orderly and non-violent. They are essential constitutional functions of the United States government. An attempt to disrupt those procedures, particularly through violence, is an attack on our country itself.

78.    This was no mere riot; it was an attempt to disrupt an essential constitutional function and illegally prolong Trump's tenure in office. And while an

attack on public authority need not be likely to succeed in order to constitute an

insurrection, *see Davila*, 212 F.2d at 736 ("An insurrection aimed to accomplish the

overthrow of the constituted government is no less an insurrection because the

chances of success are forlorn."), the January 6 insurrectionists' violent seizure of

the House and Senate Chambers and key congressional offices did, in fact, obstruct

and delay this essential constitutional procedure. They very nearly succeeded in

achieving their aim of overturning the results of the 2020 presidential election.

U.S. Representative Peter Meijer of Michigan, a member of Cawthorn's party who

joined the House on the same day as him, has described the attack as "a violent

attempt to interfere with the proceedings of Congress, and specifically the

certification of the Electoral College results."[77] General Mark Milley, Chairman of

the Joint Chiefs of Staff, "believed January 6 was a planned, coordinated,

synchronized attack on the very heart of American democracy, designed to

overthrow the government"; he referred to January 6 as a "coup attempt."[78] If this

violent attack on the political system of the United States in the heart of the

nation's capital is not an insurrection, then nothing is.

79.     This analysis of January 6 is consistent with the understanding of

Congress, the U.S. Department of Justice, and federal courts.

---

[77] *Death threats, primary challenge followed Rep. Meijer's vote to impeach Trump after Jan. 6*, PBS (Jan. 4, 2022), https://to.pbs.org/3FXcKAj.
[78] BOB WOODWARD & ROBERT COSTA, PERIL, xviii (2021).

80.     On the evening of January 6, after Congress was finally able to reconvene, Senator Mitch McConnell of Kentucky, the Senate Majority Leader, described the assault as a "failed insurrection."[79]

81.     In court filings, the U.S. Department of Justice has characterized the attack on the Capitol as "an insurrection attempting to violently overthrow the United States Government."[80] Judge Carl Nichols of the U.S. District Court for the District of Columbia has described the attack as an "uprising" that "target[ed] a proceeding prescribed by the Constitution and established to ensure a peaceful transition of power."[81] Bipartisan majorities of the House and Senate voted for articles of impeachment describing the attack as an "insurrection."[82] And in the impeachment trial, President Trump's own defense lawyer stated that "the question before us is not whether there was a violent insurrection of [sic] the Capitol. On that point, everyone agrees."[83] The Senate voted by unanimous consent to award a Congressional Gold Medal for Capitol Police officer Eugene Goodman via a bill that categorized the January 6 attackers as "insurrectionists."[84] Congress

[79] Nicholas Fandos et al., *Resuming electoral counting, McConnell condemns the mob assault on the Capitol as a 'failed insurrection'*, N.Y. Times (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/insurrection.html.

[80] United States v. Chansley, No. 21-cr-00003 (D. Ariz. filed Jan. 14, 2021), ECF No. 5, https://bit.ly/3FJ1LdM.

[81] United States v. Miller, No. 21-cr-00119 (D.D.C. Dec. 21, 2021), ECF No. 67, https://bit.ly/318NBmX.

[82] 167 Cong. Rec. H191 (daily ed. Jan. 13, 2021); 167 Cong. Rec. S733 (daily ed. Feb. 13, 2021).

[83] 167 Cong. Rec. S729 (daily ed. Feb. 13, 2021), http://bit.ly/EveryoneAgrees.

[84] 167 Cong. Rec. S694–95 (daily ed. Feb. 12, 2021).

separately voted to award Congressional Gold Medals to other Capitol Police, using the same "insurrectionists" language.[85]

82.     Recognizing January 6 as an insurrection or rebellion for purposes of Section Three is also consistent with the intent of the Fourteenth Amendment's drafters, who worried that the reelection of the pre-war political class in the South would re-empower those willing to use violence or otherwise reject the results when their preferred policies were not enacted, or their preferred candidates were not elected. *See, e.g.*, 69 CONG. GLOBE, 39th Cong., 1st Sess. 2532 (1866) (statement of Rep. Banks) ("They do not rely on ideas for success. They govern by force. Their philosophy is force. Their tradition is force."). The idea behind Section Three was that politicians who took an oath to protect the Constitution and then disregarded the norms of peaceful and lawful political discourse could not be trusted to hold office—that was true then, and it remains true today.

**If Representative Cawthorn helped plan January 6 events with the intent to incite or aid an insurrection or rebellion or with the knowledge that an insurrection or rebellion was substantially likely, he has engaged in an insurrection within the meaning of Section Three of the Fourteenth Amendment.**

83.     To "engage" in insurrection or rebellion, one must voluntarily and knowingly aid the insurrection by providing it with something useful or necessary.

84.     The Disqualification Clause does not require that individuals personally commit acts of violence or open defiance to be considered as having

---

[85] Pub. L. No. 117-32, 135 Stat. 322 (2021).

