# EXHIBIT A

MADISON CAWTHORN, an individual,

*Plaintiff,*

v.

MR. DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, MS. STELLA ANDERSON, in her official capacity as a member of the North Carolina State Board of Elections, MR. JEFF CARMON, in his official capacity as a member of the North Carolina State Board of Elections, MR. STACY EGGERS IV, in his official capacity as a member of the North Carolina State Board of Elections, MR. TOMMY TUCKER, in his official capacity as a member of the North Carolina State Board of Elections, MS. KAREN BRINSON BELL, in her official capacity as the Executive Director of the North Carolina State Board of Elections,

*Defendants, and*

BARBARA LYNN AMALFI, LAUREL ASHTON, NATALIE BARNES, CLAUDE BOISSON, MARY DEGREE, CAROL ANN HOARD, JUNE HOBBS, MARIE JACKSON, MICHAEL JACKSON, ANNE ROBINSON, DAVID ROBINSON, CAROL ROSE, and JAMES J. WALSH,

*Proposed Defendant-Intervenors.*

**DEFENDANT-INTERVENORS'
MEMORANDUM IN OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION[1]**

---

[1] This Memorandum is provisionally filed as Exhibit A to Defendant-Intervenors' Motion to Intervene. Defendant-Intervenors respectfully request that it be filed upon the granting of their Motion to Intervene.

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ..................................................................................................1

    A.    North Carolina's Statutory Procedure for Candidate Filing and Challenges ..............1

    B.    The Challenge to Cawthorn ..................................................................................4

STANDARD OF REVIEW ..................................................................................................5

ARGUMENT ......................................................................................................................6

I.     Cawthorn's Claims Do Not Implicate This Court's Jurisdiction.........................................6

    A.    Cawthorn's Claims Are Not Ripe.............................................................................6

    B.    Even if Plaintiff Presented a Ripe Controversy, the Court Should Abstain ...............8

II.    Plaintiff is Not Likely to Succeed on the Merits...............................................................11

    A.    The Challenge Statute's Reasonable Suspicion Standard Does Not Violate Cawthorn's First Amendment Rights. ......................................................................11

        1.    The *Anderson-Burdick* Balancing Test...................................................11

        2.    The Challenge Statute presents only a modest burden on ballot access...............12

        3.    Any burden on Cawthorn's right to run for office is outweighed by State and voter interests. ...............................................................................14

    B.    The Challenge Statute Does Not Violate Cawthorn's Fourteenth Amendment Rights Under the Due Process Clause by Requiring Him to Prove He is a Constitutionally Qualified Candidate ........................................................................15

    C.    The Qualifications Clause Does Not Prevent North Carolina From Exercising Its Constitutionally Delegated Authority To Verify Congressional Candidates' Constitutional Eligibility As A Condition For Ballot Access. ...............19

        1.    The Elections Clause delegates to States the authority to verify congressional candidates' constitutional eligibility as a condition for ballot access. .......................................................................................................19

        2.    The Qualifications Clause does not prevent States from pre-election verification of congressional candidates' eligibility.............................................21

        3.    Pre-election verification is constitutional in the parallel constitutional structures of presidential elections and state legislative elections.........................22

        4.    The Qualifications Clause and Elections Clause must work in concert to ensure orderly and legitimate elections.................................................................23

    D.    The Amnesty Act of 1872 Did Not Forever Absolve All Future Insurrectionists................................................................................................................24

        1.    The 1872 Act's plain meaning is to "remove[]" disabilities that had already been "imposed." ....................................................................................25

        2.    Legislative history confirms congressional intent to apply the Disqualification Clause prospectively but amnesty only retrospectively..............25

     3.      Congress has consistently interpreted the 1872 Act as retrospective only. ...........26

     4.      The 1872 Act must be construed to avoid unconstitutionality. ............................27

III.    Plaintiff Has Not Shown that a Preliminary Injunction Is Necessary to Prevent Irreparable Harm ........................................................................................................28

IV.    The Balance of Equities Weigh Against an Injunction.......................................29

V.     A Preliminary Injunction Would Not Be in the Public Interest.........................29

CONCLUSION.............................................................................................................30

**Cases**

*Ackerman v. ExxonMobil Corp.*,
  734 F.3d 237 (4th Cir. 2013) ............................................................. 30

*American Party of Texas v. White,*
  415 U.S. 767 (1974)............................................................................ 12

*Amoco Prod. Co. v. Village of Gambell,*
  480 U.S. 531 (1987) ............................................................................ 5

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983)...................................................................... *passim*

*Barry v. United States ex rel. Cunningham,*
  279 U.S. 597 (1929)............................................................................ 21

*Bullock v. Carter,*
  405 U.S. 134 (1972).................................................................... 20, 21

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ........................................................................... 11

*Buscemi v. Bell,*
  964 F.3d 252 (4th Cir. 2020) ...................................................... 11-12

*Campbell v. Davidson,*
  233 F.3d 1229 (10th Cir. 2000) ........................................................ 20

*Clements v. Fashing,*
  457 U.S. 957 (1982)...................................................................... 13, 14

*Colorado River Water Conservation Dist. v. United States,*
  424 U.S. 800 (1976)............................................................................ 8

*Cox v. McCrery,*
  No. Civ.A.06-2191, 2007 WL 97142 (W.D. La. 2007) .................... 22

*Goldman Sachs Group, Inc. v. Arkansas Teacher Ret. Sys.,*
  141 S. Ct. 1951 (2021)................................................................... 18-19

*Gonzales v. Carhart,*
  550 U.S. 124 (2007)............................................................................ 27

*Hackford v. Utah,*
  827 F. App'x 808 (10th Cir. 2020) ..................................................... 9

*Harper v. Hall,*
  No. 413PA21, slip op. (N.C. Feb. 4, 2022) ................................... 4, 8

*Hassan v. Colorado,*
  495 Fed. Appx. 947 (10th Cir. 2010)..................................... 14, 16, 22

*Hassan v. State of North Carolina,*
  No. 11-cv-00720 (E.D.N.C. filed Dec. 9, 2011)................................ 3

*In re De Puy,*
  7 F. Cas. 506 (S.D.N.Y. 1869)........................................................... 28

*In re McGee,*
  36 Cal.2d 592, 226 P.2d 1 (1951) ................................................. 22-23

*In re Microsoft Corp. Antitrust Litig.,*
  333 F.3d 517 (4th Cir. 2003) ............................................................. 5

*IInt'l Academy of Oral Medicine & Toxicology v. N.C. Bd. of Dental Examiners*,
    451 F. Supp. 2d 746 (E.D.N.C. 2006)................................................................ 7-8
*Jenness v. Fortson*,
    403 U.S. 431 (1971)................................................................................................ 12
*Johnson v. Collins Ent't Co., Inc.*,
    199 F.3d 710 (4th Cir. 1999)............................................................................ 9, 30
*Konigsberg v. State B. of Calif.*,
    366 U.S. 36 (1961).................................................................................................. 18
*Lindsay v. Bowen*,
    750 F.3d 1061 (9th Cir. 2014)....................................................................... 15, 22
*Louisiana Power & Light Co. v. City of Thibodaux*,
    360 U.S. 25 (1959).................................................................................................... 9
*Lynch v. Snepp*,
    472 F.2d 769 (4th Cir. 1973) ................................................................................ 1
*Manigault v. Springs*,
    199 U.S. 473 (1905)...........................................................................................27-28
*Martin-Trigona v. Underwood*,
    529 F.2d 33 (7th Cir. 1976) ................................................................................ 18
*McFarland v. American Sugar Refining Co.*,
    241 U.S. 79 (1916).................................................................................................. 18
*MicroStrategy, Inc. v. Motorola, Inc.*,
    245 F.3d 335 (4th Cir. 2001) ................................................................................ 5
*Moore v. City of Asheville*,
    396 F.3d 385 (4th Cir. 2005) ...................................................................10-11, 30
*Munro v. Socialist Workers Party*,
    479 U.S. 189 (1986).................................................................................................. 9
*Nat. Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003).................................................................................................. 6
*Pac. Gas & Elec. Co. v. Energy Resources Com'n*,
    461 U.S. 190 (1983).................................................................................................. 7
*PDX N., Inc. v. Comm'r New Jersey Dep't of Lab & Workforce Dev.*,
    978 F.3d 871 (3d Cir. 2020).................................................................................. 10
*Railroad Comm'n of Texas v. Pullman Co.*,
    312 U.S. 496 (1941).................................................................................................. 9
*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
    575 F.3d 342 (4th Cir. 2009) ................................................................................ 6
*Reigh v. Schleigh*,
    784 F.2d 1191 (4th Cir. 1986) .............................................................................. 5
*Renne v. Geary*,
    501 U.S. 312 (1991).................................................................................................. 7
*Roudebush v. Hartke*,
    405 U.S. 15 (1972)..................................................................................... 19, 20, 23
*Rust v. Sullivan*,
    500 U.S. 173 (1991)................................................................................................ 27
*Smiley v. Holm*,
    285 U.S. 355 (1932)................................................................................................ 19

