|  |  |  |
|---|---|---|
| | ) | |
| MADISON CAWTHORN, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | **STATE BOARD DEFENDANTS'** |
| | ) | **RESPONSE TO** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| v. | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| DAMON CIRCOSTA, in his official capacity | ) | |
| as Chair of the North Carolina State Board of | ) | |
| Elections,, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**NOW COME** Defendants Damon Circosta, Stella Anderson, Jeff Carmon, III, Stacy Eggers, IV, Tommy Tucker, and Karen Brinson Bell ("Defendants" or "State Board Defendants"), through undersigned counsel, to provide this response to Plaintiff's motion for preliminary injunction. [D.E. 8, 9].

## Nature of the Case

Plaintiff filed this action on January 31, 2022 alleging that North Carolina's candidate challenge law, N.C.G.S. §§ 163-121.1, *et seq*. ("candidate challenge law"), is unconstitutional. [D.E. 1]. Plaintiff raises four claims in his Complaint. He alleges 1) that the candidate challenge statute is unconstitutional because its "reasonable suspicion" standard is insufficient justification under the First Amendment to trigger a government investigation; 2) the statute's burden shifting provision is unconstitutional under the Due Process Clause of the Fourteenth Amendment because it requires him to prove a negative; 3) the statute is unconstitutional because it conflicts with Congress's exclusive authority to judge its members' qualifications under Article I, Section 5; and, 4) the application of Section 3 of the Fourteenth Amendment violates federal law. *Id.*

As a threshold matter, this Court does not have subject-matter jurisdiction because Plaintiff lacks standing and his causes of action are not ripe. Plaintiff's claims are therefore subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1). Further, this Court should abstain from hearing this case under the *Younger* abstention doctrine. In addition, each of Plaintiff's claims are subject to dismissal under Rule 12(b)(6) because Plaintiff has failed to state a claim upon which relief can be granted.

Moreover, for the reasons detailed below, Plaintiff cannot meet the other factors required to justify the issuance of a preliminary injunction because he cannot demonstrate a likelihood of success on the merits and the balance of equities and hardships favors denial of the motion.

For these reasons, Plaintiff's request for preliminary injunction should be denied.

## Statement of Facts

On December 7, 2021, Plaintiff filed his application to be a candidate for the 13th Congressional District. [D.E. 1, ¶ 9, 41]. On December 8, 2021, the North Carolina Supreme Court enjoined Defendants from continuing the candidate filing period and ordered that the election scheduled for March 8, 2022 would instead take place on May 17, 2022.[1]

On January 10, 2022, candidate challenges were filed with the State Board by individuals alleging that Plaintiff was not qualified to be a member of Congress. [D.E. 1, ¶ 42, 43].[2] Due to the potential impact of the redistricting litigation, the next day the State Board sought and obtained a stay of all candidate challenges to candidates for districts potentially affected by that litigation until the redistricting matters were fully resolved. *Id.,* ¶ 46.[3] Three weeks later, Plaintiff filed this

---

[1] https://s3.amazonaws.com/dl.ncsbe.gov/Press/NC_Supreme_Court_413P21.pdf
[2] https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-01-12/Cawthorn%20Challenges%20-%20Legal%20Argument.pdf
[3] https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-01-12/2022.01.11%20Order%20on%20Motion%20to%20Stay.pdf

action. [D.E. 1].

On Friday, February 4, the North Carolina Supreme Court ruled that the current congressional and legislative redistricting plans were unconstitutional and ordered the drawing of new maps.[4]  Consequently, the stay on candidate challenge remains in place.

Given that congressional districts will be redrawn, the current candidate challenge may not proceed.  Once districts are known, candidates who have already filed, like Plaintiff, will have the opportunity to withdraw and to refile elsewhere if desired.  Moreover, if the district is redrawn, the challengers may no longer be residents of the district.  Thus, it is possible that this challenge will be withdrawn or dismissed, and there is no certainty that a new challenge against Plaintiff's proposed candidacy will be filed.

_Candidate Challenge Process_

As a general matter, and pursuant to Article 11B of Chapter 163 of the North Carolina General Statutes, a candidate challenge may be brought against any person who files a notice of candidacy under the appropriate statute for any elective office in this State.  N.C.G.S. § 163-127.1.  The challenge must be made by a qualified voter registered in the same district as the office for which the candidate has filed.  _Id._, -127.1.  The challenge must be filed with the same board of elections, State or county that received the notice of candidacy from the candidate no later than 10 business days after the closing of the filing period.[5]  _Id._, -127.2.  The challenge must consist of a verified affidavit, based on a reasonable suspicion or belief that the candidate does not meet the

---

[4]

https://appellate.nccourts.org/orders.php?t=PA&court=1&id=397836&pdf=1&a=0&docket=1&dev=1

[5] Candidate filing was temporarily stayed by the North Carolina Supreme Court on December 8, 2021 and will resume from February 24, 2022 to March 4, 2022.  Thus, this period will run until March 18, 2022.

3

constitutional or statutory qualifications for the office. *Id.* The candidate challenge form itself notifies the challenger that "FRAUDULENTLY OR FALSELY COMPLETING THIS FORM IS A CLASS I FELONY".[6]

Within two business days of the filing of the challenge the State Board must appoint a panel made up of county board members from the counties within the district. *Id.*, -127.3(2). In the case of a multi-county district that covers more than five counties, the panel shall have five members with at least one member from the county receiving the notice of candidacy or petition and at least one member from the county of residency of the challenger. The State Board shall, to the extent possible, appoint members affiliated with different political parties in proportion to the representation of those parties on the county boards of elections in the district for the office. Within five days of the filing of the challenge, the panel must schedule a hearing and issue a written decision no more than 20 business days after the challenge is filed. *Id.*, -127.4(a). Depositions and subpoenas for witnesses or documents are permitted upon request of the parties or the panel. *Id.* The panel may allow evidence to be presented, such as affidavits, documents, or witnesses under oath; the receipt of which shall be subject to the North Carolina Rules of Evidence. *Id.*, -127.4(c). The candidate must then show, by a preponderance of the evidence, that he or she is qualified to be a candidate for office. *Id.*, -127.5(a). The panel must issue a written decision, which includes findings of fact, conclusions of law, and an order. *Id.*, -127.4(d).

