UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:22-cv-00050-M

| | | |
|---|---|---|
| MADISON CAWTHORN, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF LAW** |
| | ) | **IN SUPPORT OF** |
| v. | ) | **STATE BOARD DEFENDANTS'** |
| | ) | **MOTION TO DISMISS** |
| DAMON CIRCOSTA, in his official capacity | ) | |
| as Chair of the North Carolina State Board of | ) | |
| Elections,, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NOW COME** Defendants Damon Circosta, Stella Anderson, Jeff Carmon, III, Stacy Eggers, IV, Tommy Tucker, and Karen Brinson Bell ("Defendants" or "State Board Defendants"), through undersigned counsel, to provide this memorandum in support of their motion to dismiss.

**Nature of the Case**

The State Board is a quasi-judicial administrative body that has a duty under North Carolina law to oversee candidate challenge proceedings, such as those that were initiated by a group of voters against the Plaintiff. The State Board takes no position on the allegations against Plaintiff, and it may eventually be called upon to address an appeal from a decision adjudicating the challenges against Plaintiff. The State Board is before this Court defending the state law authorizing candidate challenges that Plaintiff has challenged.

Plaintiff raises four claims in his Complaint alleging that North Carolina's candidate challenge law, N.C.G.S. §§ 163-127.1, *et seq*. ("candidate challenge law"), is unconstitutional. [D.E. 1]. This Court should dismiss Plaintiff's Complaint under Rule 12(b)(1) or (b)(6) because Plaintiff lacks standing, his claims are not ripe, the Court should abstain from hearing his claims

per the *Younger* doctrine, and Plaintiff fails to state a claim.

**Statement of Facts**

The State Board relies upon the Statement of Facts in its previously filed Response to Plaintiff's Motion for a Preliminary Injunction, which is incorporated by reference. [D.E. 51].

**Legal Argument**

**I.  PLAINTIFF'S CLAIM SHOULD BE DISMISSED FOR LACK OF JURISDICTION.**

This Court is without jurisdiction[1] because Plaintiff lacks standing and his case is not ripe.

The standard of review for lack of subject matter jurisdiction pursuant to a motion to dismiss under Rule 12(b)(1) is set forth generally in *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Plaintiff bears the burden of proving subject matter jurisdiction on a motion to dismiss. *Id.*; *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

**A.  Plaintiff Lacks an Injury for Article III Standing.**

Article III standing exists only when a plaintiff "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 99 (1979). If a plaintiff has not suffered an injury, there is no standing, *see Allen v. Wright*, 468 U.S. 737, 750-66 (1984), and the action is subject to dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *See, e.g.*, *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).

Plaintiff, who is alleging a future injury, must show "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 156 (2014) (internal quotations omitted). A plaintiff lacks standing when

---

[1] Plaintiff also failed to properly serve Defendants by failing to serve a process agent, *see* Fed. R. Civ. P. 4(j)(2); N.C. R. Civ. P. 4(j)(4), resulting in this Court lacking personal jurisdiction.

2

their claimed injury is "premised on a speculative chain of possibilities." *Clapper v. Amnesty, Int'l USA*, 568 U.S. 398, 410 (2013)(citations omitted). Thus, allegations of a merely possible future injury do not create standing. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

Here, Plaintiff alleges that he may suffer the future harm of being unable to run for office. This is entirely speculative.

First, significant uncertainties remain with regard to even the *initiation* of state proceedings. The congressional district at issue is likely to change imminently, Plaintiff may refile in a new district, and it remains to be determined whether the current challengers would still be eligible to challenge Plaintiff's candidacy or whether a candidate challenge would follow. For example, the speculative nature of the case at present is demonstrated by the fact that the North Carolina legislature's proposed remedial congressional map would move Plaintiff's district (CD-13) over a hundred miles to the east, covering counties where none of the present challengers currently reside. [D.E. 2-3]

Second, as discussed in the next section, Plaintiff has made his claim before he has suffered any harm. Any candidate challenge proceeding may result in Plaintiff successfully demonstrating that he is not disqualified; in that case, he would suffer no injury whatsoever.

Third, Plaintiff cannot show that he faces a substantial risk of harm when the harm can result only from actions taken by independent non-party actors. *Clapper*, 568 U.S. at 413-14. Here, the panel, which is not a party to this action, has yet to be constituted, and has taken no action at all. The party Defendants in this action, after appointing the panel, will have no further role unless and until the panel's determinations are appealed. Thus, to show injury, Plaintiff must establish that he will suffer an injury that is three steps removed from this stage of the litigation: first, the potential, future hearing panel members who are presently unknown independent actors will have

to make a final decision on the challenges to Plaintiff's candidacy; second, that decision will have to be appealed by either the Plaintiff or the challengers (who are also not parties to this lawsuit); and third, the result of that appeal must be against Plaintiff. *Id.*, at 410 (citing *Whitmore*, 495 U.S. at 159-160) (In considering whether a separate court would authorize a surveillance warrant, the *Clapper* Court declined to abandon a longstanding "reluctan[ce] to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.")

Thus, Plaintiff's alleged injury is, at best, speculative, and multiple reasons exist to demonstrate why he lacks standing to pursue these claims.

### B. Plaintiff's Claims Are Not Ripe.

Plaintiff also lacks standing because his claims are not ripe. The ripeness doctrine aims to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977).

*Abbott* established a two-pronged test for ripeness: (1) whether the issues are fit for judicial decision and (2) whether hardship will fall to the petitioning party on withholding court consideration. *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992) (citing *Abbot*, 387 U.S. at 149). Under the first prong, a case is fit for judicial review if "the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Id.* Under the second prong, hardship "is measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law." *Id.*

4

Under the first prong, the issues presented by Plaintiff are not yet ripe for this Court's review. While Plaintiff has raised legal questions, no agency action has occurred, much less an adverse agency action that could give rise to injury. Plaintiff therefore cannot show that he has been or will imminently be injured. Rather, he alleges that "[*i*]*f successful*, a Challenge to his candidacy would prevent him from running for Congress . . .", [h]is *potential* injury is not in any way hypothetical …", and "Rep. Cawthorn's *potential* disqualification . . . ." [D.E. 1, ¶¶ 52, 53, 55; D.E. 8, pp. 8-9] (emphasis added). In short, Plaintiff's claims are not yet ripe because the alleged harm is entirely dependent on "future uncertainties [and] intervening agency rulings." *Charter,* 976 F.2d at 208-09.