"engaged" in an insurrection.[86] In the leading national case on the standard for "engaging" in insurrection under Section Three, the North Carolina Supreme Court interpreted the word "engage" to mean "[v]oluntarily aiding the rebellion, by personal service, or by contributions, other than charitable, of any thing that was useful or necessary" to it. *Worthy*, 63 N.C. at 203; *see also United States v. Powell*, 65 N.C. 709 (C.C.D.N.C. 1871) (holding that "engage" merely required "a voluntary effort to assist the Insurrection . . . and to bring it to a successful [from insurrectionists' perspective] termination").

85. Someone who helps plan a demonstration with the intent, knowledge, or reason to know that it will result in an insurrection or rebellion has voluntarily given their "personal service" to the insurrection by providing something "necessary" to the insurrection: an assembly point. Similarly, someone who does not plan the insurrection or rebellion itself, but plans an inciting event and knows that an insurrection is substantially likely to result, has also "engaged" in an insurrection. They have created a chaotic situation that makes it more likely for the insurrection to come to "a successful [on its own terms] termination," and by knowing that an insurrection is substantially likely, they have given that aid voluntarily.

86. Here, there is reliable reporting that Representative Cawthorn, who was intimately involved in the plans *inside* the Capitol to reject the electoral votes

---

[86] For example, Confederate President Jefferson Davis did not personally engage in violence during the Civil War.

of Arizona and Pennsylvania, and spoke at the "Save America" demonstration, was also involved with, at minimum, the planning of events that led to the insurrection.

87.     Supporters of the movement to prevent President-elect Biden's victory from being certified in Congress, with whom Representative Cawthorn continues to associate, made it clear beforehand that they understood the demonstration as a call to forcibly prevent the certification of Biden and install Trump as president for another four years. At no point before the demonstration did Representative Cawthorn insist on peaceful protest.[87] Instead, he promoted the demonstration by encouraging his supporters that it was "time to fight" and show their "backbone," and spoke in an equally incendiary fashion during the demonstration.

88.     Representative Cawthorn has advocated for political violence both before and after the insurrection. He urged his supporters to "lightly threaten" Members of Congress and has insisted that the necessary and justifiable outcome of continued "fraud" is violence.

89.     Although he couches his language in American values, his support for false election fraud claims and references to bloodshed and violent confrontation demonstrate his public position that violence and intimidation is justified in response to a peaceful, orderly election if his candidate of choice loses. His occasional professions of denial or disdain for the foot soldiers who stormed the

---

[87] Nor are Challengers aware of any affirmative action by Cawthorn to abandon, defeat, or disavow the insurrection—certainly not before the violence that he knew or should have known was substantially likely.

Capitol cannot conceal the fact that he encouraged, and upon reasonable suspicion helped aid, the insurrection.

## CONCLUSION

90.     Challengers have reasonable suspicion that Representative Cawthorn was involved in planning efforts to intimidate Congress and the Vice President into rejecting valid electoral votes and subvert the essential constitutional function of an orderly and peaceful transition of power. Challengers have reasonable suspicion that Cawthorn was involved in either planning the attack on January 6, or alternatively the planning of the pre-attack demonstration and/or march on the Capitol with the advance knowledge that it was substantially likely to lead to the attack, and otherwise voluntarily aided the insurrection after taking an oath, as a member of Congress to support the Constitution, disqualifying him from federal office under the Disqualification Clause of Section Three of the Fourteenth Amendment; and, therefore, that he "does not meet the constitutional . . . qualifications for the office" he seeks. N.C. GEN. STAT. § 163-127.2(b).

## REQUESTED RELIEF

WHEREFORE, the Challengers respectfully request that:

1. The State Board of Elections immediately appoint a multi-county board to hear the challenge.

2. The Challengers be authorized to depose Representative Cawthorn before the hearing.

3. The Challengers be authorized to issue subpoenas to Representative Cawthorn and to other persons, within and outside North Carolina, of documents and tangible things that may provide relevant evidence.

Respectfully submitted,

John R. Wallace
State Bar No. 7374
Lauren T. Noyes
State Bar No. 28130
Post Office Box 12065
Raleigh, North Carolina 27605
(919) 782-9322 – telephone
(919) 782-8133 – facsimile
jrwallace@wallacenordan.com
ltnoyes@wallacenordan.com


Robert F. Orr
State Bar No. 6798
3434 Edwards Mill Road
Suite 112-372
Raleigh, NC 27612
919-608-5335
orr@rforrlaw.com

Ronald Fein*
John C. Bonifaz*
Ben Clements*
Benjamin Horton*
Free Speech For People
1320 Centre St. #405
Newton, MA 02459
(617) 244-0234
rfein@freespeechforpeople.org

*Attorneys for Challengers*

* Motions for pro hac vice admission forthcoming.

*Of counsel*

James G. Exum, Jr.
State Bar No. 1392
6 Gleneagle Ct.
Greensboro, NC 27408
336-554-1140
jimxzoom@gmail.com