*Speiser v. Randall*,
  357 U.S. 513 (1958)......................................................................................... 18
*State ex rel. Chavez v. Evans*,
  1986-NMSC-167, 446 P.2d 445 (1968)........................................................ 20
*State ex rel. Gralike v. Walsh*,
  483 S.W.2d 70 (Mo. 1972)........................................................................ 22, 24
*State ex rel. Gramelspacher v. Martin Circuit Ct.*,
  231 Ind. 114, 107 N.E. 666 (1952) ................................................................ 23
*Storer v. Brown*,
  415 U.S. 724 ................................................................................................ *passim*
*Trustgard Ins. Co. v. Collins*,
  942 F.3d 195 (4th Cir. 2019) .............................................................................. 8
*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995)..................................................................................... 20, 21
*United States v. Dietrich*,
  126 F. 676 (C.C.D. Neb. 1904) ........................................................................ 21
*Western & A.R.R. v. Henderson*,
  279 U.S. 639 (1929)........................................................................................... 18
*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)........................................................................................... 25
*Williams v. Rhodes*,
  393 U.S. 23 (1968)............................................................................................. 22
*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)....................................................................................... 5-6, 29
*Yates v. United States*,
  574 U.S. 528 (2015)........................................................................................... 21
*Younger v. Harris*,
  401 U.S. 37 (1971)....................................................................................... 8-9, 29

**Statutes**
3 U.S.C. § 15....................................................................................................... 22
N.C. Gen. Stat. § 150B-51.................................................................................. 29
N.C. Gen. Stat. § 163-106............................................................................... 1-2, 15
N.C. Gen. Stat. § 163-127.1................................................................................ 1, 3
N.C. Gen. Stat. § 163-127.2............................................................... 3, 12, 15, 28
N.C. Gen. Stat. § 163-127.4................................................................................. 16
N.C. Gen. Stat. § 163-127.5............................................................................. 3, 15
N.C. Gen. Stat. § 163-127.6..................................................................... 1, 10, 28

**Rules**
Fed. R. Evid. 301................................................................................................ 16
N.C. R. Evid. 301............................................................................................... 16

**Other Authorities**
*Cannon's Precedents of the House of Representatives of the United States*, ch. 157, §§ 56-59
  (1936)............................................................................................................... 26
Paul E. Salamanca & James E. Keller, *The Legislative Privilege to Judge the Qualifications,
  Elections, and Returns of Members*, 95 Ky. L.J. 241 (2007).................................. 22

William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm. & Mary L. Rev. 475 (1977) .................................................................................................. 27

Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comm. 87 (2021) (1977) ............................................................................................. 17, 26

## INTRODUCTION

In January, Defendant-Intervenors ("Challengers") filed a challenge pursuant to North Carolina law to the candidacy of Plaintiff Madison Cawthorn ("Cawthorn") which will require him to do something very few Americans, let alone sitting members of Congress, would find onerous: demonstrate that, after taking an oath of office, he did not engage in insurrection or rebellion against the United States in violation of Section 3 of the Fourteenth Amendment to the Constitution (the "Disqualification Clause"), which disqualifies such persons from holding future public office.

Cawthorn contends that *merely requiring him to participate* in North Carolina's statutory process to determine if he meets the constitutional qualifications for office will irreparably harm him. In bringing this action, Cawthorn asks the Court to put aside the "general notions of comity, equity, and federalism, applied since the early days of our Union of States" and which "occupy a highly important place in our history and our future." *Lynch v. Snepp*, 472 F.2d 769, 773 (4th Cir. 1973). For the reasons stated below, Cawthorn cannot make the required showing for an injunction in this case and Challengers respectfully request that Cawthorn's motion be denied and that the Challenge to Cawthorn's candidacy be permitted to proceed under North Carolina law.

## STATEMENT OF FACTS

### A.     North Carolina's Statutory Procedure for Candidate Filing and Challenges

Cawthorn's complaint notably puts all its focus on only one side of the North Carolina statutory regime for establishing that a candidate is qualified: the "Challenge to Candidacy" procedures set forth in Article 11B of Chapter 163 of the North Carolina General Statutes, N.C. Gen. Stat. § 163-127.1 through § 163-127.6 (the "Challenge Statute"). (*See* Compl. ¶¶ 16-37.) Cawthorn, however, entirely ignores the corresponding side of the candidate-qualification regime embodied in the deliberately permissive statute concerning Notice of Candidacy, N.C. Gen. Stat. § 163-106, which permits candidates to file for office in an essentially perfunctory fashion.

1

Indeed, the Notice of Candidacy form[2] promulgated by the North Carolina State Board of Elections (NCSBE) pursuant to that statute requires candidates for office to simply provide basic information such as name, address, and the like. Candidates are required only to sign and have the document notarized with a sworn statement that it is "true, correct, and complete to the best of my knowledge and belief." (*Id.*)

Candidates are required to submit no documentary proof that they meet any other qualifications of office. For example, candidates for judicial office, which the North Carolina Constitution (at Art. IV, § 22) requires to be authorized to practice law in the State, are not required to aver that they are lawyers, let alone provide any documentary proof of that fact. An averment of the candidate's age – a federal and North Carolina constitutional requirement for multiple offices[3] – is not required. A candidate for the U.S. House of Representatives is not required to state, let alone prove, that he or she is a citizen or, as required by the U.S. Constitution (at Art. III, § 2, cl 2), that he or she has been a U.S. citizen for the constitutionally mandated 7 years.

In sum, North Carolina's candidate filing requirements are markedly lenient and could never be characterized as "burdensome." Filling out the two-page form would take only minutes. The sole vetting of the filing is a county elections board certification, pursuant to N.C. Gen. Stat. § 163-106.5 and found on the same form, attesting to the candidate's voter registration. After those minimal steps, the candidate presumptively appears on the ballot.

The sole method for challenging a candidate's qualifications to appear on the ballot – both those required to be stated pursuant N.C. Gen. Stat. § 163-106 and any other qualifications not

---

[2] Found at:
https://s3.amazonaws.com/dl.ncsbe.gov/Candidate%20Filing/NC_Candidate_General_Notice_Candidacy_Fillable.pdf
[3] *E.g.*, North Carolina governor and lieutenant governor (30 years of age, N.C. Const., Art. III, §2(2), U.S. House (25 years of age, U.S. Const., Art. I, § 2, cl. 2), and U.S. Senate (30 years of age, *id*. § 3, cl. 3.)

covered by that statute or the form – is the Challenge to Candidacy procedure outlined in N.C. Gen. Stat. § 163-127.1, *et seq.*, in which a "Challenger" defined as a "qualified voter registered in the same district as the office for which the candidate has filed," *id.* at § 163-127.1(3), may, within 10 business days of the closing of the filing period and by "verified affidavit," raise an issue, "on reasonable suspicion," that a candidate "does not meet the constitutional or statutory qualifications for the office, including residency." *Id.* at 163-127.2(a) & (b). Only at that point is a candidate required to demonstrate by a preponderance of the evidence that "he or she is qualified to be a candidate for the office." *Id.* at 163-127.5(a).

Thus, the North Carolina General Assembly has chosen to enact a procedure in which the filing by a candidate to run for office is perfunctory. But North Carolina has never surrendered its interest in ensuring that constitutionally ineligible candidates do not occupy space on the ballot, including in federal races. For example, the general counsel for the State Board has confirmed that a naturalized citizen "will not qualify as a Presidential Candidate in the State of North Carolina."[4] In the North Carolina system, though, the primary responsibility for vetting a candidate's qualifications is left to one or more of the district's voters who may initiate and ultimately prosecute a challenge under the Challenge Statute. North Carolina could have adopted any number of other permutations designed to assure that only qualified candidates appear on the ballot, including, most obviously, requiring more verified information and documentation at the candidate-filing stage. It chose not to do so.