Within two days of the issuance of the written decision, either party has the right to appeal to the State Board, which must render an expedited decision based on the entirety of the record. *Id.*, -127.6(a). Within two days of the State Board's issuance of a written decision, either party

---

[6] North Carolina Candidate Challenge Form is publicly available on the State Board's website: https://s3.amazonaws.com/dl.ncsbe.gov/Forms/2021/Candidate_Challenge_Form_Fillable_2021 07.pdf

may appeal to the North Carolina Court of Appeals. *Id.*, -127.6(b).

The administrative process for candidate challenges before the State Board, county boards of elections, and designated panels is well-established. In the fifteen years since the enactment of the candidate challenge statutes, the State Board has considered and ruled upon numerous challenges, typically in the form of appeals from the initial hearing panel.

In the past four years alone, the State Board has decided 12 candidate challenge appeals,[7] involving all types of races, including candidates for the judiciary, state legislature, sheriffs, and county and municipal offices. In contrast with post-election protests, these pre-election challenges serve the critical purpose of ensuring that only qualified candidates appear on the ballot and are voted on by the electorate, while promoting public confidence in the electoral system.

## Legal Argument

Legal Standard

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mt. Valley Pipeline, L.L.C. v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 24 (2008)). The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Requests that disturb the status quo are disfavored. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014).

---

[7]

https://dl.ncsbe.gov/index.html?prefix=State_Board_Meeting_Docs/Orders/Candidate%20Challenge%20Appeals/

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Plaintiff has the burden to prove each factor. *Id*. Additionally, a plaintiff must show that success on the merits is likely regardless of whether the balance of hardships weighs in his favor. *Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). This burden requires more than simply showing that "grave or serious questions are presented." *Id*. at 346-47.

## I.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.

### A.   This Court Lacks Jurisdiction[8] Because Plaintiff Lacks an Injury and the Case Is Not Ripe.

#### 1.   Plaintiff Lacks an Injury for Standing Purposes.

Plaintiff cannot demonstrate an actual injury to support standing. Article III standing exists only when a plaintiff "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 99 (1979). If a plaintiff has not suffered an injury, there is no standing, see *Allen v. Wright*, 468 U.S. 737, 750-66 (1984), and the matter is subject to dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *See, e.g.*, *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

---

[8] Plaintiff also failed to properly serve Defendants resulting in this Court lacking personal jurisdiction. Defendants reserve the right to raise those arguments in any future motion to dismiss.

conjectural or hypothetical.'" *Beck v. McDonald*, 848 F.3d 262, 270-71 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).

Plaintiffs must show that their risk of future injury is certain, or at least substantial. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 156 (2014). A plaintiff lacks standing when their claimed injury is "premised on a speculative chain of possibilities." *Clapper v. Amnesty, Int'l USA*, 568 U.S. 398, 410 (2013)(citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). Thus, allegations of a merely possible future injury do not create standing. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

Here, Plaintiff has not alleged an actual injury, and instead cites his concern that he may suffer the future harm that he may not be able to run for office. These alleged injuries are entirely speculative at this early stage of litigation when the State Board has not even had the opportunity to name the panel to consider the underlying matter. Indeed, there remains a question of whether the district at issue will change, whether Plaintiff will refile in any new district, whether the challengers would still be eligible to challenge Plaintiff's candidacy, or whether a candidate challenge will follow.

First, as discussed in the next section, Plaintiff has made his claim before he has suffered any harm. The candidate challenge proceeding may result in Plaintiff successfully demonstrating that he is not disqualified; in this case, he would have suffered no injury whatsoever.

Second, a plaintiff cannot show that he faces a substantial risk of harm because he cannot control or predict the actions of independent non-party actors in the chain of events necessary for his alleged injury to occur. *Clapper*, 568 U.S. at 413-14 ("[i]t is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case.")(internal

quotations omitted). This is precisely the situation here because the panel, which has yet to be constituted and has taken no action at all, is not a party to this action.

Moreover, once a panel is appointed, State Board Defendants will have no further role unless and until the panel's determinations are appealed. Thus, to prevail at this stage of the litigation, Plaintiff would have to establish that an injury will be inflicted upon him by the potential, future panel that is comprised of presently unknown independent actors. *Id.*, at 410 (citing *Whitmore*, 495 U.S. at 159-160) (In considering whether a separate court would authorize a surveillance warrant, the *Clapper* Court declined to abandon a longstanding "reluctan[ce] to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.")

Thus, without knowing how the panel will rule, Plaintiff's alleged injury is, at best, speculative, and he lacks standing to pursue these claims.

## 2. Plaintiff's Claims are Not Ripe.

Plaintiff also lacks standing because his claims are not ripe. The ripeness doctrine aims to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977).