As to the second prong, withholding court consideration until a later date, if at all, presents no hardship to Plaintiff. Permitting the state matter to proceed does not in any way limit Plaintiff's defenses or likelihood of success overall. Plaintiff is free to present any argument he is making here through that process. If he is adversely affected, he is entitled to an expedited appeal to the State Board, followed by review by the North Carolina Court of Appeals. He will then have the option to seek further review from the North Carolina Supreme Court and even the United States Supreme Court assuming he has a justiciable federal issue. Therefore, interceding at this point is unnecessary and refusing to do so presents no hardship to Plaintiff.

Other courts considering similar challenges to an agency action have routinely found that such matters are not ripe for judicial determination until the agency has substantially completed its work. For a claim to be ripe, it must involve "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *Arch Mineral Corp. v. Babbitt,* 104 F.3d 660, 665 (4th Cir. 1997) (alteration in original) (quoting *Charter Fed. Sav. Bank*, 976 F.2d at 208). In *Babbitt*, the Fourth Circuit found that the case was sufficiently ripe

because the outcome of the agency process, while not formally finished, was all but final and the injury to the party was clear. *Id.* at 668. For comparison, in *Charter*, the Fourth Circuit held that where an agency was required to make multiple decisions and take several actions before an injury could occur, the issues were not ripe for judicial decision. 976 F.2d at 208-09.

Similarly, in *Doe v. Va. Dep't of State Police,* the Fourth Circuit applied the two-pronged *Abbott* analysis to reject plaintiff's challenge to statutes that led to her placement on the sex offender registry as unripe because she had not petitioned the state court for removal, the outcome of which was wholly speculative.[2] 713 F.3d 745, 758-760 (4th Cir. 2013). With *Doe,* the Fourth Circuit further explained that even though "the Virginia law itself is harsh on Doe, requiring her to wait to bring this case to federal court until after she has sought permission from a Virginia circuit court will not cause her undue hardship." *Id.*, at 759.

Here, the matter is not yet ripe because there have been no formal proceedings whatsoever; no harm is possible until those proceedings are complete. Plaintiff has not, and will not, suffer hardship because each of his arguments may be addressed through the State proceedings.

Importantly, the longstanding doctrine of constitutional avoidance supports finding ripeness. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 568-70 n.34 (1947) (quoting *Spector Motor Service* v. *McLaughlin*, 323 U.S. 101, 105 (1944)). Courts should reject requests to resolve a constitutional question in advance of the necessity for such a decision, or based upon "abstract, hypothetical, or contingent questions . . . ." *Id.* (citations omitted).

---

[2] The *Doe* court found that plaintiff did have standing to challenge her placement on the registry, as that had already occurred, but dismissed that claim nonetheless under Rule 12(b)(6). *Id.*, at 759-760.

6

For these reasons, this Court should dismiss Plaintiff's Complaint for lack of jurisdiction.

## C. Exercising Jurisdiction Would Violate the *Younger* Abstention Doctrine.

Plaintiff solicits this Court to interfere with state proceedings in violation of the abstention doctrine outlined in *Younger v. Harris,* 401 U.S. 37 (1971). *Younger*, and its progeny, created a "strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n.*, 457 U.S. 423, 431 (1983). The *Younger* abstention doctrine began with state criminal proceedings, but was later expanded to civil enforcement proceedings and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *New Orleans Pub. Serv., Inc. v. Council of Orleans*, 491 U.S. 350, 368 (1989); *c.f. Sprint Comms. v. Jacobs*, 571 U.S. 69, 78 (2013).

This action falls within the last category as an order related to candidate challenges from the State Board or Court of Appeals is uniquely in furtherance of North Carolina's judicial functions. The panel's hearing and decision is quasi-judicial in nature because it will involve a factual presentation regarding the qualifications of a candidate, follow traditional rules of evidence, and result in a written finding about the candidate's qualifications in light of existing state law and the Constitution. *New Orleans Pub. Serv., Inc.*, 491 U.S. at 369-71 (citation omitted); *see also Middlesex,* 457 U.S. at 433-34. The State Board and county boards of elections are quasi-judicial agencies when hearing challenges or protests. *Ponder v. Joslin*, 262 N.C. 496, 501 (1964); *Bouvier v. Porter*, 2021-NCCOA-522, ¶ 28, 865 S.E.2d 732, 741 (2021)).

The Supreme Court in *Middlesex* provided factors to help determine the appropriateness of abstention. 457 U.S. at 432. It is appropriate where "(1) there is an ongoing state judicial proceeding that began prior to substantial progress in the federal proceeding, (2) that proceeding

implicates important, substantial, or vital state interests, and (3) there is an adequate opportunity to raise constitutional challenges within the framework of the state judicial process." *Golphin v. Thomas*, 855 F.3d 278, 285 (4th Cir. 2017) (citing *Middlesex* at 432).

Here, there can be no dispute that the candidate challenge is an ongoing state judicial proceeding that began before this matter. While temporarily stayed, it will continue when the stay is lifted, unless redistricting moots the matter. Assuming a challenge survives redistricting, the State Board will appoint the panel, which will oversee discovery, conduct a hearing, and issue a written ruling. N.C.G.S § 163-127.4. The hearing will be conducted under the North Carolina Rules of Evidence and the written decision must contain findings of fact and conclusions of law. *Id.*, -127.4(c) and (d). The matter will be immediately appealable to the State Board, and the State Board's decision is appealable to North Carolina Court of Appeals. *Id.*, -127.6. The nature of the panel's proceedings and Plaintiffs' right to appeal that decision to the Court of Appeals renders it an ongoing state judicial proceeding.

Second, the proceedings relate to the North Carolina's oversight of its elections and how best to ensure the qualifications of a candidate seeking to represent North Carolina voters—matters of important state interest. Ensuring that only qualified candidates are placed on the ballot for elective office is an important state interest. This requirement serves the dual purpose of preventing costly special elections while promoting confidence in elections. *See* Part II-A below for further explanation of state interests in elections.