Yet, Cawthorn, in seeking to declare just one-half of that process unconstitutional, would undo the balancing process determined by the General Assembly. In other words, he would take

---

[4] Letter from Don Wright, General Counsel, N.C. State Board of Elections, to Abdul K. Hassan, July 22, 2011, ECF No. 1-1, *Hassan v. State of North Carolina*, No. 11-cv-00720 (E.D.N.C. filed Dec. 9, 2011).

advantage of the lenient process that minimally burdens candidates seeking to run for office in the first instance, while forgoing compliance with the only check of that process, a voter Challenge.

### B.     The Challenge to Cawthorn

On December 7, 2021, Plaintiff filed his candidacy for the upcoming 2022 election for North Carolina's 13th congressional district. (Compl. ¶ 9.) On January 10, 2021, the "Challengers filed a Challenge against Rep. Cawthorn." (Compl. ¶ 43.) As alleged in Cawthorn's complaint, the Challenge "was based upon claims that Rep. Cawthorn engaged in 'insurrection or rebellion' against the United States and was not qualified to be a Member of Congress under Section Three of the Fourteenth Amendment to the U.S. Constitution." (*Id.* at ¶ 44.)

That Challenge, however, was stayed the day after its filing by a North Carolina Superior Court "until 'final resolution' is reached on the ongoing litigation related to the drawing of North Carolina's congressional districts." (Compl. ¶ 47.) That same court had upheld the maps outlining the district in which Cawthorn had filed (*see id.*), but that ruling had been appealed, and, at the time Cawthorn filed this action on January 31, 2022, the Supreme Court of North Carolina was slated to hear "appellate arguments of that decision as to congressional and other districts on February 2, 2022." (*Id.* at ¶ 47.)

In fact, on February 4, 2022, the North Carolina Supreme Court issued an order striking down those congressional maps as unconstitutional under the North Carolina Constitution, ordering the General Assembly to submit new maps to the trial court no later than February 18, and advising the parties "to anticipate that new districting plans for Congress…will be available by 23 February 2022." *Harper v. Hall*, No. 413PA21, slip op., at 9 (N.C. Feb. 4, 2022).[5]

---

[5] Found at: https://appellate.nccourts.org/orders.php?t=PA&court=1&id=397836&pdf=1&a=0&docket=1&dev=1

Cawthorn, nevertheless, contends that he "intends to run in the 2022 elections in an appropriate congressional district for North Carolina after the congressional map question is resolved (by either continuing his candidacy as filed, or re-filing in a different district)." (Compl. ¶ 48.) At this point, though, there is no court-approved district in which Cawthorn can file to run.

Cawthorn, moreover, has not suffered any actual injury (related to office or place on the primary ballot) from the Challenge procedure. Rather, the sole injury he claims – and the basis for the relief he seeks in striking down the Challenge Statute – is just the putative injury of simply having to *participate* in the Challenge procedure, which, after it has run its course *and* if he is unsuccessful, *might* adjudicate him ineligible for a place on the ballot.

## STANDARD OF REVIEW

Preliminary injunctive relief is an extraordinary remedy afforded at the Court's discretion. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524-26 (4th Cir. 2003). It is an extraordinary remedy never awarded as of right, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. The Fourth Circuit has also warned that "federal courts should be loath both on grounds of comity and federalism to intrude upon the rule-making functions of state courts and, even in those rare instances when compelled to do so under their duty to uphold federal constitutional rights, should act cautiously and with moderation." *Reigh v. Schleigh*, 784 F.2d 1191, 1198 (4th Cir. 1986).

To obtain a preliminary injunction, the plaintiff must establish (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009). The relief, moreover, "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Plaintiff's Motion for Preliminary Injunction – far from making a "clear showing" – is deficient with respect to each of the four requirements.

## ARGUMENT

## I. Cawthorn's Claims Do Not Implicate This Court's Jurisdiction.

The Complaint and the preliminary injunction motion do not present a controversy over which this Court should exercise jurisdiction. First, because his claims are not ripe, this Court lacks subject matter jurisdiction under the "case and controversy" requirements of Article III. Second, because Cawthorn's claims seek to undermine state law without giving the procedures designated by state law an opportunity to play out, the Court should decline jurisdiction based on the principles underlying the abstention doctrines calling on federal courts to abstain from cases that unnecessarily create federalism-based tensions with state judicial systems.

### A. Cawthorn's Claims Are Not Ripe.

When, as here, a case is not ripe, it should be dismissed for lack of subject matter jurisdiction. "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat. Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (internal quotation omitted). "Determining whether administrative action is ripe for judicial review requires

us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship of the parties of withholding court consideration." *Id.* at 808. Where state agency decisions are made on a "case-by-case" basis and the federal courts "cannot know" how the state agency will act, "judicial consideration of [an allegedly unconstitutional portion of a statutory scheme] should await further developments." *Pac. Gas & Elec. Co. v. Energy Resources Com'n*, 461 U.S. 190, 203 (1983). "Postponing consideration of the questions presented, until a more concrete controversy arises, also has the advantage of permitting the state courts further opportunity to construe [the challenged statute] and perhaps in the process to materially alter the question to be decided." *Renne v. Geary*, 501 U.S. 312, 323 (1991) (internal quotation omitted).

In a close analog, Judge Dever considered the ripeness of a similar constitutional challenge to a North Carolina statutory scheme and held that the case was not ripe. *See Int'l Academy of Oral Medicine & Toxicology v. N.C. Bd. of Dental Examiners*, 451 F. Supp. 2d 746 (E.D.N.C. 2006). In that case, plaintiff sued the members of a North Carolina administrative board because it had opened investigations into some of the plaintiff's members which appeared to implicate an informal agency policy that could govern the plaintiff's members' speech, arguably in violation of the First Amendment. Judge Dever held that the issues were not fit for judicial resolution because it was not "clear" how the board would act. *Id.* at 753. Here, for the case to be ripe, Cawthorn would need to admit that it is "clear" that NCSBE will remove him from the ballot – an admission that he expressly refuses to make. (Compl. ¶ 45 ("vigorously" denying the underlying facts that constitutionally bar Cawthorn from candidacy, and predicting "factual defenses").)

Much like Cawthorn, the *Oral Medicine* plaintiff sought to overcome the ripeness problems by pointing to the First Amendment and the constitutional scope of its alleged injuries. And much like Cawthorn, the *Oral Medicine* plaintiff argued that the agency lacked authority to rule on

constitutional questions. *Compare Oral Medicine*, 451 F.Supp.2d at 753 *with* Compl. ¶ 64. The Court rejected those arguments, observing that the means for ripening an otherwise speculative threat to a constitutional right by a state agency was to seek a declaratory ruling from the agency under North Carolina law, so that the agency could establish an official interpretation that would aid in formulating "a controversy specific enough for a court to adjudicate." *Oral Medicine* 451 F.Supp.2d at 754. The same declaratory mechanisms applicable to the agency in *Oral Medicine* are available here, and Cawthorn has not pursued them. *See* 8 N.C. Admin. Code § 15.0102 (providing authority to the NCSBE to grant declaratory rulings).

The North Carolina Supreme Court added to these ripeness[6] concerns on February 4, 2022, when it concluded that the congressional map setting Cawthorn's district violates the North Carolina Constitution. (*Harper*, *supra*, slip op. at 8-9.) These post-filing developments create significant uncertainty concerning the factual bases of Cawthorn's complaint, even calling into question whether they constitute a concrete controversy as required by Article III.

## B.     Even if Plaintiff Presented a Ripe Controversy, the Court Should Abstain.

In addition to the ripeness doctrine, the Court should decline jurisdiction in the interest of federalism, efficiency, and comity. "[E]ven where jurisdiction is not discretionary, courts may abstain from exercising jurisdiction under certain circumstances that may intrude on the prerogative of the state courts." *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201-02 (4th Cir. 2019) (collecting Supreme Court abstention decisions including *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976); *Younger v. Harris*, 401 U.S. 37 (1971);

---

[6] The North Carolina Supreme Court's decision also raises mootness concerns because it has changed the procedural posture of the Challenge. However, because Cawthorn has stated his intent to file candidacy in a redrawn district, the Challengers approach the justiciability question from the perspective of Cawthorn's planned re-filing of his candidacy, and not from the perspective of Cawthorn's now-ceased candidacy for the originally drawn 13th district.

*Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)[7]; and *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941). As the Fourth Circuit has held, although abstention "has many different forks and prongs, its central idea has always been one of comity." *Johnson v. Collins Ent't Co., Inc.*, 199 F.3d 710, 718-19 (4th Cir. 1999). Therefore, "the federal judiciary has always maintained a modicum of respect for state public policies in areas of paramount state concern." *Id.* at 719.

Attempting to argue that this Court should not abstain under *Younger*, Cawthorn himself acknowledges that "interests of comity and federalism counsel federal courts to abstain from jurisdiction whenever federal claims … could be presented in ongoing state judicial proceedings that concern important state interests." (Pl. Mem. 10 (quoting *Younger*).) But he contends that abstention doctrines do not apply here for two reasons: (1) because there is no "ongoing state judicial proceeding" and (2) because the NCSBE has no authority to decide the constitutional issues before this Court. (*Id.*) Both contentions lack merit.

On the first point, Cawthorn cannot have it both ways. Either there is no "ongoing state judicial proceeding" that presents the constitutional issues he asks the Court to wade into here (and therefore his claims are not ripe) or there *is* an ongoing proceeding in favor of which this Court should abstain. The cases Cawthorn cites are not to the contrary. In *Hackford v. Utah*, 827 F. App'x 808, 811 n.2 (10th Cir. 2020), the Tenth Circuit held (in a footnote) only that there was no reason for the federal court to abstain when the state court had already made the decision to stay the proceeding in "*favor of federal resolution of the issues.*" *Id.* In other words, like two people

---

[7] In addition to *Younger* abstention (which is discussed in Cawthorn's filings and below), *Burford* extension specifically calls upon federal courts to consider whether their decisions "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Johnson v. Collins Entertainment Co., Inc.*, 199 F.3d 710, 719 (4th Cir. 1999). Moreover, *Burford* abstention is particularly appropriate where, as here, "the state courts can fully vindicate any federal interest." *Id.* at 723.

9

standing in a doorway saying "no, you go first," if the federal court had abstained, there would have been *no court* to resolve the constitutional issues presented. Here, to the extent the case is ripe and not moot, it is because a challenge to Cawthorn's candidacy will eventually proceed once final congressional districts are drawn. In other words, Cawthorn merely seeks to take advantage of a lull in the state proceedings, in an attempt to persuade this Court to step in and resolve complex constitutional questions, before the ongoing state proceedings inevitably proceed.[8]

Cawthorn's argument that abstention is unwarranted because "the NCBSE has no power to hear or decide a constitutional challenge to its own statute" fares no better. As established in Cawthorn's own cases, it is well-established that there is an "adequate opportunity" in state court proceedings to present constitutional claims when the claimant "can assert his constitutional claims during state-court judicial review of the administrative determination." *PDX North*, 978 F.3d at 885 (citations omitted)*; see* N.C. Gen. Stat. § 163-127.6 (establishing appeal as of right of Challenge Process to North Carolina Court of Appeals). Cawthorn himself acknowledges that his alleged actual injury would come from hypothetical "subsequent appellate decisions" providing judicial review to any NCSBE determination. (Pl. Mem. at 9.) In fact, Cawthorn asks the Court to exercise jurisdiction to interfere with a state administrative proceeding that includes all the relevant parties as well as established mechanisms for evidence collection and appeal. That would amount to exactly the kind of gratuitous interference that our courts have warned against. *See*, *e.g.*, *Moore v. City of Asheville*, 396 F.3d 385, 395 (4th Cir. 2005) (abstaining in circumstances in which plaintiff "did not avail himself of state-provided avenues for review" and sought to "deprive the State of a function which quite legitimately is left to the state appellate bodies, that of

---

[8] Cawthorn also cites *PDX N., Inc. v. Comm'r New Jersey Dep't of Lab & Workforce Dev.*, 978 F.3d 871, 885 (3d Cir. 2020), but there the Court *did* abstain in favor of a proceeding that had been stayed repeatedly.

overseeing agency dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction") (internal quotation and brackets omitted).

## II.    Plaintiff is Not Likely to Succeed on the Merits

### A.    The Challenge Statute's Reasonable Suspicion Standard Does Not Violate Cawthorn's First Amendment Rights.

Cawthorn is unlikely to succeed on the merits of his claim that his First Amendment rights are violated by the fact that the Challenge Statute is invoked by the affidavit of district voters upon reasonable suspicion, because that burden, if any, on Cawthorn's right to run for office is minimal.[9]

#### 1.    The *Anderson-Burdick* Balancing Test

The Supreme Court has established a balancing test for assessing whether ballot access laws violate the First Amendment. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Under that test, "courts 'must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Buscemi v. Bell*, 964 F.3d 252, 262–63 (4th Cir. 2020) *cert. denied sub nom. Kopitke v. Bell*, 141 S. Ct. 1388 (2021).

Election laws that impose a "severe" burden on ballot access are subject to strict scrutiny. *Buscemi*, 964 F.3d at 263. But state election laws that pose only a "modest" burden are generally upheld based on "the State's important regulatory interests." *Id.*; *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S., at 788). A modest burden is one that imposes "reasonable, nondiscriminatory

---

[9] Cawthorn's claim is not tied to the basis (Disqualification Clause) for the Challenge; his argument would invalidate North Carolina's reasonable suspicion standard for challenges in all federal, state, or local races.

restrictions[.]" *Buscemi*, 964 F.3d at 263 (quoting *Anderson*, 460 U.S. at 788) (holding filing deadline and voter signature requirements posed only modest burden on ballot access).

### 2.    The Challenge Statute presents only a modest burden on ballot access.

In North Carolina, a candidate must meet the qualifications established by the U.S. Constitution, the North Carolina Constitution, and state law in order to run for office. As discussed above, in North Carolina, a candidate who has filed for office is presumed to be qualified unless a challenge is brought by a qualified voter under the Challenge Statute based upon "reasonable suspicion or belief" that a candidate does not meet the qualifications for office. N.C. Gen. Stat. § 163-127.2. By establishing a procedure for voters to challenge the qualification of a candidate in the voter's district, North Carolina imposes a minimal burden on a candidate by requiring him to present evidence of his qualification only in that limited circumstance.

The Supreme Court has consistently "upheld generally-applicable and evenhanded restrictions" imposed by States on candidates' eligibility for the ballot under the First Amendment "to protect the integrity and reliability of the electoral process itself." *Anderson*, 460 U.S. at 788 n.9 (1983) (overturning an Ohio statute requiring early filing deadline for Presidential candidates that unequally burdened independent voters); *see also e.g.*, *Jenness v. Fortson,* 403 U.S. 431 (1971) (upholding Georgia code requiring nominating petition of 5% of eligible voters for a candidate's name to be placed on the ballot); *American Party of Texas v. White,* 415 U.S. 767 (1974); *Storer v. Brown,* 415 U.S. 724 (upholding California statute requiring candidates to be politically disaffiliated for at least one year before being on the ballot as an independent candidate). Unlike the restriction statutes at issue in most ballot access cases, the Challenge Statute does not "restrict" a candidate's eligibility. Instead, it merely enacts a procedure that includes requiring a candidate to provide evidence of his qualifications when called into question. Such a procedural

statute enacted to prevent frivolous, fraudulent, or otherwise ineligible candidates from seeking office poses a minimal burden on candidates.

Cawthorn claims that having to engage in a process invoked upon reasonable suspicion violates his First Amendment rights. (Pl. Mem. 14-16). He claims a "reasonable suspicion standard is not enough to infringe" upon his right to run for office. (Pl. Mem. 15). By Cawthorn's logic, a state requirement that he submit *any* evidence of qualification *at all* in order to be placed on the ballot, even a driver's license to verify his age, without probable cause, would unconstitutionally infringe upon his right to run for office. That contention is manifestly wrong.[10]

Although Cawthorn cites *Clements v. Fashing*, 457 U.S. 957 (1982), as supporting authority for his position that running for office is "afforded great protection" as a First Amendment right, he is relying on a principle found only in the *dissent*. (Pl. Mem. 14). The majority opinion in *Clements* held that a two-year waiting period for a justice of the peace to qualify to run for the legislature was "hardly" a significant barrier to candidacy and amounted to an "insignificant interference" with ballot access. *Clements*, 457 U.S. at 967-68. If a two-year delay for an aspirational candidate is an "insignificant interference" with the right to ballot access, then certainly being called upon to demonstrate one's qualification to run for office only when questioned by an affidavit made on "reasonable suspicion or belief" is also insignificant.