*Abbott* established a two-pronged test for ripeness: (1) whether the issues are fit for judicial decision and (2) whether hardship will fall to the petitioning party on withholding court consideration. *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992) (citing *Abbot*, 387 U.S. at 149). Under the first prong, a case is fit for judicial review if "the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency

8

rulings." *Id.* Under the second prong, hardship "is measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law." *Id.*

Under the first prong, the issues presented by Plaintiff are not yet ripe for this Court's review. While Plaintiff has raised legal questions, no agency action has occurred, much less an adverse agency action that could give rise to injury. Plaintiff therefore cannot show that he has been or will imminently be injured. Rather, he alleges that "[*i*]*f successful*, a Challenge to his candidacy would prevent him from running for Congress . . .", [h]is *potential* injury is not in any way hypothetical …", and "Rep. Cawthorn's *potential* disqualification . . . ." [D.E. 1, ¶¶ 52, 53, 55; D.E. 8, pp. 8-9] (emphasis added). In short, Plaintiff's claims are not yet ripe because the alleged harm is entirely dependent on "future uncertainties [and] intervening agency rulings." *Id.*

As to the second prong, withholding court consideration until a later date, if at all, presents no hardship to Plaintiff. Permitting the state matter to proceed does not in any way limit Plaintiff's defenses or likelihood of success. Plaintiff is free to present any argument he is making here through that process. If he is adversely affected, whether by factual findings or conclusions of law, he is entitled to an appeal to the State Board, followed by review before the Court of Appeals. He will then have the option to seek further review from the North Carolina Supreme Court and even the United States Supreme Court assuming he has a justiciable federal issue. Therefore, interceding at this point is unnecessary and refusing to do presents no hardship to Plaintiff.

Other courts considering similar challenges to an agency administrative process have routinely found that such matters are not yet ripe for judicial determination. For a claim to be

ripe, it must involve "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *Arch Mineral Corp. v. Babbitt,* 104 F.3d 660, 665 (4th Cir. 1997) (alteration in original) (quoting *Charter Fed. Sav. Bank*, 976 F.2d at 208 ). In *Babbitt*, the Fourth Circuit found that the case was sufficiently ripe because the outcome of the agency process, while not formally finished, was all but final and the injury to the party was clear. *Id.* at 668. For comparison, in *Charter Federal Savings Bank*, the Fourth Circuit held that where an agency was required to make multiple decisions and take several actions before an injury could occur, the issues at hand were not ripe for judicial decision. 976 F.2d at 208-09.

Similarly, in *Doe v. Va. Dep't of State Police,* the Fourth Circuit applied the two-pronged *Abbott* analysis to reject plaintiff's challenge to statutes that led to her placement on the sex offender registry as not ripe because she had not petitioned the state court for removal, the outcome of which was wholly speculative.[9] 713 F.3d 745, 758-760 (4th Cir. 2013). With *Doe,* the Fourth Circuit further explained that even though "the Virginia law itself is harsh on Doe, requiring her to wait to bring this case to federal court until after she has sought permission from a Virginia circuit court will not cause her undue hardship." *Id.*, at 759.

Here, the matter is not yet ripe because there have been no formal proceedings whatsoever; no harm is possible until those proceedings are complete. Moreover, Plaintiff does not suffer hardship because each of his arguments may be addressed through the State proceedings.

Importantly, the longstanding doctrine of constitutional avoidance supports application of the ripeness doctrine. "If there is one doctrine more deeply rooted than any other in the process

---

[9] The *Doe* court found that plaintiff did have standing to challenge her placement on the registry, as that had already occurred, but dismissed that claim nonetheless under Rule 12(b)(6). *Id.*, at 759-760.

of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 568-69, 570 n.34 (1947) (quoting *Spector Motor Service* v. *McLaughlin*, 323 U.S. 101, 105 (1944). Courts should reject requests to resolve a constitution question placed before the court in advance of the necessity for such a decision, or based upon "abstract, hypothetical, or contingent questions . . . ." *Id.*, (quoting *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 461 (1945)); *see also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) ("Always we must balance 'the heavy obligation to exercise jurisdiction,' [...]against the 'deeply rooted' commitment 'not to pass on questions of constitutionality' unless adjudication of the constitutional issue is necessary.") (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 820 (1976) and *Spector Motor Service*, 323 U.S. at, 105.

Ultimately, because there is no present injury, and Plaintiff can only speculate on future injuries, entering a preemptive injunction at this stage would serve "merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *John Lemmon Films, Inc. v. Atlantic Releasing Corp.*, 617 F. Supp. 992, 996 (W.D.N.C. 1985) (citations omitted).

## B. Exercising Jurisdiction Would Violate the *Younger* Abstention Doctrine.

Plaintiff solicits this Court to interfere with state proceedings in violation of the abstention doctrine outlined in *Younger v. Harris,* 401 U.S. 37 (1971). *Younger*, and its progeny, created a "strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n.*, 457 U.S. 423, 431 (1983). The *Younger* abstention doctrine began with state criminal proceedings, but was later expanded to civil enforcement proceedings and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to

11

perform their judicial functions." *New Orleans Pub. Serv., Inc. v. Council of Orleans*, 491 U.S. 350, 368 (1989).

This action falls squarely within the last category as any order of the State Board or Court of Appeals is uniquely in furtherance of North Carolina's judicial functions. The panel's hearing and decision is quasi-judicial in nature because it will involve a factual presentation regarding the qualifications of a candidate, follow traditional rules of evidence, and result in a written finding about the candidate's qualifications in light of existing state law and the Constitution. *Id.* at 369-71 (quoting *Prentis* v. *Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908)); *see also Middlesex,* 457 U.S. at 433-34. The State Board and county boards of elections are quasi-judicial agencies when hearing challenges or protests. *Ponder v. Joslin*, 262 N.C. 496, 501 (1964); *Bouvier v. Porter*, 2021-NCCOA-522, ¶ 28, 865 S.E.2d 732, 741 (2021)).

The Supreme Court in *Middlesex* provided factors to help determine the appropriateness of abstention. *Id.* at 432. It is appropriate where "(1) there is an ongoing state judicial proceeding that began prior to substantial progress in the federal proceeding, (2) that proceeding implicates important, substantial, or vital state interests, and (3) there is an adequate opportunity to raise constitutional challenges within the framework of the state judicial process." *Golphin v. Thomas*, 855 F.3d 278, 285 (4th Cir. 2017) (citing *Middlesex* at 432). This matter meets each factor.