Third, exhaustion of the administrative process will afford Plaintiff the opportunity to raise the same constitutional challenges. As stated above, Plaintiff has the right to appeal an adverse challenge decision directly to the Court of Appeals. "[I]t is sufficient under *Middlesex,* that constitutional claims may be raised in state-court judicial review of the administrative proceeding."

8

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 629 (1986) (citation omitted); *see also Ragland v. NC State Bd. of Educ.*, No. 5:16-CV-288-FL, 2017 U.S. Dist. LEXIS 106765, at *7 (E.D.N.C. July 11, 2017) (Finding *Younger* abstention appropriate where state-court judicial review of administrative proceedings presented a sufficient opportunity for plaintiff to raise constitutional challenges); *PDX North, Inc. v. Comm'r N.J. DOL & Workforce Dev.*, 978 F.3d 871, 885 (3d Cir. 2020), *cert. denied*, 142 S. Ct. 69 (2021) (Finding same). Moreover, "[w]hen an appeal lies directly to the Appellate Division from an administrative tribunal, in the absence of any statutory provision to the contrary, *see*, *e.g.*, N.C.G.S. § 150B-45(a), a constitutional challenge may be raised for the first time in the Appellate Division as it is the first destination for the dispute in the General Court of Justice." *In re Redmond*, 369 N.C. 490, 497, 797 S.E.2d 275, 280 (2017).

Plaintiff contends *Younger* does not apply because the state administrative proceeding has been stayed. He is incorrect. A state proceeding is considered pending for the purpose of *Younger*, even when it has been stayed. *See PDX North, supra,* 978 F.3d at 885 (3d Cir. 2020). Here, the stay was issued to allow for state court redistricting litigation unrelated to this matter to be completed, which is scheduled to occur this week.

Thus, it is appropriate for this Court to invoke the *Younger* abstention doctrine and dismiss Plaintiff's Complaint accordingly.

## II. PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM.

As an alternative to dismissing Plaintiff's Complaint under Rule 12(b)(1), the Court should dismiss it under Rule 12(b)(6) because Plaintiff fails to state a claim.

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "Threadbare recitals of the

9

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. None of the four claims in the Complaint have sufficient merit to survive Rule 12(b)(6).

### A. Plaintiff Fails to State a Claim for a First Amendment Violation.

In Count I, Plaintiff claims that his First Amendment right to run for political office has been violated when the candidate challenge process was triggered by a challenger's reasonable suspicion or belief. This argument is meritless.

Article 1, Section 2, Clause 2, of the U.S. Constitution provides that "[n]o person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." U.S. Const. art. I, § 2, cl. 2. The Fourteenth Amendment, Section 3, makes an addition to the perquisite qualifications entitled, "Disqualification to Hold Office," which states:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3.

As noted *supra*, under N.C.G.S. § 163-127.2, a challenge to a candidate "must be made in a verified affidavit by a challenger, based on reasonable suspicion or belief of the facts stated. Grounds for filing a challenge are that the candidate does not meet the constitutional or statutory qualifications for the office, including residency." N.C.G.S. § 163-127.2(b).

The First Amendment as applied to the States through the Fourteenth Amendment provides that States "shall make no law . . . abridging the freedom of speech." U.S. Const. amends. I and

XIV. The Fourth Circuit acknowledged the existence of a First Amendment right to run for office in *Washington v. Finlay*, 664 F.2d 913, 927-28 (4th Cir. 1981). Specifically, in rejecting a First Amendment challenge to an at-large election system which allegedly diluted minority votes, the Court held in *Washington*, with little discussion, that "[t]he first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate do not also include entitlement to success in those endeavors." *Id.*

Supreme Court jurisprudence indicates that to the extent the right to run for office exists under the First Amendment, it arises from the First Amendment's right to association. *See Cousins v. Wigoda*, 419 U.S. 477, 487 (1975) ("The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." (citation omitted)); *see also Anderson v. Celebrezze*, 460 U.S. 780, 793–94 (1983) ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates.").

Because the right to run for office is dependent upon the right of association, a candidate bringing a right-to-run claim must allege that "by running for Congress he was advancing the political ideas of a particular set of voters." *Newcomb v. Brennan*, 558 F.2d 825, 828 (7th Cir. 1977). Here, Plaintiff makes no allegations about any voters who associate with him politically. Plaintiff thus fails to state a First Amendment claim.

Even if it is assumed a plaintiff can allege a right-to-run claim without making such associational allegations, Plaintiff still has not sufficiently stated a claim because his argument concerning the candidate challenge law is fundamentally flawed. As evident in the discussion of standing above, there has not been a deprivation. Plaintiff has not been deprived of his right to run for office, based upon reasonable suspicion or any other standard. Nor will he ever be deprived of

11

that opportunity based upon reasonable suspicion alone. A reasonable suspicion or belief, as utilized in the candidate challenge statutory procedure, is merely the standard for the pleading to initiate that proceeding. It is for the quasi-judicial hearing panel to decide, based upon the facts and arguments presented, whether the candidate meets the legal qualifications to stand for election. Plaintiff's right to run for office is not diminished because of the reasonable suspicion standard—rather, it is dependent on the result of the entire adjudicatory process. Because Plaintiff alleges no deprivation at all, his First Amendment claim fails.

The cases Plaintiff cites reveal that his claim is unsubstantiated. Those cases concern the level of justification needed to detain or arrest individuals where they are exercising their First Amendment Right to free speech. *See Tobey v. Jones*, 706 F.3d 379, 390 n.5 (4th Cir. 2013) (indicating that the First Amendment requires more exacting application of Fourth Amendment requirements); *Lowe v. Spears*, 258 F. App'x 568, 570 (4th Cir. 2007) (per curiam) (unpublished) ("Arresting a person solely based on speech that questions or opposes police action violates the First Amendment"). These cases fail to establish grounds for Plaintiff's claim. Nor are they analogous to the facts in the case. Reasonable suspicion is not being used to detain Plaintiff, or otherwise subject him to any sort of deprivation.