Under *Anderson*, in fact, a State can require a "preliminary" showing of support from voters to qualify for the ballot, without first demonstrating probable cause to require proof from each candidate. *Anderson*, 460 U.S. at 788 n.9 ("The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on

---

[10] Cawthorn also improperly analogizes criminal-law provisions in Fourth Amendment claims to argue that a "reasonable suspicion or belief" is inadequate to interfere with his First Amendment rights. (Pl. Mem. 15). The proper analysis of the constitutionality of a ballot access laws, however, is well-settled under *Anderson-Burdick*, discussed above; analogies to "probable cause" or searches and seizures is irrelevant.

the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates."). Similarly, North Carolina here *could* require a candidate to make a "preliminary showing" of his qualifications before filing. Instead, as discussed above, North Carolina has adopted a lenient candidate-filing regime which requires very little from a candidate in the first instance and only requires a "showing" of qualification upon a voter in his district making a Challenge through the filing of an affidavit raising reasonable suspicion that the candidate does not meet the qualifications. The Challenge Statute is therefore substantially *less* burdensome than other ballot access restrictions that have been upheld.

### 3. Any burden on Cawthorn's right to run for office is outweighed by State and voter interests.

Under the *Anderson-Burdick* balancing test, a court must weigh the burden on First Amendment rights with a State's regulatory interests. The Supreme Court has explicitly recognized a State's substantial interest in regulating elections. *Anderson*, 460 U.S. at 788 ("as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."). The Court has also recognized States' "important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." *Clements*, 457 U.S. at 965.

The interests of the State, and more importantly, the voters, to ensure candidates for office meet the constitutional qualifications vastly outweigh any interest of a candidate to access the ballot. The Challenge Statute, thus, survives First Amendment scrutiny. *See Hassan v. Colorado*, 495 Fed. Appx. 947 948-49 (10th Cir. 2010) (Gorsuch, J.) ("a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from

the ballot candidates who are constitutionally prohibited from assuming office."); *see also Lindsay v. Bowen*, 750 F.3d 1061, 1065 (9th Cir. 2014).

**B.** **The Challenge Statute Does Not Violate Cawthorn's Fourteenth Amendment Rights Under the Due Process Clause by Requiring Him to Prove He is a Constitutionally Qualified Candidate**

Cawthorn also contests the constitutionality of the Challenge Statute under the Fourteenth Amendment's Due Process Clause because it, unsurprisingly, places the ultimate "burden of proof" on "the candidate" to show that he is "qualified to be a candidate for the office." N.C. Gen. Stat. § 163-127.5(a). Cawthorn claims that the statute "unfairly shift[s] the burden of proof" (Pl. Mem. 17), but there is no *shifting* of the burden. *At all times*, North Carolina law quite naturally places the burden to demonstrate "qualification" on the candidate – the one best situated to do so. N.C. Gen. Stat. § 163-127.5(a) ("The burden of proof shall be upon the candidate, who must show by a preponderance of the evidence … that he or she is qualified ….").

Of course, under North Carolina law, candidates benefit from a *presumption* of qualification that does not require them to present evidence to meet their burden of proving their qualification – or indeed to do anything other than spend a few minutes filling out a two-page form. *See* N.C. Gen. Stat. § 163-106. Only once a challenge is brought by a qualified voter based upon a "reasonable suspicion" that a candidate "does not meet the constitutional or statutory qualifications for the office" must a candidate come forward with evidence to meet his burden of establishing his qualifications. N.C. Gen. Stat. § 163-127.2. That legal framework reflects a decision by North Carolina to *minimize* the burden on a candidate's access to the ballot – by not insisting that every candidate present evidence of each of his or her qualifications in every race – not an unconstitutional burden on it. There is no more *shifting* of the burden of proof onto the candidate to demonstrate that he is qualified in this context than there is at trial when a party's evidence is presumed to be admissible (and admitted) until challenged by objection, at which point

the party seeking to admit the evidence must meet the burden it *always had* to demonstrate that the evidence is admissible. Indeed, legal frameworks just like this one are so familiar in civil law that there is a mechanism expressly incorporated in the rules of evidence that addresses them. *See* Fed. R. Evid. 301 (Presumptions in Civil Cases Generally) ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom the presumption is directed has the burden of producing evidence to rebut the presumption. But this rule *does not shift the burden of persuasion, which remains on the party who had it originally.*" (emphasis added)); *see also* N.C. R. Evid. 301.[11]

Again, as discussed above, the applicable legal test for a challenge to a ballot access law under the Fourteenth Amendment is the *Anderson-Burdick* balancing analysis entirely ignored by Cawthorn. *Anderson*, 460 U.S. at 786 & n.7. Requiring a candidate to participate in a hearing, with notice, before a neutral tribunal – and with full appeal rights – where the candidate (the one most knowledgeable about his qualifications) must prove by a preponderance of the evidence that he qualifies under the handful of requirements expressly imposed by the text of U.S. Constitution to run for Congress – and only in limited circumstances where those qualifications are challenged – imposes a minimal burden, if any, on a candidate's access to the ballot. And balanced against that burden is North Carolina's unquestionably strong state interest in excluding ineligible candidates from its ballots. *See Hassan*, 495 Fed. Appx. at 948-49 (Gorsuch, J.) (finding a legitimate state interest in excluding "from the ballot candidates who are constitutionally prohibited from assuming office.").

While Cawthorn appears to concede that he may be required to prove some qualifications for office (*see* Pl. Mem. 16 (noting that proof of residency is "relatively straightforward")), he

---

[11] The hearing in a North Carolina candidacy challenge is required by statute to adhere to the rules of evidence. *See* N.C. Gen. Stat. § 163-127.4(c)(2).

claims the "same is not true" for the qualification requirement in Section Three of the Fourteenth Amendment. (*See also* Compl. Count II (challenging the imposition of the burden of proof "as applied" to any Challenge under Section Three of the Fourteenth Amendment)). But there is no reason to treat this constitutional requirement for office any differently.

Cawthorn complains that for this specific requirement, his access to the ballot is unconstitutionally burdened because it requires him "to prove a negative." (Pl. Mem. 16.) But that complaint is overblown. The reality is that he could meet his burden simply by testifying truthfully and credibly that he did not engage in insurrection or rebellion against the United States in a manner that the fact-finder finds credible, and credibly addressing any contrary evidence.

Furthermore, in 1870, when Congress (not long after passing the Fourteenth Amendment) enacted a statute specifically to enforce Section Three of the Fourteenth Amendment, it also placed the burden on office holders to demonstrate that they had not engaged in insurrection or rebellion. *See* First Klu Klux Klan Act ("KKK Act"), ch. 114, 16 Stat. 140 (1870)[12]; *see also* Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comm. 87, 108-09 (2021). Section 14 of the KKK Act provided that federal prosecutors had a duty to seek a writ of *quo warranto* to remove any officials who held office contrary to Section Three. The Act has long since been repealed, but in a *quo warranto* action, then as now, the officeholder has the burden of proof to demonstrate that he is eligible to serve. *See, e.g.*, 65 Am. Jur. 2d Quo Warranto § 100; 74 C.J.S. Quo Warranto § 71. Therefore, if it would be unconstitutional to impose a burden of proving qualification to serve under Section Three today, then the KKK Act – which was enacted by essentially the same Congress that passed the Fourteenth Amendment – was also unconstitutional. Cawthorn does not (and cannot) offer any justification for why that would be so.