Here, there can be no dispute that the candidate challenge is an ongoing state judicial proceeding that began before this matter. While temporarily stayed, it will continue when the stay is lifted, unless redistricting moots the matter. Assuming a challenge survives redistricting, the State Board will appoint the panel, which will oversee discovery, conduct a hearing, and issue a written ruling. N.C.G.S § 163-127.4. The hearing will be conducted under the North

Carolina Rules of Evidence and the written decision must contain findings of fact and conclusions of law. *Id.*, -127.4(c) and (d). The matter will be immediately appealable to the State Board, and the State Board's decision is appealable to North Carolina Court of Appeals. *Id.*, -127.6. The nature of the panel's proceedings and Plaintiffs' right to appeal that decision to the Court of Appeals renders it an ongoing state judicial proceeding. Thus, the first factor described in *Middlesex* is satisfied.

Second, the proceedings relate to the North Carolina's oversight of its elections and how best to resolve the qualifications of a candidate seeking to represent North Carolina voters. No reasonable argument can be made that this does not involve the most vital of state interests. See Part II-A below for further explanation of state interests in elections.

Third, by proceeding through the state administrative process, Plaintiff will have the opportunity to raise the same constitutional challenges. As stated above, Plaintiff has the right to appeal an adverse challenge decision directly to the Court of Appeals. "[I]t is sufficient under *Middlesex, supra*, at 436, that constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 629 (1986). Moreover, even if he fails to raise the issue to the panel or the State Board, "[w]hen an appeal lies directly to the Appellate Division from an administrative tribunal, in the absence of any statutory provision to the contrary, *see*, *e.g.*, N.C.G.S. § 150B-45(a), a constitutional challenge may be raised for the first time in the Appellate Division as it is the first destination for the dispute in the General Court of Justice." *In re Redmond*, 369 N.C. 490, 497, 797 S.E.2d 275, 280 (2017). *Younger* abstention is appropriate where "constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Beam v. Tatum*, 299 F. App'x 243, 246 (4th Cir. 2008) (citing *Ohio Civil Rights Comm'n*, 477 U.S. at 629.

13

In *Beam*, the Plaintiff was informed of his right to appeal an administrative decision to the Superior Court, Wake County pursuant to N.C.G.S. § 20-91.1. *Id.,* 299 F. App'x at 247. The Plaintiff did not do so; instead, he filed suit in federal court raising constitutional claims under section 1983. *Id.* The Fourth Circuit found that *Younger* abstention was appropriate under those circumstances. *Id.* at 248. To find otherwise would permit all similarly situated litigants with the ability to forum shop rather than follow the review and appellate process outlined under state law. *Id.* at 246 (quoting *Moore v. City of Asheville*, 396 F.3d 385, 388 (4th Cir. 2005) ("[A] defendant to a coercive state administrative proceeding must exhaust his state administrative and judicial remedies and may not bypass them in favor of a federal court proceeding in which he seeks effectively to annul the results of a state administrative body.") Because the candidate challenge process permits Plaintiff to assert constitutional defenses, the third *Middlesex* factor is met.

Plaintiff contends *Younger* does not apply because the state administrative proceeding has been stayed. He is incorrect. A state proceeding is considered pending for the purpose of *Younger*, even when it has been stayed. *See PDX North, Inc. v. Comm'r New Jersey Dep't of Labor & Workforce Dev.*, 978 F.3d 871 (3d Cir. 2020), *cert. denied*, 142 S. Ct. 69 (2021). The case Plaintiff relies upon is distinguishable. In that case, *Southwest Air Ambulance Inc. v. City of Las Cruces*, 268 F.3d 1162 (10th Cir. 2001), the court concluded the *Younger* doctrine did not apply because the state court had "stayed its own proceedings in favor of federal resolution of the issues." Here, by contrast, the stay was issued to allow for state court redistricting litigation unrelated to this matter to be completed. The stay of candidate challenges will be lifted when redistricting is resolved.

14

Thus, it is appropriate for this the Court to abstain from deciding this matter pursuant to the *Younger* abstention doctrine.

## II. Plaintiff Fails to Establish a Likelihood of Success on the Merits, Because He Fails to State a Claim.

### A. Plaintiff Fails to State a Claim for a First Amendment Violation.

In Count I, Plaintiff claims that his First Amendment right to run for political office has been violated when the candidate challenge process was triggered by a challenger's reasonable suspicion. [D.E. 1, ¶¶ 66-72]. According to Plaintiff, the challenge law violates his "First Amendment rights in the same way a peaceful protestor's rights would be violated if arrested based upon a reasonable suspicion." [DE 9 at 2 ¶ 2] Plaintiffs' contentions fail to demonstrate a likelihood of success as to this claim.

Article 1, Section 2, Clause 2, of the U.S. Constitution provides that "[n]o person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." U.S. Const. art. I, § 2, cl. 2.

The Fourteenth Amendment, Section 3, entitled, "Disqualification to Hold Office," specifies that:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3.

As noted *supra*, under N.C.G.S. § 163-127.2, a challenge to a candidate "must be made in a verified affidavit by a challenger, based on reasonable suspicion or belief of the facts stated.

15

Grounds for filing a challenge are that the candidate does not meet the constitutional or statutory qualifications for the office, including residency." N.C.G.S. § 163-127.2(b).