Finally, to the extent Plaintiff intended to raise a ballot-access claim, his allegations also fail to state such a claim. "It is well established that ballot-access restrictions 'implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments.'" *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (citation omitted). In analyzing whether state election laws impermissibly infringe on such rights, the Supreme Court has instructed lower courts to weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put

12

forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (citing *Anderson*, 460 U.S. at 789, *and Burdick v. Takshi*, 504 U.S. 428, 434 (1992)). "Election laws will invariably impose some burden upon individual voters. Each provision of a code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects-at least to some degree-the individual's right to vote[.]'" *Burdick*, 504 U.S. at 433 (quoting *Anderson*, 460 U.S. at 788).

"[E]lection laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are 'narrowly drawn to advance a state interest of compelling importance.'" *Pisano*, 743 F.3d at 933 (citation omitted). However, "if a statute imposes only modest burdens, then a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.*

The candidate challenge law is not an unconstitutional ballot-access restriction. The burden it imposes on candidates is minimal at best. When a challenge is filed, candidates are required to prove they are eligible to stand for office by a mere preponderance of the evidence. And not every candidate is required to avail themselves of the challenge process to gain access to the ballot. They are only required to do so when a challenge is lodged against them by a registered voter based on reasonable suspicion of facts proving ineligibility.

Moreover, the burden, if any, imposed by the candidate challenge law is outweighed by the compelling interest of the State and its people. It is well-established that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974), *quoted in Anderson*, 460 U.S. at 788. "[A] State has an interest, *if not a duty*, to

protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock v. Carter*, 405 U.S. 134, 145 (1972) (emphasis added). States also have an interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election," and "in ensuring orderly, fair, and efficient procedures for the election of public officials." *Pisano,* 743 F.3d at 937 (cleaned up).

North Carolina's challenge law serves these objectives. Undoubtedly, the public's interest in having only eligible candidates is fundamental to representative government and more than outweighs any burden that may be imposed on candidates by North Carolina's challenge law. For example, if a candidate is disqualified after the primary results are certified, but before the general election, N.C.G.S. § 163-114 controls. In that circumstance, a district level party committee selects the replacement candidate who will appear on the general election ballot. The primary voters will not be able to choose their candidate. Had they known that their candidate of choice was ineligible, they might have voted for someone else.

Moreover, elections are held at significant time and expense to the State and local governments. If the candidate is disqualified after the general election, resulting in a vacancy, N.C.G.S § 163-13 or § 163-182.13 would control, and it would result in a special election. To potentially conduct a new election after a candidate is disqualified from taking office is a tremendous waste of state and county resources. Counties, which bear the direct costs of administering elections, N.C.G.S. §§ 163-33(4)-(6) & (11), -37, -46, do not budget for conducting any special congressional election, *see id.* § 163-33(11). In addition to the administrative and financial hardships, such a whiplash outcome would undermine voter confidence the State's electoral process, a governmental interest that the Supreme Court has recognized as important. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197, 204 (2008).

14

To conclude, Plaintiff's Count I fails to state a claim.

**B.  Plaintiff Fails to State a Claim for a Procedural Due Process Violation.**

In Count II, Plaintiff claims that his Fourteenth Amendment right to procedural due process is violated because the candidate challenge process places the burden by a preponderance on the candidate to prove they are legally eligible for office. Plaintiff argues the burden-shifting provision is constitutionally infirm specifically where the law operates to disqualify a candidate under Section 3 of the Fourteenth Amendment. Like Plaintiff's allegations supporting Count I, those supporting Count II also fail to state a claim.

Procedural due process is guaranteed by the Fourteenth Amendment. *See* U.S. Const. amend. XIV. It "prevents mistaken or unjust deprivation[.]" *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 145 (4th Cir. 2014). To show entitlement to due process, a plaintiff must establish "(1) [he possessed] a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012). Those procedures are adequate where the plaintiff receives "fair notice of impending state action and an opportunity to be heard." *Snider Int'l*, 739 F.3d at 149.

The candidate challenge law's burden-shifting framework does not violate Plaintiff's procedural due process rights. First, Plaintiff does not have a liberty or property interest in being a candidate. *See Snowden v. Hughes*, 321 U.S. 1, 7 (1944) ("More than forty years ago this Court determined that an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause. … [W]e reaffirm it now."); *Wilson v. Birnberg*, 667 F.3d 591, 598 (5th Cir. 2012) (rejecting procedural due process claim similar to Plaintiff's and asserting "public office does not constitute property within the meaning

15

of the Due Process Clause."); *Wilson v. Moore*, 346 F. Supp. 635, 643 (N.D.W. Va. 1972) ("…the question of whether an elective post in state government constitutes such property or liberty as that protected by the Due Process Clause of the Fourteenth Amendment … has been answered rather emphatically by the Supreme Court." (quoting *Snowden* at 7)). Indeed, in this case, Plaintiff appears to concede this, as he has offered no legal basis for concluding he has a liberty or property interest at stake.

Second, and more importantly, assuming arguendo he has a liberty interest or property right in running for office, there has been no deprivation of that right at all because he has not been stopped from running for office, and he could ultimately be successful in demonstrating that he is eligible. Moreover, even if Plaintiff finds his interest in the challenge procedures, shouldering the burden of proof in this process is no deprivation.

Finally, the procedures employed by the candidate challenge law are more than constitutionally adequate, as they give challenged candidates ample opportunity to be heard. The Supreme Court instructs that when assessing whether procedures give individuals an opportunity to be heard, courts must consider: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Plaintiff makes no attempt to show that his claim meets these standards, which it plainly cannot. Starting with the State's interest in the function of the candidate challenge procedure, that interest is paramount, as discussed above. Next, even assuming arguendo running for office can

16

be considered a substantial "private interest," an examination of the extensive procedures employed by the candidate challenge law establishes that there is little if any risk of an erroneous deprivation. And given the significant safeguards built into the procedure, there is no probable value of additional or substitute procedural safeguards.