---

[12] Found at: https://govtrackus.s3.amazonaws.com/legislink/pdf/stat/16/STATUTE-16-Pg140.pdf

In raising this specific objection to the Challenge Statute, Cawthorn does not cite a single case involving unconstitutional burdens on a candidate's right to access the ballot, but instead cites only free speech cases. Those cases have no bearing here. Cawthorn cannot rely upon cases restricting burdens on free speech under the First Amendment to *narrow* the obligation he otherwise reasonably bears to demonstrate his qualification to seek a seat in Congress under Section Three. For example, Cawthorn relies principally on *Speiser v. Randall*, 357 U.S. 513, 520 (1958), but that case had nothing to do with ballot access. Instead, it held that a tax defendant facing penalties designed to deter criminal speech could not be required to bear the burden of proof as the State must bear the burden, just as it would in a criminal proceeding.[13]

Cawthorn also cites cases that "struck down state statutes unfairly shifting the burden of proof" to a defendant in both "criminal and civil contexts." But here there is no burden being *shifted* to Cawthorn to avoid either civil or criminal penalties. Instead, he reasonably bears the burden as the one *seeking* federal office to demonstrate his qualifications for that office. In any event, *McFarland v. American Sugar Refining Co.*, 241 U.S. 79 (1916), deals with criminal law and is inapplicable here, and it is doubtful that *Western & A.R.R. v. Henderson*, 279 U.S. 639, 641 (1929), which extended the rule that the burden of proof may not be shifted to a defendant to the civil context, is still good law. *See, e.g.*, 2 McCormick on Evid. § 345 (8th ed.) ("*Henderson* may simply no longer be valid law"); Fed. R. Evid. 301 (advisory committee notes) (same); *Goldman*

---

[13] Even the free speech line of cases that Cawthorn cites stand for the proposition that the State's interest in having public officials who are "devoted to the law" is clearly "sufficient to outweigh the minimal effect upon free association" in cases where the principal aim of a law is "not to penalize political beliefs but to deny positions to persons supposed to be dangerous because the position might be used to the detriment of the public." *Konigsberg v. State B. of Calif.*, 366 U.S. 36, 52-54 (1961) (distinguishing *Speiser* and holding there was "no attempt directly to control speech but rather to protect, from an evil shown to be grave, some interest clearly within the government concern" and affirming burdens of compulsory disclosure from candidate); *Martin-Trigona v. Underwood*, 529 F.2d 33, 36-37 (7th Cir. 1976) (rejecting bar applicant's claim that he was denied due process of law where the burden was on him "to prove his innocence (good character) and to disprove the 'charges' of bad moral character" the committee had advanced against him").

*Sachs Group, Inc. v. Arkansas Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961-63 (2021) (placing burden of persuasion on defendants in securities-fraud class action to prove a "negative" of a lack of price impact by a preponderance of the evidence).

**C.    The Qualifications Clause Does Not Prevent North Carolina From Exercising Its Constitutionally Delegated Authority To Verify Congressional Candidates' Constitutional Eligibility As A Condition For Ballot Access.**

North Carolina has the authority and responsibility to prevent constitutionally unqualified candidates from running for office.  The Qualifications Clause, U.S. Const. art. I, § 5, cl. 1, does not prevent North Carolina from verifying the constitutional eligibility of congressional candidates as a condition for ballot access, consistent with the power delegated to the State by the Elections Clause, U.S. Const. art. I, § 4, cl. 1.

Cawthorn's Qualifications Clause argument is not limited to the specific qualification (the Fourteenth Amendment's Disqualification Clause) at issue in the State proceeding. His argument would apply with equal force to the age and citizenship qualifications in U.S. Const. art. I, § 2, cl. 2.  If he prevails on this claim, North Carolina is prevented not just from excluding insurrectionists from the ballot, but from excluding 14-year-old non-citizens and any other would-be candidate no matter how clearly they fail to meet constitutional requirements.

**1.    The Elections Clause delegates to States the authority to verify congressional candidates' constitutional eligibility.**

Under the Elections Clause, "broad powers [are] delegated to the States." *Roudebush v. Hartke*, 405 U.S. 15, 25 (1972).  This power "embrace[s an] authority to provide a complete code for congressional elections . . . [and] to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  This authority extends to ballot access. "[A] State has an interest, if not a duty, to protect the integrity of its political process from frivolous

or fraudulent candidacies." *Bullock v. Carter*, 405 U.S. 134, 145 (1972); *see also Storer*, 415 U.S. at 733 (extending that interest to the congressional context); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) ("we have approved the States' interests in avoiding voter confusion, ballot overcrowding, or the presence of frivolous candidacies").  Thus, "[t]here is no question that the State can insure its candidates meet the minimum requirements of [U.S. Const. art. I, § 2, cl. 2] and in turn represent this fact to its electors through affidavits or a variety of other means." *Campbell v. Davidson*, 233 F.3d 1229, 1235–36 (10th Cir. 2000).  In fact, Congress only readmitted North Carolina to the Union after the Civil War by an Act explicitly *requiring* the State to exclude insurrectionists from office.  *See An Act to admit the States of North Carolina [et al.], to Representation in Congress*, 15 Stat. 73 (June 25, 1868).

This authority necessarily exceeds "ministerial" powers as described by Cawthorn.  (Pl. Br. 20.)  Cawthorn's reliance on *Roudebush* is fundamentally misplaced.  That case only discussed whether the recount in question was "ministerial"; the Court did not suggest that States *only* have ministerial powers.  405 U.S. at 20–23.  The question there was whether *post-election* state action under the Elections Clause "usurps" the independent judgment of the House to judge its members. *Roudebush*, 405 U.S. at 25–26.  *Pre-election* verification of candidate eligibility does not.[14]

---

[14] Cawthorn also relies wrongly on two other cases that involve issues that can only arise *after* an election. In *State ex rel. Chavez v. Evans*, 1986-NMSC-167, 446 P.2d 445, 448–49 (1968), the court ruled that a State could not exclude from the ballot a candidate who affirmed that he would become a resident by the election, as required by Article I § 2 cl. 2.  The truth of his residency affirmation could not be confirmed until *after* his election to office, placing authority in the hands of Congress.  Here, Cawthorn's eligibility can be ascertained before the election.  *Cox v. McCrery*, No. Civ.A.06-2191, 2007 WL 97142 (W.D. La. 2007), is similarly inapposite.  *McCrery* also involved a post-election residency challenge; the issue was whether an Article III court could decide the issue of inhabitancy qualification. *Id.* at *3.  That decision has no bearing on whether a *State* has authority to omit unqualified candidates from the ballot.

### 2. The Qualifications Clause does not prevent States from pre-election verification of congressional candidates' eligibility.

Congress's authority under the Qualifications Clause to assess a member's eligibility attaches *after* an election. This authority does not prevent States from barring unqualified candidates' access to the ballot *before* an election.

The Qualifications Clause makes each house "the Judge of the Elections, Returns, and Qualifications of its own Members." As the Supreme Court has noted, "we rely on the principle of *noscitur a sociis* – a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543, (2015). The placing of "Qualifications" with "Elections" and "Returns" indicates that the power to judge qualifications is limited to *after* an election. This is further reinforced by the reference to "its own Members." While this includes members-elect who have "present[ed] [themselves] to the Senate, claiming all the rights of membership," *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 614 (1929),[15] it does not include candidates.[16]

None of this conflicts with a State's authority to limit the ballot to qualified members as ascertainable before the election. Pre-election verification of candidates like Cawthorn does not "usurp" the House's post-election powers. *See Bullock*, 405 U.S. at 145; *see also Storer*, 415 U.S. at 733 (explaining that a State can "absolutely and validly" bar an ineligible congressional candidate from the ballot); *U.S. Term Limits, Inc.*, 514 U.S. at 834; *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986). To the contrary, the House retains all its Qualifications Clause powers after the general election has concluded, including, *in extremis*, the power to void congressional elections if it disagrees with a State's determination of candidate eligibility. Simply

---

[15] *See also United States v. Dietrich*, 126 F. 676, 680–84 (C.C.D. Neb. 1904) (a "member" of Congress is one who has been admitted).

[16] The "House" in question is the one sworn in on January 3, 2023, not the one of which Cawthorn is currently a member.

because the House might eventually exercise its Qualifications Clause powers does not mean a State may not consider the issue; it only means it cannot usurp the House *once the House's jurisdiction has attached*.

### 3. Pre-election verification is constitutional in the parallel constitutional structures of presidential elections and state legislative elections.