The First Amendment as applied to the States through the Fourteenth Amendment provides that States "shall make no law . . . abridging the freedom of speech." U.S. Const. amends. I and XIV. The Fourth Circuit has acknowledged the existence of a First Amendment right to run for office in *Washington v. Finlay*, 664 F.2d 913, 927-28 (4th Cir. 1981) (noting, in a challenge to an at-large election system which allegedly diluted minority votes, "[t]he first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate do not also include entitlement to success in those endeavors").

Supreme Court jurisprudence indicates that to the extent the right to run for office exists under the First Amendment, it arises from the First Amendment's right to association. *See Cousins v. Wigoda*, 419 U.S. 477, 487 (1975) ("There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity' protected by the First and Fourteenth Amendments. . . . The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." (citation omitted and alteration in original)); s*ee also Anderson v. Celebrezze*, 460 U.S. 780, 793–94 (1983) ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. *794 It discriminates against those candidates").

Because the right to run for office is dependent upon the right of association, a candidate bringing a right-to-run claim must allege that "by running for Congress he was advancing the political ideas of a particular set of voters." *Newcomb v. Brennan*, 558 F.2d 825, 828 (7th Cir.

1977) (noting that given Supreme Court cases "indicate that plaintiff's interest in seeking office, by itself, is not entitled to constitutional protection").

Plaintiff makes no allegations in his Complaint about any voters who associate with him politically. Plaintiff thus fails to state a First Amendment claim based upon that amendment's freedom of association clause. Even if his Complaint could be construed as raising such a claim, he still cannot show a substantial likelihood of success.

Assuming a plaintiff can allege a right-to-run claim without making allegations regarding the freedom of association, Plaintiff has still not demonstrated a substantial likelihood of success. This is because Plaintiffs' argument concerning N.C.G.S. § 163-121.2(b) is fundamentally flawed.

As evident in the discussion of standing above, there has not been a deprivation. Plaintiff has not been deprived of his right to run for office, based upon reasonable suspicion or any other level of suspicion, or based upon any other standard. Nor will he ever be deprived of that opportunity based upon reasonable suspicion alone. A reasonable suspicion is nothing more than a triggering mechanism for the challenge proceeding. [D.E. 9, 1-2] It is merely the standard for the pleading to initiate a judicial proceeding. It is for the quasi-judicial hearing panel to decide, based upon the facts and arguments presented, whether the candidate meets the legal qualifications to stand for election. Plaintiff's right to run for office does not diminish until the petition goes through the statutorily mandated adjudicatory process, and the challenge is not resolved in his favor. For this reason alone, Plaintiff's First Amendment claim fails.

The cases Plaintiff cites reveal that his claim lacks substantiation. Those cases concern the level of justification needed to detain or arrest individuals where they are exercising their First Amendment Right to free speech. *See Tobey v. Jones*, 706 F.3d 379, 390 n.5 (4th Cir. 2013)

17

(indicating that the First Amendment requires more exacting application of Fourth Amendment requirements); *Lowe v. Spears*, 258 F. App'x 568, 570 (4th Cir. 2007) (per curiam) (unpublished) (concluding that officer was not protected by qualified immunity because no reasonable officer would have believed probable cause existed to arrest the plaintiff, as "[a]rresting a person solely based on speech that questions or opposes police action violates the First Amendment"). These cases fail to establish grounds for Plaintiff's claim. Nor are they analogous to the facts in the case. Here again, reasonable suspicion is not being used to detain Plaintiff, or otherwise subject him to any sort of deprivation. It simply triggers North Carolina's candidate challenge procedures.

Finally, Defendants note to the extent Plaintiff's allegations can be construed as raising a ballot-access claim, such a claim also fails to establish a likelihood of success.

"It is well established that ballot-access restrictions 'implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments.'" *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir.1995)). In analyzing whether state election laws impermissibly infringe on such rights, the Supreme Court has instructed lower courts to weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (citing *Anderson*, 460 U.S. at 789 (1983), *and Burdick v. Takshi*, 504 U.S. 428, 434 (1992)). "Election laws will invariably impose some burden upon individual voters. Each provision of a code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting

process itself, inevitably affects-at least to some degree-the individual's right to vote[.]'" *Burdick*, 504 U.S. at 433 (quoting *Anderson*, 460 U.S. at 788).

"[E]lection laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are 'narrowly drawn to advance a state interest of compelling importance.'" *Pisano*, 743 F.3d at 933 (citation omitted). However, "if a statute imposes only modest burdens, then a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.*

North Carolina's candidate challenge law does not violate the First Amendment. Even assuming that the challenge laws impose a burden, any such burden is outweighed by the interest of the State and its people. It is well-established that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974), *quoted in Anderson*, 460 U.S. at 788.

"[A] State has an interest, *if not a duty*, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock v. Carter*, 405 U.S. 134, 145 (1972) (emphasis added). States also have an interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election," and "in ensuring orderly, fair, and efficient procedures for the election of public officials." *Pisano,* 743 F.3d at 937 (cleaned up).

North Carolina's challenge statute serves every one of these objectives. Undoubtedly, the interests of the public to have presented to them a slate of qualified candidates is fundamental to representative government and more than outweighs any burden that may be imposed by North Carolina's challenge statute. For example, if a candidate is disqualified after the primary results

are certified, but before the general election, N.C.G.S. § 163-114 controls. In that circumstance, a district level party committee selects the replacement candidate who will appear on the general election ballot. The primary voters will not be able to choose their candidate. Had they known that their candidate of choice was ineligible, they might have voted for someone else.

Moreover, elections are held at significant time and expense to the State and local governments. If the candidate is disqualified after the general election, resulting in a vacancy, N.C.G.S § 163-13 or § 163.13 would control, and it would result in a special election. To potentially conduct a new election after a candidate is disqualified found to have not qualified to serve is a tremendous waste of time, money, and other resources. County boards of elections, which bear the direct costs of administering elections, have not requested or received funds to conduct a special congressional election. In addition to the administrative and financial hardships, such a whiplash outcome would undermine voter confidence in their ability to elect representatives, a state interest that the Supreme Court has recognized as important. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197, 204 (2008).