To trigger a challenge, a voter must allege in a verified affidavit, under penalty of being convicted of a felony, facts amounting to a reasonable suspicion or belief that the candidate is disqualified.[3] N.C.G.S. § 163-127.2. Plaintiff then has the burden of proving he is qualified at a subsequently held hearing. N.C.G.S. § 163-127.5(a). Prior to the hearing, he has an opportunity to take depositions and subpoena witnesses or documents. N.C.G.S. § 163-127.4(a). At the hearing, the presentation of evidence, which can include affidavits, documents, and witnesses under oath, is subject to the familiar safeguards of the North Carolina Rules of Evidence. N.C.G.S. § 163-127.4(c). The list of evidence specified in the statute is non-exclusive. The burden of proof is by a mere preponderance of the evidence, not by clear and convincing evidence or beyond a reasonable doubt. N.C.G.S. § 163-127.5(a). The panel must issue a written order and make findings of fact and conclusions of law. N.C.G.S. § 163 -127.4(d). Plaintiff has a statutory right to expedited review by the State Board. N.C.G.S. § 163-127.6(a). The process does not end there. Any decision by the State Board is immediately subject to judicial review, as of right, by the Court of Appeals. N.C.G.S. § 163-127.6(a). There, Plaintiff can raise any and all constitutional claims. *See In re Redmond*, 369 N.C. at 497, 797 S.E.2d at 280.

If there is a dissent in the Court of Appeals or Plaintiff's case presents a substantial constitutional question, he has a statutory right to further review by the Supreme Court of North

---

[3] North Carolina's Candidate Challenge Form is publicly available on the State Board's website: https://s3.amazonaws.com/dl.ncsbe.gov/Forms/2021/Candidate_Challenge_Form_Fillable_2021 07.pdf

Carolina. N.C.G.S. § 7A-30. He can also seek discretionary review in that court. N.C.G.S. § 7A-31. And, of course, from there, if Plaintiff's case presents a federal question, he can seek certiorari review in the U.S. Supreme Court. U.S. S. Ct. R. 13. In sum, the above procedures are more than adequate to provide Plaintiff with an opportunity to be heard.

The case Plaintiff cites to support his argument in opposition is distinguishable. In *Speiser v. Randall*, 357 U.S. 513 (1958), taxpayers challenged a state tax-code provision dictating that to obtain a veterans' property tax exemption, a taxpayer was required to establish he did not advocate for the violent overthrow of the Government by first signing an oath on his tax form. The taxpayer then had to provide other proof of the same, depending upon review of his oath affirmation. The Supreme Court struck down the oath requirement, concluding that requiring a taxpayer to carry the burden of proof under those circumstances "[could] only result in a deterrence of speech which the Constitution makes free." *Id.* at 526.

*Speiser* does not support Plaintiff's procedural due process claim. Unlike Plaintiff's theory of relief, that case was grounded in the well-established principle that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech," *Perry v. Sindermann*, 408 U.S. 593, 596-98 (1972). It can, however, deny a benefit like the tax exemption in *Speiser* based upon *unprotected,* unlawful speech.

The problem in *Speiser*, according to the Supreme Court, was that "the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed or punished [was] finely drawn." *Speiser*, 357 U.S. at 529. To ensure that a state did not use a person's protected speech to deny that person a government benefit (thereby unconstitutionally infringing on that person's First Amendment right to free speech), the Court in *Speiser* held that "[w]hen the

18

State undertakes to restrain unlawful advocacy it must provide procedures which are adequate to safeguard against infringement of constitutionally protected rights." *Id.* at 521, 525. And the Supreme Court ultimately concluded the procedure for regulating the tax exemption in *Speiser* was unconstitutional because the "separation of legitimate from illegitimate speech call[ed] for more sensitive tools than [the state in that case had] supplied." *Id.* at 525.

Here, Plaintiff is not alleging the State Board is using any of his speech that skirts the line between protected and unprotected speech to take away a benefit and that "more sensitive tools" are therefore needed to discern whether his speech was protected or unprotected. *Id.* It follows that *Speiser* does not support Plaintiff's claim.

Plaintiff is alleging, simply, that the procedure used by the State Board to disqualify him as a candidate, the candidate challenge law, is inadequate. That is a straightforward procedural due process claim, to which the above analysis from *Mathews v. Eldridge* applies. And, under that analysis, Plaintiff's claim fails, as explained above.

Also, unlike in *Speiser*, the candidate challenge law does not subject candidates to adverse governmental action for engaging in constitutionally protected activity. The danger in *Speiser* was that the state could deprive a benefit based on "advoca[cy]," *Speiser*, 357 U.S. at 516, which included expressive activity protected by the First Amendment; whereas a challenge proceeding to enforce the disqualification clause of the Fourteenth Amendment is necessarily concerned with activity that is *not* protected by the Constitution, "engag[ing] in insurrection or rebellion." U.S. Const. amend. XIV, § 3. As the Supreme Court would later make clear, "*Speiser* was explicitly limited so as not to reach cases where, as here, there is no showing of an intent to penalize political beliefs." *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 54 (1961).

Finally, the procedure used in *Speiser* is also distinguishable from the procedure challenged in this case. Unlike the State in *Speiser*, Defendants here are undoubtedly not enforcing a "short-cut procedure." *Speiser*, 357 U.S. at 529. The disqualification procedure has numerous safeguards to ensure that a candidate has a full and fair opportunity to refute allegations. Also unlike in *Speiser*, that procedure does not place the initial burden on the candidate; it shifts it to him upon a showing of reasonable suspicion, based upon allegations made under penalty of being convicted of a felony. He is "not obliged to take the first step in such a procedure." *Id.* at 529. And, most importantly, the State here has a compelling interest, if not a duty, to enforce candidate eligibility requirements to ensure that the public's representatives occupy their office lawfully. For these reasons, Plaintiff's procedural due process claim fails.

### C. Plaintiff Fails to State a Claim that Article I, Section 5, of the United States Constitution Deprives the State of Authority to Determine the Qualifications of Candidates.

In Count III, Plaintiff claims that North Carolina's candidate challenge process is unconstitutional because it conflicts with Congress's exclusive authority as provided for in Article I, Section 5 of the Constitution to judge the qualifications of its members. Here again, Plaintiff's argument is meritless.