In two parallel structures, presidential elections and state legislative races, there is a constitutionally appointed final judge of qualifications. In both circumstances, States typically retain the authority to verify candidate eligibility before granting them access to the ballot. Thus, in presidential elections, States take the primary role in regulating pre-election conduct. *See, e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 29 (1968) (the U.S. Constitution grants "extensive power to the States to pass laws regulating the selection of electors."). Congress also has the final say over presidential election results.[17] But despite Congress's authority to confirm those election results, States retain the ability to disqualify constitutionally ineligible candidates from their ballots. As then Circuit Judge Gorsuch explained, "a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office." *Hassan*, 495 Fed. Appx. at 948–49 (candidate not a natural-born citizen); *see also Lindsay*, 750 F.3d at 1065 (underage candidate).

Parallel state constitutional law is also persuasive. Most state constitutions make state legislatures the final judges of elections and qualifications of their members, just like the Qualifications Clause of the U.S. Constitution.[18] And of the twenty-two States that have addressed the question, *all but one* allow for pre-election verification of candidate constitutional eligibility.[19]

---

[17] 3 U.S.C. § 15 (creating a procedure for members of Congress to object to electoral votes).

[18] Paul E. Salamanca & James E. Keller, *The Legislative Privilege to Judge the Qualifications, Elections, and Returns of Members*, 95 Ky. L.J. 241, 243 n. 7 (2007).

[19] *See e.g.*, Mo. Const. art. III, § 18 ("Each house . . . shall be sole judge of the qualifications, election and returns of its own members"); *State ex rel. Gralike v. Walsh*, 483 S.W.2d 70, 72 (Mo. 1972) (the state

State courts grappling with the interaction between the power to manage elections and the legislature's power to judge qualifications and elections have consistently recognized that pre-election cases are "not [actions] to determine either the election, eligibility, qualifications, or returns of relator as a *member of the Legislature* . . . [but to] determine his rights, if any, to the *nomination of his party's ticket*." *State ex rel. Gramelspacher v. Martin Circuit Ct.*, 231 Ind. 114, 107 N.E. 666, 668 (1952) (emphases added).

### 4. The Qualifications Clause and Elections Clause must work in concert to ensure orderly and legitimate elections.

The Elections Clause and Qualifications Clause work in concert to ensure orderly and constitutional elections, with the former granting broad powers *before* an election and the latter granting broad powers *after*.

Cawthorn's argument would lead to the absurd result that States cannot conduct recounts or adjudicate contests of primary elections. As noted above, under U.S. Const. art. I, § 5, cl. 1, "Qualifications" stand on the same footing as "Elections" and "Returns." If this power displaces a State's ability to judge "Qualifications" before the general election, then it must equally displace a State's ability to judge "Elections" and "Returns." Cawthorn unsuccessfully tries to distinguish the general election recount in *Roudebush* on the theory that "the Senate was still free to accept or reject the apparent winner" whereas here, North Carolina's verification of candidate eligibility would "frustrate the House of Representatives' ability to make its independent, final judgment." (Pl. Br. 20-21.) But the same could be said of a primary election recount or contest: it affects which candidate proceeds to the general election, no less than an adjudication of candidate eligibility. Any theory by which the Qualifications Clause precludes state adjudication of

---

Qualifications Clause does not prevent a pre-election determination of eligibility for ballot access to the primary); *contra In re McGee*, 36 Cal.2d 592, 226 P.2d 1 (1951) (the only exception).

candidate eligibility also precludes state adjudication of primary recounts and disputes – a plainly absurd and unworkable result. *Cf. State ex rel. Gralike v. Walsh*, 483 S.W.2d 70, 73 (Mo. 1972) (making similar point in interpreting state Qualifications Clause).

"[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer*, 415 U.S. at 730. But Cawthorn's interpretation would lead to precisely that chaos if patently ineligible candidates gained a federal court ruling entitling them a place on state ballots. Ineligible candidates – teenagers; insurrectionists; foreign citizens – would be guaranteed places on the ballot. Ineligible candidates could intentionally run in order to spoil an election's results; hostile foreign actors might file candidacy paperwork to disrupt elections; teenagers or foreign pranksters might raise Internet funding for efforts to get placed onto state congressional ballots to disrupt orderly elections. That the House might ultimately sort it out through the mechanism of the Qualifications Clause is hardly a remedy.

State courts have consistently recognized the real danger of confusion in races for state legislatures. *See, e.g.*, *Gralike*, 483 S.W.2d at 73. The risk is just as present in federal elections. States have a clear interest in preventing "frivolous or fraudulent" congressional candidacies. *Storer*, 415 U.S. at 733. North Carolina is acting well within its delegated powers when it acts to ensure that only qualified candidates are placed on its ballots, and there is no merit to Cawthorn's contention that Congress's after-the-fact power excludes any role for North Carolina.

D.     **The Amnesty Act of 1872 Did Not Forever Absolve All Future Insurrectionists.**

Cawthorn argues that the 1872 Act granted amnesty to all future insurrectionists from 1872 until the end of time. (Pl. Mem. 21-24, citing Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872).) Cawthorn's novel and bizarre statutory interpretation contradicts text, legislative history, and Congress's own understanding, and would, in any event, likely render the Act unconstitutional.

1. **The 1872 Act's plain meaning is to "remove[]" disabilities that had already been "imposed."**

If the 1872 Act had rendered the Disqualification Clause forever nugatory, then, at a minimum, Congress would have plainly said so. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Scalia, J.). Rather, in both title ("An Act to remove political Disabilities imposed by the fourteenth article of the Amendments to the Constitution of the United States") and body, the Act uses "imposed" in past tense. That necessarily means disabilities *already* imposed – not disabilities the amendment might impose in the future. By analogy, we do not say the First Amendment "protected" freedom of speech; we say it "protects" that freedom. Likewise, the Disqualification Clause *imposes* disqualification on all people who engage in insurrection. In addition, the 1872 Act uses the word "remove," which means to take *away* something already present. The 1872 Act could not "remove" disabilities from people not yet alive with no disabilities yet to remove.

2. **Legislative history confirms congressional intent to apply the Disqualification Clause prospectively but amnesty only retrospectively.**

In drafting the Disqualification Clause, Congress twice rejected alternative language that would apply *only* to the Civil War. *See* Cong. Globe, 39th Cong., 1st Sess. 2900 (1866)[20] (proposed amendment limiting disqualification to those who "within ten years preceding the 1st of January, 1861" swore oath to support Constitution; rejected 32-10); Cong. Globe, 39th Cong., 1st Sess. 2545 (1866)[21] (earlier House version referring to "the late insurrection"). Both times, Congress instead chose to disqualify *future* insurrectionists as well.

By contrast, the 1872 Act's legislative history – passed just six years after the Fourteenth Amendment's enactment, with several amendment framers still in office – exclusively addressed

---

[20] Found at: http://bit.ly/1S2900.
[21] Found at: http://bit.ly/1H2545.

amnesty for *ex-Confederates*. *See* Magliocca, *supra*, 36 Const. Comm. at 111-20. Cawthorn has not identified, and undersigned counsel have not seen, *any* indication in the legislative record that Congress in 1872 had an intention or inkling of absolving *future* insurrectionists.

### 3. Congress has consistently interpreted the Act as retrospective only.

In 1919, the House considered a claim similar to Cawthorn's from Representative-elect Victor Berger. *See* 6 Clarence Cannon, *Cannon's Precedents of the House of Representatives of the United States*, ch. 157, §§ 56-59, at 52–63 (1936).[22] Under Cawthorn's logic, the 1872 Act absolved Berger as a non-Confederate. No one raised Cawthorn's argument, but the House rejected a nearly identical claim based on the Amnesty Act of June 6, 1898, ch. 389, 30 Stat. 432:

> Congress has no power whatever to repeal a provision of the Constitution by a mere statute, and … no portion of the Constitution can be repealed except in the manner prescribed by the Constitution itself. While under the provisions of section 3 of the fourteenth amendment Congress was given the power, by a two-thirds vote of each House, to remove disabilities incurred under this section, *manifestly it could only remove disabilities incurred previously to the passage of the act, and Congress in the very nature of things would not have the power to remove any future disabilities.*

*Id.* at 55 (emphasis added).