Finally, Plaintiff's First Amendment claim is meritless because he argues that the State is violating the First Amendment by enforcing the Fourteenth Amendment. It is well established, however, that the Constitution cannot be "at war with itself." *See Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998) ("No sensible person believes that the supremacy clause, which explicitly binds states to federal law, contradicts the guarantee clause and thereby puts the Constitution at war with itself."). Because the Constitution cannot be at war with itself, Plaintiff's claim that the State is violating the First Amendment by enforcing the Fourteenth Amendment necessarily fails.

### B. Plaintiff Fails to State a Claim for a Procedural Due Process Violation.

In Count II, Plaintiff claims that his Fourteenth Amendment right to procedural due process is violated because the candidate challenge process places the burden by a preponderance on the candidate to prove they are qualified for the office. [D.E. 1, ¶¶ 73-79]. Plaintiff argues the burden-shifting provision is constitutionally infirm specifically where the law operates to disqualify a candidate under Section 3 of the Fourteenth Amendment. Like Plaintiff's allegations supporting Count I, those supporting Count II also fail to show the substantial likelihood of success.

Procedural due process is guaranteed by the Fourteenth Amendment. *See* U.S. Const. amend. XIV. "Procedural due process prevents mistaken or unjust deprivation[.]" *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 145 (4th Cir. 2014). To show entitlement to due process, a plaintiffs must establish "(1) [he possessed] a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012). Those procedures are adequate where the individual allegedly deprived receives "fair notice of impending state action and an opportunity to be heard." *Snider*, 739 F.3d at 149.

The candidate challenge law's burden-shifting framework does not violate Plaintiff's procedural due process rights. First, Plaintiff does not have a liberty or property interest in being a candidate—indeed, he appears to concede this as he has shown no legal basis to support a finding of sufficient liberty or property interest to confer due process rights. Second, and more importantly, assuming arguendo he has a liberty interest or property right in running for office, there has been no deprivation of that right at all because he has not been stopped from running

for office, and he could ultimately be successful in demonstrating that he is not disqualified. Moreover, even if Plaintiff finds his interest in the challenge procedures, shouldering the burden of proof in this process is no deprivation.

Finally, the procedures employed by the candidate challenge law most assuredly are constitutionally adequate, as they give challenged candidates ample opportunity to be heard. The Supreme Court has dictated that when assessing whether procedures give individuals an opportunity to be heard, courts must consider: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Defendant makes no attempt to show that his claims meet these standards. Moreover, examining them shows that challenged candidates have an opportunity to be heard under the candidate challenge law. Starting with the State's interest in the function of the candidate challenge procedure, that interest is paramount, as discussed above.

Moreover, even assuming arguendo running for office can be considered a substantial "private interest," an examination of the extensive procedures employed by the candidate challenge law establishes that there is little if any risk of an erroneous deprivation, and given the procedure's breadth, there is no probable value of additional or substitute procedural safeguards.

To trigger a challenge, a voter must allege in a verified affidavit, under penalty of being convicted of a felony, facts amounting to a reasonable suspicion or belief that the candidate is disqualified. N.C.G.S. § 163-127.2. Although the law does shift the burden to Plaintiff at a

subsequently held hearing, he has an opportunity to take depositions and subpoena witnesses or documents. N.C.G.S. § 163-127.4(a). At the hearing, the presentation of evidence, which can include affidavits, documents, and witnesses under oath, is subject to the North Carolina Rules of Evidence. N.C.G.S. § 163-127.4(c). The list of evidence specified in the statute is non-exclusive. The burden of proof is by a preponderance of the evidence. N.C.G.S. § 163-127.5(a); *see* Herman N. Johnson, Jr., *The Evolving Strong-Basis-In-Evidence Standard*, 32 Berkeley J. Emp. & Lab. L. 347, 357 (2011) (indicating the preponderance-of-the-evidence standard is the minimal standard delineated by the Supreme Court). The panel must issue a written order and make findings of fact and conclusions of law. N.C.G.S. § 163 -127.4(d). Plaintiff has a statutory right to review of the panel's decision by the State Board. N.C.G.S. § 163-127.6(a). The process does not end there. Not only is it subject to review by the State Board, it is also subject to judicial review, as of right, by the Court of Appeals. N.C.G.S. § 163-127.6(a). There, he can raise any and all constitutional claims. *See In re Redmond*, 369 N.C. at 497, 797 S.E.2d at 280.

If there is a dissent in the N.C. Court of Appeals or Plaintiff's case presents a substantial constitutional question, he has a statutory right to further review by the Supreme Court of North Carolina. N.C.G.S. § 7A-30 (2021). He can also seek discretionary review in that court. N.C.G.S. § 7A-31 (2021). And, of course, from there, if Plaintiff's case presents a federal constitutional or other federal question, he can seek certiorari review in the U.S. Supreme Court. U.S. S. Ct. R. 13. In sum, the above procedures are more than adequate to provide Plaintiff with an opportunity to be heard.

The cases Plaintiff cites in opposition are distinguishable. In *Speiser v. Randall*, 357 U.S. 513 (1958), taxpayers challenged a state tax-code provision dictating that to obtain a veterans' property tax exemption, a taxpayer had to prove he did not advocate for the violent overthrow of

23

the Government by signing an oath on his tax form. The Supreme Court struck down the oath requirement, concluding that requiring a taxpayer to carry the burden of proof under those circumstances "[could] only result in a deterrence of speech which the Constitution makes free." *Id.* at 526. This was true because "[a] man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens." *Id.* The Supreme Court determined that the State in *Speiser* did not have a compelling interest to justify what the Supreme Court called its "short-cut procedure," which "place[d] the burdens of proof and persuasion on the taxpayer." *Id.* at 529.