It seems in Plaintiff's view that the State cannot have a role in regulating federal candidate qualifications for candidates at all. But Plaintiff must also acknowledge that states have long enforced the constitutional qualifications for congressional candidates, including through state administrative procedures to ensure only eligible candidates appear on the ballot. *See, e.g.* N.C.G.S. §§ 163-106.2(a) & -106.5(b) (2021) (providing that the State Board "shall" inspect a notice of candidacy for U.S. House and cancel the notice for any person who fails to meet "the constitutional or statutory qualifications for the office, including residency"); Ariz. Rev. Stat. § 16-351B (2021) (providing for candidate challenges based upon "any reason relating to

20

qualifications for the office sought as prescribed by law"); Colo. Rev. Stat. § 1-4-501 (2021) (providing, among other things, that election officials can only certify candidates who swear under oath that they meet the applicable qualifications and that voters can challenge candidate eligibility by filing verified petitions); N.H. Rev. Stat. Ann. § 665:7 (2021) (allowing state Ballot Law Commission to hear disputes about "nomination papers or declarations of candidacy," and providing that the Commission's decision is final); Ind. Code Ann. §§ 3-8-1-8, 3-8-2-3, & 3-8-8-1, *et al.* (2021) (providing that U.S. House candidate must have the qualifications specified in the U.S. Constitution, and establishing a candidate challenge process); Neb. Rev. Stat. §§ 32-503 & -624 (2021) (providing that candidates for U.S. House "shall" meet the qualifications in Article I, Section 2; that candidate filing forms are subject to objections; and that state political parties can file legal actions "to determine the legality of any candidate for a state or congressional office"); Va. Code Ann. § 24.2-501 (2021) (providing that candidates for U.S. House "shall" file a statement of qualification under oath with the state board of elections); Minn. Stat. Ann. § 204B.06 (2021) (stating that U.S. House candidates are required to file affidavit affirming "the candidate will be an inhabitant of this state when elected and will be 25 years of age or older and a citizen of the United States for not less than seven years on the next January 3").

Article I, Section 4, provides that the State shall prescribe "the times, places and manner of *holding elections* for Senators and Representatives[.]" U.S. Const. art. I, § 4 (emphasis added). The U.S. Supreme Court has "approved the States' interests in avoiding 'voter confusion, ballot overcrowding, or the presence of frivolous candidacies,' in 'seeking to assure that elections are operated equitably and efficiently,' and in 'guarding against irregularity and error in the tabulation of votes[.]'" *United States Term Limits v. Thornton*, 514 U.S. 779, 834 (1995) (quoting *Munro v. Socialist Workers Party,* 479 U.S. 189, 194-95 (1986), *Burdick v. Takushi*, 504 U.S. at 433, and

21

*Roudebush v. Hartke*, 405 U.S. 15, 25 (1972)). The Court has also acknowledged that "a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock*, 405 U.S. at 145.

Article I, Section 5, of the U.S. Constitution provides that "each house shall be the judge of the elections, returns and qualifications of its own members." U.S. Const. art. I, § 5, cl. 1. In reviewing candidate qualifications pursuant to its constitutionally delegated election duties, however, the State does not run afoul of Article I, Section 5. The State does not judge the qualifications of the elected members of the U.S. House of Representative. It reviews *candidate* qualifications prior to the elections. *See, e.g.*, *In re Nomination Papers of Carlson*, 430 A.2d 1210, 1211-12 (Pa. Cmwlth. Ct.) (concluding Congress could judge the qualifications of "a newly-seated Congressman's qualifications" but only "*after* his election," and issuing an order directing the pre-election enforcement of the Constitution's habitation requirement for a congressional candidate to "preserv[e] the integrity of the election process" (emphasis added)), *aff'd*, 430 A.2d 1155 (Pa. 1981).

The Supreme Court has examined the U.S. House's authority under Article I, Section 5, to judge the qualifications of its members, against the State's authority to judge the qualifications of candidates, most notably in two cases, *Storer v. Brown*, 415 U.S. 724, and *United States Term Limits v. Thornton*, 514 U.S. 779.

In *Storer,* the Supreme Court rejected the argument that a state's law providing ballot access for unaffiliated candidates added a qualification for congressional office over and above those provided for in U.S. Constitution. *Id.* at 726. That law denied an otherwise qualified independent candidate a place on the ballot where "he voted in the immediately preceding primary or if he had registered affiliation with a qualified political party at any time within one year prior

to the immediately preceding primary election" *Id.*(citations omitted). In specifically addressing the State's constitutional authority concerning elections, the Court in *Storer* emphasized that

> the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates. . . . It is very unlikely that all or even a large portion of the state election laws would fail to pass muster under our cases[.]

*Id.* at 730.

Twenty years later in *United States Term Limits,* 514 U.S. 779, the Court invalidated a state constitutional amendment imposing term limits on "otherwise-eligible candidates for Congress." *Id.* at 783. This was because the amendment had "the likely effect of handicapping a class of candidates," those being candidates who served in Congress for the length of time designated by the amendment, and had "the sole purpose of creating *additional* qualifications," albeit doing so indirectly. *Id.* at 836 (emphasis added). The Court made it clear that the only qualifications for congressional office were those in the Constitution and that the State had no authority to add others. *Id.*

The Court in *U.S. Term Limits* distinguished the law at issue in *Storer*, noting the nonaffilation provision was constitutional because it

> regulated election procedures and did not even arguably impose any substantive qualification rendering a class of candidates ineligible for ballot position. They served the state interest in protecting the integrity and regularity of the election process, an interest independent of any attempt to evade the constitutional prohibition against the imposition of additional qualifications for service in Congress.

*U.S. Term Limits,* 514 U.S. at 835. The express ruling in *U.S. Term Limits*, that a State cannot create additional qualifications, reflects an implied understanding that a State can enforce Constitutional qualifications.

23

By ensuring that U.S. House candidates meet the federal constitutional qualifications, including by enforcing the disqualification in Section 3 with the candidate challenge law, the State Board is not doing what *U.S. Term Limits* held is prohibited by the Constitution. It is not adding qualifications for congressional members. It is, like the state in *Storer*, simply exercising its authority to administer the election by utilizing procedures which serve the State's interest to, among other things, ensure that only eligible candidates are placed before the voters.