More recently, Congress granted posthumous amnesty to Robert E. Lee and Jefferson Davis. *See* S.J. Res. 23, 94th Cong. (1975) (Lee); S.J. Res. 16, 95th Cong. (1978) (Davis). Both fell within the 1898 Act's textual scope, but died before 1898. Amnesty for them therefore required separate congressional acts because previous amnesties only covered persons *alive at the time of the amnesty*. *See also* Cong. Res. Serv., "The Insurrection Bar to Office: Section 3 of the Fourteenth Amendment" (Jan. 29, 2021), at 2 ("The [1872] Act appears to be retrospective and

---

[22] Found at:  http://bit.ly/6Canon56.

apparently would not apply to later insurrections or treasonous acts")[23]; Cong. Res. Serv. Rept. R41946, "Qualifications of Members of Congress" (Jan. 15, 2015), at 18 (similar).[24]

### 4. The 1872 Act must be construed to avoid unconstitutionality.

Under the canons of constitutional avoidance, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) (cleaned up). Indeed, "a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (cleaned up). Cawthorn's reading presents several constitutional problems for the 1872 Act.

**a. Article V workaround.** Cawthorn nominally disclaims any argument that the 1872 Act *actually* repealed the Disqualification Clause. Instead, he claims, Congress simply used its amnesty power broadly. (Pl. Mem. 21.) But his empty formalism elides the real consequences of his claims. Under his logic, Congress could extend a president's term indefinitely via calendar reform legislation that eliminates the month of January. *Cf.* U.S. Const. amend. XX, § 1.

**b. Prospective amnesties.** A president cannot pardon crimes not yet committed. *See Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1866). The power to pardon future crimes would be "a power to dispense with the observance of the law." William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm. & Mary L. Rev. 475, 525-26 (1977). The same logic applies to prospective congressional amnesties.

**c. Statute irrevocably binding future Congress.** Outside a constitutional amendment, one Congress cannot bind future Congresses. *See Manigault v. Springs*, 199 U.S. 473, 487 (1905) ("a general law enacted by the legislature . . . may be repealed, amended, or disregarded by the

---

[23] Found at: http://bit.ly/CRSs3.
[24] Found at: http://bit.ly/CRS41946.

legislature which enacted it"). But Cawthorn's reading would do just that. Amnesties, once granted, are likely irrevocable. *Cf. In re De Puy*, 7 F. Cas. 506, 509 (S.D.N.Y. 1869) (pardons irrevocable). Under Cawthorn's reading, the 1872 Act is a general law (applicable to future insurrections) that would unconstitutionally bind future Congresses from *ever* reinstating the Disqualification Clause since any such action would "rescind" amnesty granted in 1872.

## III. Plaintiff Has Not Shown that an Injunction Is Necessary to Prevent Irreparable Harm

Cawthorn's theory that he would suffer irreparable harm is based on the presumption that the violation of a constitutional right can constitute irreparable harm. (Pl. Mem. at 24.) As identified by Cawthorn, his supposed constitutional rights are "the rights to run for office, to have one's name on the ballot, and to present one's views to the electorate." (Pl. Mem. at 8, 14.) The problem with Cawthorn's theory is that the injunction Cawthorn seeks is untethered from any threat that Cawthorn would be deprived of an opportunity to present his constitutional rights.

The challenge procedure Cawthorn seeks to enjoin would not deprive Cawthorn of the rights identified in the Complaint. Instead, the very purpose of the Challenge is to determine whether or not Cawthorn is entitled to those rights. Cawthorn will only fail to qualify for the ballot if the procedure results in a finding that he does not satisfy "the constitutional or statutory qualifications for the office" he seeks. N.C. Gen. Stat. § 163-127.2(b). Cawthorn will either be adjudicated to have no right to be on the ballot (in which case there is no right to be infringed) or Cawthorn will be adjudicated to be an eligible candidate and will appear on the ballot (in which case he would suffer no adverse consequences whatsoever). Either way, Cawthorn will suffer no deprivation of rights.

If Cawthorn does not succeed in the NCSBE process, he would have judicial recourse through an expedited appeal to the North Carolina Court of Appeals. N.C. Gen. Stat. § 163-127.6. Cawthorn could present the same constitutional questions to the Court of Appeals that he currently

presents to this Court.  *See* N.C. Gen. Stat. § 150B-51(b) (including "violation of constitutional provisions" as a ground for a judicial body to overturn an agency action).  There is no threat that Cawthorn will be deprived of the opportunity to adjudicate any of the questions he presents.

## IV.     The Balance of Equities Weigh Against an Injunction

A plaintiff seeking a preliminary injunction must establish that the balance of equities tips in his favor.  *Winter*, 555 U.S. at 20.  Here, the sole injury from which Cawthorn seeks relief is the prospect of participating in a proceeding under the Challenge Statute.  In order to avoid that minimal injury, Cawthorn would have this Court invalidate the procedures established by the General Assembly for candidate filing and vetting of qualifications.  That balance necessarily tips heavily against the State and counsels in favor of denial of Cawthorn' motion.

## V.     A Preliminary Injunction Would Not Be in the Public Interest.

Cawthorn, in claiming to advance the public interest through the relief he seeks in this case, is conflating his personal interest with that of the public.  In fact, although Cawthorn insists on referring to it as an "undemocratic scheme" (Pl. Mem. 26), North Carolina, through its democratically elected General Assembly, has enacted a statutory regime which presumes that candidates for election are qualified, subject to a voter challenge provision overseen by a bi-partisan elections board and subject to judicial review.

Cawthorn's action seeks to upset that balance chosen by the State and to substitute a system more to his liking in which his qualifications are presumed and no mechanism exists for them to be challenged.  For Cawthorn to claim the mantle of the "public interest" turns fundamental principles of federalism – the ultimate expression of public interest in this polity – on their head.  As the Supreme Court held in *Younger*, 401 U.S. at 44 (1971), the "underlying reason for restraining courts of equity" is "notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments,

and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."

Cawthorn here, for his sole benefit, seeks to displace what the Fourth Circuit termed the bedrock "policy of commanding federal restraint when the federal action is duplicative, casts aspersion of state proceedings, disrupts important state enforcement efforts, and is designed to annul a state proceeding." *Moore*, 396 F.3d at 394-95. Given "our system of dual sovereignty," federal courts, therefore, should "avoid interference with a state's administration of its own affairs," *Collins Ent't Co.*, 199 F. 2d at 719, particularly in "cases involving complex state administrative procedures." *Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 248 (4th Cir. 2013).

## CONCLUSION

The Court should deny Plaintiff's Motion for Preliminary Injunction.

This the 7th day of February, 2022.

/s/ Pressly M. Millen
Pressly M. Millen (State Bar #16178)
Raymond M. Bennett (State Bar # 36341)
Scott D. Anderson (State Bar # 49044)
Hayes Jernigan Finley (State Bar # 47834)
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Office: 919.755.2135
Fax: 919.755.6067
Email: Press.Millen@wbd-us.com
      Ray.Bennett@wbd-us.com
      Scott.D.Anderson@wbd-us.com
      Hayes.Finley@wbd-us.com

John R. Wallace (State Bar #7374)
Lauren T. Noyes (State Bar #28130)
Post Office Box 12065
Raleigh, NC 27605
Office: 919.782.9322
Fax: 919.782.8133
Email: jrwallace@wallacenordan.com
      ltnoyes@wallacenordan.com

Robert F. Orr (State Bar #6798)
3434 Edwards Mill Road, Suite 112-372
Raleigh, NC 27612
Office: 919.608.5335
Email: orr@rforrlaw.com

Ronald Fein*
John C. Bonifaz*
Ben Clements*
Courtney Hostetler*
Benjamin Horton*
Free Speech For People
1320 Centre St. #405
Newton, MA 02459
Office: 617.244.0234
Email: rfein@freespeechforpeople.org

*Attorneys for Defendant-Intervenors
Barbara Lynn Amalfi, Laurel Ashton,
Natalie Barnes, Claude Boisson, Mary
Degree, Carol Ann Hoard, June Hobbs,
Marie Jackson, Michael Jackson, Anne
Robinson, David Robinson, Carol Rose, and
James J. Walsh*

*Special appearances pursuant to L.R. 83.1
are forthcoming.

*Of Counsel*

James G. Exum, Jr. (State Bar #1392)
6 Gleneagle Ct.
Greensboro, NC 27408
Office: 336.554.1140
Email: jimxzoom@gmail.com

\