Unlike the State in *Speiser*, the Defendants here are undoubtedly not enforcing a "short-cut procedure." *Id.* The disqualification procedure has numerous safeguards to ensure that a candidate has a full and fair opportunity to refute allegations based on reasonable suspicion. Also unlike in *Speiser*, that procedure does not place the initial burden on the candidate; it shifts it to him upon a showing of reasonable suspicion, based upon allegations made under penalty of being convicted of a felony. He is "not obliged to take the first step in such a procedure." *Id.* at 529. And, most importantly, the State here has a compelling interest, if not a duty, to oversee candidate qualifications, a fundamental aspect of representative government.

Plaintiff seems to imply that the use of burden-shifting schemes, even in civil matters, are prohibited by the Constitution. But burden-shifting schemes have long been recognized as constitutional in a wide variety of civil matters. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (establishing a burden-shifting framework for Title VII claims). The Supreme Court has concluded burden-shifting schemes in civil cases can violate due process, but only when, unlike the candidate challenge law at issue in this case, they are unreasonable,

24

arbitrary, and thus in violation of due process *See, e.g.*, *Western & Atlantic. R.R. v. Henderson*, 279 U.S. 639, 642 (1929) (finding a state statute violated due process where the statue dictated that, in an action for negligence against a railroad, the burden of proof was placed with the defendant-railroad only because the injury for which the plaintiff sought compensation was a death).

For these reasons, Plaintiff's procedural due process claim fails.

C. **Plaintiff Fails to State a Claim that Article I, Section 5 of the United States Constitution Deprives the State of Authority to Determine the Qualifications of Candidates.**

In Count III, Plaintiff claims that North Carolina's candidate challenge process is unconstitutional because it conflicts with Congress's exclusive authority as provided for in Article I, Section 5 of the Constitution to judge the qualifications of its members. [D.E. 1, ¶¶ 80-85]. It seems in Plaintiff's view that the State cannot have a role in regulating candidate qualifications for prospective candidates at all. But of course Plaintiff must also acknowledge that states have long enforced age and residency requirements.

Article I, Section 4 provides that the State shall prescribe "the times, places and manner of *holding elections* for Senators and Representatives[.]" U.S. Const. art. I, § 4 (emphasis added). The U.S. Supreme Court has "approved the States' interests in avoiding 'voter confusion, ballot overcrowding, or the presence of frivolous candidacies,' in 'seeking to assure that elections are operated equitably and efficiently,' and in 'guarding against irregularity and error in the tabulation of votes[.]'" *United States Term Limits v. Thornton*, 514 U.S. 779, 834 (1995) (quoting *Munro v. Socialist Workers Party,* 479 U.S. 189, 194-95 (1986), *Burdick v. Takushi*, 504 U.S. at 433, and *Roudebush v. Hartke*, 405 U.S. 15, 25 (1972)). The Court has also

25

acknowledged that "a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock*, 405 U.S. at 145.

As Plaintiff notes, Article I, Section 5, of the U.S. Constitution provides that "each house shall be the judge of the elections, returns and qualifications of its own members." U.S. Const. art. I, § 5, cl. 1. In policing candidate qualifications pursuant to its constitutionally delegated election duties, however, the State does not run afoul of Article I, Section 5. The State does not judge the qualifications of the elected members of the U.S. House of Representative. It polices *candidate* qualifications prior to the elections. In doing so, as indicated above, States have long enforced age and residency requirements, without question and with very few if any legal challenges. The State has the same authority to police which candidates should or should not be disqualified per Section 3 of the Fourteenth Amendment. The House, pursuant to Article I, Section 5, judges and can make its own "independent final judgment" about the qualifications of its *members. Roudebush*, 405 U.S. at 25*; see also* Jack Maskell *Congressional Research Serv.: Qualifications of Members of Congress* (Jan. 15, 2015) (providing that "a certificate of election or appointment from a governor and Secretary of State (that is, the official 'return')—is considered to be prima facie evidence that the person holding those credentials is entitled to the seat, subject to the final determination of the House or Senate." (footnotes omitted)), *available at* https://sgp.fas.org/crs/misc/R41946.pdf (last visited 2/5/2022).

https://sgp.fas.org/crs/misc/R41946.pdf (last visited 2/5/2022).

Finally, Plaintiff cites two cases to support his argument, a 1968 state supreme court case, *State ex rel. Chavez v. Evans,* 446 P.2d 445 (N.M. 1968), and an unpublished order from a Louisiana federal district court, *Cox v. McCrery*, No. 06-2191, 2007 WL 97142 (W.D. La. Jan. 5, 2007). Both these cases are distinguishable. *Cox* involved a losing candidate suing the winner, a

U.S. House member-elect, by claiming he was not qualified for office because he was no longer an inhabitant of the State. In that case, there was no challenge to the constitutionality of state qualifications law. Rather, the plaintiff tried to enforce that state law. Because the candidate had already become a member-elect, the court held that a qualifications challenge at this time may usurp Congressional power. *Id.* at 3. Here, Plaintiff challenges the validity of a statute seeking to enforce qualifications *before* a candidate stands for election. The court in *Chavez*, 446 P.2d 445, does conclude, based upon Article I, Section 2, that it was erroneous for the state in that case to disqualify a particular candidate for U.S. House because he failed to meet the constitutional qualification that a representative be an inhabitant of the state he represents. But this Court is of course not in any way bound by *Chavez,* and that decision is incorrect for the reasons discussed above. Also, although it is not entirely clear, it appears that above ruling by the court in *Chavez* was made in the alternative to a ruling that the candidate was erroneously disqualified based upon a qualification imposed by the state, which was in addition to the ones listed in the Constitution. *Id.* at 448.