State agencies, like the State Board, have, as indicated above, long been authorized through legislation to review and enforce age and residency requirements for candidates, and where such requirements do not add qualifications to the ones dictated by the Constitution, States have done so without question and with very few if any notable legal challenges. In fact, undersigned counsel could find only four cases in which State legislation or State actions enforcing the Constitutional qualifications for congressional candidates have been challenged. *See Schaefer v. Townsend*, 215 F.3d 1031 (9th Cir. 2000); *Texas Democratic Party v Benkiser*, 459 F.3d 582 (5th Cir. 2006); *Matter of Kryzan v. N.Y. State Bd. of Elections*, 55 A.D.3d 217 (N.Y. Sup. Ct, App. Div. 2008); *State ex. re. Chavez v. Evans*, 446 P.2d 445 (N.M. 1968) (relied upon Plaintiff in his preliminary injunction motion). All four cases challenged only state residency or habitation requirements or the State's enforcement of the constitutional habitation qualification, *id.,* and in only one of the four did a court squarely determine a State could not enforce the constitutional habitation requirement, *see Benkiser*, 459 F.3d 582 (concluding the state could not enforce constitutional habitation requirement against U.S. House candidate before the election, noting that habitation was a qualification which was fluid, and that it was therefore possible for the candidate to still be an inhabitant of the state on election date); *cf. State ex rel. Fleming v. Crawford*, 10 So. 118, 127 (Fla. 1891) (stating in dicta that only the U.S. Senate can judge qualifications). At most *Benkiser* stands

for the proposition that a State cannot prevent a candidate from appearing on the ballot before an election based upon the constitutional habitation requirement because the Constitution only requires that they be an inhabitant of the State in question *on election day*; a fact which cannot be known until election day itself. The same is not true of the other qualifications, including the one in Section 3.

Furthermore, the decision in *Benkiser* was expressly rejected by another court in *Matter of Kryzan* , 55 A.D.3d at 1220. Unlike the court in *Bekisker*, the court in *Kryzan* held a U.S. House candidate had become disqualified by moving out of state and thus could petition the state board of elections to allow an alternative candidate to run. *Id.* That court concluded "the Board was *duty bound* to accept [the petition]." *Id.* at 1221 (emphasis added); *see also Storer*, 415 U.S. at 373 (stating in dicta the federal district court "need not have heard a challenge to [] other provisions of the California Elections Code by one who did not satisfy the age requirement for becoming a member of Congress, and there was no more reason to consider them at the request of [plaintiff congressional and presidential candidates] or at the request of voters who desire to support unqualified candidates").

The court in *Chavez*, 446 P.2d 445, did conclude, based upon Article I, Section 2, that it was erroneous for the state in that case to disqualify a particular candidate for U.S. House because he failed to meet the constitutional qualification that a representative be an inhabitant of the state he represents. *Chavez*, 446 P.2d at 448-49. But the decision in *Chavez* is vague at best. And it appears that the court's ruling was made in the alternative to its ruling that the candidate was erroneously disqualified based upon an *additional* qualification imposed by the state which was not listed in the U.S. Constitution. *Id.* at 448. Also, it is notable that the ruling came after the court in *Chavez* cited evidence showing the candidate had indeed established he was an inhabitant. *Id.*

Finally, although the court in *Schaefer*, 215 F.3d 1031, declared unconstitutional a state residency requirement dictating that a U.S. House candidate had to be a state resident before election day, it did not hold the state was prohibited from enforcing the constitutional habitation requirement. Instead, in *Shaefer*, the court held, consistent with *U.S. Term Limits*, that because the state's residency requirement dictated the candidate had to be a resident *before* election day, it actually created an additional qualification, and therefore, as applied to a U.S. House candidate, it "handicap[ed] a class of candidates and f[ell] outside the sphere of Elections Clause cases." *Id.* at 1038-39. According to the court in *Shaefer*, the state did not "have the power to require residency prior to the time appointed by the Constitution. *This is not to say, however, that [the state] could not require candidates to file a document with their nomination papers attesting that they will be inhabitants of the state when elected.*" *Id.* at 1038 (emphasis added). The court in *Shaefer* thus acknowledged the State's authority to enforce constitutional qualifications. *Id.*

The cases discussed above are too few and far between to show there is any real disagreement with the conclusion that the State Board has the authority to enforce Article I, Section 2 qualifications for candidates. It clearly has the authority to do so under the applicable state statutes. *See* N.C.G.S. §§ 163-106.2(a), -106.5(b). & -121.1, *et seq*. The State Board has the same authority regarding which candidates should or should not be disqualified per Section 3 of the Fourteenth Amendment. *See id.* And, again, in doing so, it is not enforcing additional qualifications, only those provided for in the Constitution.

The State Board's regulation of candidates also does not otherwise supplant the House's Article I, Section 5, authority to judge member qualifications. This is because the House can make its own "independent final judgment" about the qualifications of its members when it is presented with the state's certificate of election for that member-elect. *Roudebush*, 405 U.S. at 25. "[A]

26

certificate of election or appointment from a governor and Secretary of State (that is, the official 'return')—is considered to be prima facie evidence that the person holding those credentials is entitled to the seat, subject to the final determination of the House or Senate." Jack Maskell *Congressional Research Serv.: Qualifications of Members of Congress* (Jan. 15, 2015) (footnotes omitted), *available at* https://sgp.fas.org/crs/misc/R41946.pdf (last visited 2/22/2022); *see also* 2 U.S.C. §§ 381-396 (2021) (providing a mechanism for losing candidates to contest an election for U.S. House by filing a challenge directly with the House). This process, authorized by Congress itself, not only reflects the implicit understanding from the Supreme Court in *U.S. Term Limits* that the State is authorized to consider the constitutional qualifications of the candidate before it certified the election result, it also reflects an assumption by Congress that the State did indeed consider them. Otherwise, it would have no evidentiary weight for Congress.

Finally, in his preliminary injunction motion, Plaintiff cited *Chavez* and one other, unpublished order from a Louisiana federal district court, *Cox v. McCrery*, No. 06-2191, 2007 WL 97142 (W.D. La. Jan. 5, 2007). Like *Chavez*, *Cox* is of little value to Plaintiff. The decision there involved a losing candidate suing the winner, a U.S. House member-elect, by claiming he was not qualified for office because he was no longer an inhabitant of the state. In that case, there was no challenge to the constitutionality of state qualifications law. Rather, the plaintiff in *Cox* was trying to invoke the Constitutional Qualifications Clause under state law. Because the challenged individual had already become a member-elect, the court held a qualifications challenge at that time may usurp Congressional power and dismissed the action. *Id.* at *2-3. Plaintiff's case is wholly distinguishable. Unlike the losing candidate in *Cox*, Plaintiff challenges the validity of a statute seeking to enforce qualifications *before* a candidate stands for election.