Despite Plaintiff's contrary contentions, the challenge statute simply does not conflict with Congress's authority under Article I, Section 5.

### D. Plaintiff Fails to State a Claim That the Constitution Violates the Amnesty Act of 1872 as Applied to Him.

In Count IV, Plaintiff invokes the Amnesty Act of 1872, which narrowly permitted former Confederates to engage in public civic life during reconstruction. *See* Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872). Plaintiff claims that the Act abrogated Section 3 of the Fourteenth Amendment to allow any member of Congress to engage in insurrection or rebellion without being barred from office.

27

This argument is unavailing. It has long been understood that the Amnesty Act of 1872 was a one-time only waiver of Section 3 of the Fourteenth Amendment that applies only to former Confederates. This was most notably established by the actions of the U.S. House of Representative itself, when in 1920 it applied Section 3 to refuse to seat one of its own members, Victor Berger. *See* Maskell *Congressional Research Serv.: Qualifications of Members of Congress* at 19-20. Berger had been convicted of violating the Espionage Act based on certain activities he undertook during World War I. Clarence Cannon, 6 *Cannon's Precedents of the House of Representatives of the United States* 53-56 (1935) available at https://www.govinfo.gov/collection/precedents-of-the-house?path=/gpo/Precedents%20of%20the%20U.S.%20House%20of%20Representatives/020-Cannon%27s%20Precedents. (last visited 2/7/2022).

The U.S. House committee overseeing the congressional disqualification proceedings regarding Berger examined Section 3 in light of the Amnesty Act of 1898. *Id.* at 55. The committee concluded that the Amnesty Act of 1898 did not waive Section 3 from applying to Berger. *Id.* This was because a "mere statute" could not repeal the U.S. Constitution, and Congress did not have the authority to immunize future acts from enforcement of Section 3. *Id.* The same is true for the act under which Plaintiff begs protection, the Amnesty Act of 1878.

III.    **THE LACK OF IRREPARABLE HARM TO PLAINTIFF, BALANCE OF EQUITIES, AND PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION.**

A.    **Plaintiff Will not Suffer Irreparable Harm.**

The second factor of the *Winter* test requires that plaintiffs demonstrate they will suffer irreparable harm if an injunction is not issued.  *Winter*, 555 U.S. at 20.  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our

characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22.

In the absence of an injunction, Plaintiff would only be a party to an adversarial proceeding before the selected panel, and then before Defendants. Plaintiff claims that even these inconveniences will cause him irreparable harm. But being required to attend a deposition and offer a defense before the panel to allegations regarding whether or not Plaintiff engaged in constitutionally disqualifying actions is not an injury, much less irreparable harm. *Kariuki v. N.C. Dep't of Ins.,* No. 5:18-CV-00341-D, 2021 U.S. Dist. LEXIS 101858, at *3 (E.D.N.C. May 28, 2021).

Moreover, even if Plaintiff were found to be disqualified, he is not without recourse. He has available to him the opportunity to appeal that decision to the Court of Appeals, and potentially the Supreme Court of North Carolina and the Supreme Court of the United States.

The ability to answer the allegations in an adversarial proceeding, to compel documents and testimony from the challengers, and appeal any adverse decision to appellate courts, including the Supreme Court of the United States, assuming he has a valid constitutional issue, does not amount to irreparable harm. For these reasons, Plaintiff cannot show that it is "likely" that he will suffer irreparable harm absent an injunction. *Winter*, 555 U.S. at 22.

**B.    The Equities to Parties and Public Interest Weigh Against Injunction.**

The final two *Winter* factors require Plaintiff to demonstrate that the equities weigh in his favor and that an injunction is in the public interest. *Id*. at 20. In cases involving challenges to governmental action, courts typically consider the balance of the equities and the public interest factors together. *Taliaferro v. N.C. State Bd. of Elections*, No. 5:20-CV-411-BO, 2020 WL 5709252, at *3 (E.D.N.C. Sept. 24, 2020).

29

In contrast to Plaintiff's lack of injury, much less irreparable harm, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

Here, Plaintiff seeks to halt a process before it has even begun. If that request is granted and is later overruled with a holding that he should have been disqualified, it may result in the public being deprived of an election of qualified candidates or the imposition of a special election. If Plaintiff first secures his party's nomination and is disqualified prior to the general election, the district level party committee appoints a replacement nominee to appear on the general election ballot. N.C.G.S. § 163-114(a). If he is disqualified after the general election resulting in vacancy, the State must conduct a special election, complete with a primary. N.C.G.S. § 163-13. As stated above, the latter result, a second election, presents a costly and significant administrative burden to be borne by the State, and both scenarios damage public confidence in the electoral system. *Crawford*, 553 U.S. at 197.

Even more problematic, Plaintiff's Motion seeks to enjoin all candidate challenges in this state—regardless of whether a town council candidate clearly resides outside the municipality, or a district attorney or judge candidate is not a member of the Bar, or a sheriff candidate has a prior felony conviction. The public harm from allowing candidates who would otherwise be unqualified to run in elections, only to be later disqualified, requiring a repeat of the election, would not only tax the public, but may undermine public participation. .

## Conclusion

For the reasons above, the State Board Defendants respectfully request that Plaintiff's motion for a preliminary injunction be denied.

This the 7th day of February, 2022.

JOSHUA H. STEIN
Attorney General

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
tsteed@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25713
mcbabb@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
N.C. State Bar No. 35955
sbrennan@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar No. 24668
amajmundar@ncdoj.gov

Post Office Box 629
Raleigh, NC 27602
Phone: (919) 716-6900
Fax: (919) 716-6763