Because the challenge statute does not conflict with Congress's authority under Article I, Section 5, Claim III fails as a matter of law.

### D. Plaintiff Fails to State a Claim That the Amnesty Act of 1872 Absolved All Future Acts of Insurrections.

In Count IV, Plaintiff invokes the Amnesty Act of 1872. *See* Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872). He argues that the Act abrogated Section 3 of the Fourteenth Amendment to allow any member of Congress, from 1872 onward, to engage in insurrection or rebellion without being barred from office.

Plaintiff's argument is meritless, as it would invalidate the expressed intent of the legislators who enacted both the Fourteenth Amendment and the Amnesty Act of 1872. First, the prospective application of the Amnesty Act of 1872 is not supported by the language of the Act itself. That language provides, both in the Act's title and text, that it was intended to remove political disabilities "imposed" by Section 3. 17 Stat. 142. The use of the past tense "imposed" indicates that Congress did not intend the Act to apply prospectively, but to apply only to remove disabilities previously imposed on the former Confederates.

Second, limiting the application of Section 3 of the Fourteenth Amendment to former Confederates is not supported by the Congressional legislative history pertaining to that section. For example, during the debates regarding the passage of Section 3, Senator Willey of West Virginia stated Section 3 is

> not to punish the men who engaged in the rebellion for the crime which they have committed; the law in that respect is ample now; but, not being penal in its character, it is precautionary. It looks not to the past, but it has reference, as I understand it, wholly to the future. It is a measure of self-defense. It is designed to prevent a repetition of treason by these men, and being a permanent provision of the Constitution, it is intended to operate as a preventive of treason hereafter by holding out to the people of the United States that such will be the penalty of the offense if they dare to commit it.

28

The Congressional Globe, Senate, 39th Congress, 1st Session, p. 2918 of 3840, May 31, 1866, https://guides.loc.gov/14th-amendment/digital-collections (last visited 2/22/22).[4] Thus, Plaintiff's argument that the 1872 Congress intended to overturn the underlying purpose of the Fourteenth Amendment a few short years later is unpersuasive. This is particularly true considering a review of the legislative history surrounding the Amnesty Act of 1872 demonstrates that Congress intended it to apply only to former Confederates. *See* Gerard N. Magliocca *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comm. 87, 110-24 (2021) (hereinafter "Magliocca").

Finally, and perhaps most significantly, the conclusion that Congress intended the Amnesty Act of 1872 to serve as an all-time waiver of Section 3 of the Fourteenth Amendment for any future violations of the oath of office is contradicted by a subsequent act of Congress itself. In 1919, the U.S. House of Representative applied Section 3 to refuse to seat one of its own members, Victor Berger, for the term beginning in January 1920. *See* Maskell, *Congressional Research Serv.: Qualifications of Members of Congress* at 19-20. Berger had been convicted of violating the Espionage Act based on certain activities he undertook during World War I. Clarence Cannon, 6 *Cannon's Precedents of the House of Representatives of the United States* 53-56 (1935) (hereinafter "Cannon's*")* available at https://www.govinfo.gov/help/precedents-of-the-house (last visited 2/22/2022).

The U.S. House committee overseeing the congressional disqualification proceedings regarding Berger's status examined Section 3 in light of the Amnesty Act of 1898. Cannon's at

---

[4] This Court may take judicial notice of public Congressional records. *See Fauconier v. Clarke*, 652 F. App'x. 217, 220 (4th Cir. 2016); *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir.2009); *Hall v. Virginia*, 385 F.3d 421, 424 & n.3 (4th Cir. 2004); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); Fed. R. Evid. 803(8), (16).

29

55. The committee concluded that the Amnesty Act of 1898 did not waive Section 3 from applying to Berger. *Id.* Not only would it be impossible for a "mere statute" to repeal the U.S. Constitution, but Congress also did not have the authority to immunize future acts from enforcement of Section 3. *Id.* The principle applies equally to the act under which Plaintiff begs protection, the Amnesty Act of 1872.

Moreover, Berger contended, similar to what Plaintiff argues here, that Section 3 did not apply because it was an "outgrowth" of the Civil War. In response, the House committee stated the following:

> It is perfectly true that the entire fourteenth amendment was the child of the Civil War and that its main purpose was the security and protection of the political and civil rights of the African race. It is equally true, however, that its provisions are for all time . . . . It is inconceivable that the House of Representatives, which without such an express provision in the Constitution repeatedly asserted its right to exclude Members-elect for disloyalty, should ignore this plain prohibition which has been contained in the fundamental law of the Nation for more than half a century.

*Id.*

Plaintiff asks this Court to disregard the fact that Congress applied Section 3 to Berger. In the Preliminary Injunction Motion, Plaintiff attempts to distinguish Congress's application of Section 3 to Berger by noting that when Congress disqualified him, it examined and disregarded the Amnesty Act of 1898, not the Amnesty Act of 1872, the one under which Plaintiff seeks protection. The differences in the acts cited by Plaintiff are irrelevant. What is relevant is that they both granted amnesty *only* to former Confederates. *See* Act of June 6, 1898, ch. 389, 30 Stat. 432, *and* Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872); *see generally* Magliocca at 87-88, 124-27. It follows that the U.S. House's findings concerning the Amnesty Act of 1898 applies equally to the act under which Plaintiff seeks protection, the Amnesty Act of 1872. In other words, neither waived Section 3's prospective application. *See* Cannon's at 55.

At bottom, the application of Section 3 to Berger and the above reasoning supporting that application provide strong, and arguably dispositive, support establishing Section 3 remains applicable today. For this reason and the others stated above, Plaintiff's Count IV fails to state a claim upon which relief can be granted.

## Conclusion

For the reasons above, Defendants respectfully request that Plaintiff's Complaint be dismissed with prejudice.

This the 22nd day of February, 2022.

JOSHUA H. STEIN
Attorney General

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
tsteed@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25713
mcbabb@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
N.C. State Bar No. 35955
sbrennan@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar No. 24668
amajmundar@ncdoj.gov

Post Office Box 629
Raleigh, NC 27602
Phone: (919) 716-6900
Fax:  (919) 716-6763