UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF NORTH
CAROLINA WESTERN DIVISION

| | |
|---|---|
| MADISON CAWTHORN, an individual,<br><br>*Plaintiff,*<br><br>v.<br><br>MR. DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, MS. STELLA ANDERSON, in her official capacity as a member of the North Carolina State Board of Elections, MR. JEFF CARMON, in his official capacity as a member of the North Carolina State Board of Elections, MR. STACY EGGERS IV, in his official capacity as a member of the North Carolina State Board of Elections, MR. TOMMY TUCKER, in his official capacity as a member of the North Carolina State Board of Elections, MS. KAREN BRINSON BELL, in her official capacity as the Executive Director of the North Carolina State Board of Elections.<br><br>*Defendants.* | Civ. No. 5:22-cv-00050-M |

## BRIEF OF THE NORTH CAROLINA REPUBLICAN PARTY
## AS *AMICUS CURIAE.*

### INTRODUCTION

Challengers to Madison Cawthorn's candidacy have invoked N.C.G.S. § 163-127.2 in an attempt to trigger authority by the North Carolina State Board of Elections ("SBE") to make a decision as to whether Representative Cawthorn is qualified to serve in Congress. They ask to have Representative Cawthorn disqualified for congressional office under Section 3 of the Fourteenth Amendment to the United States Constitution. However, while the SBE may have the

power to regulate the mechanics and procedures for filing for office, the law is clear that such power does not give the SBE the power to decide who is barred from running for office.

Issuance of the preliminary injunction, in this case, turns upon the question, *who decides?* The federal Constitution specifically grants Congress, not the states, the power to determine who is qualified for congressional office. Therefore, as a fundamental, constitutional matter of law, the SBE does not have the power to judge whether a candidate is qualified for such office, and any attempt to exercise such power violates the federal Constitution.

## ARGUMENT

**The State Board of Elections lacks power under the federal Constitution to decide whether a candidate is qualified for congressional office.**

The precise issue before the Court is whether the SBE's claimed authority to determine an individual's qualifications to run for congressional office under N.C.G.S. § 163-127.2 is a valid exercise of the State's power under Article I, Section 4 of the U.S. Constitution to prescribe the times, places, and manner of holding elections (the Elections Clause), or is a forbidden infringement upon the power of the House of Representatives under Article I, Section 5 (the Qualifications Clause).

The SBE seeks refuge in the Elections Clause to justify its claimed power to judge whether a candidate is qualified to run for the House of Representatives. *See* Response to Plaintiff's Motion for Preliminary Injunction at 25. The Supreme Court of the United States long ago described the scope of state powers under the Election Clause:

> It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm,* 285 US 355, 366 (1932). However, state powers under the Elections Clause do not include judging and enforcing qualifications for congressional office. *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 832-33 (1995) ("The Framers intended the Elections Clause to grant States authority to create procedural regulations, not to provide States with license to exclude classes of candidates from federal office.").

This brief provides a thorough analysis of the Supreme Court of the United States' opinion in *U.S. Term Limits*. The Court recognizes "the States' interest in avoiding 'voter confusion, ballot overcrowding, or the presence of frivolous candidacies,' in 'seeking to assure that elections are operated equitably and efficiently,' and in 'guarding against irregularity and error in the tabulation of votes.'" *U.S. Term Limits*, 514 U.S. at 834. However, to stop the analysis here would be to ignore the Supreme Court's holding that such interest only applies when the applicable state statute does "not involve measures that exclude candidates from the ballot without reference to the candidates' support in the electoral process." *Id.* at 835.

### I. The power to judge qualifications for congressional office is reserved to Congress, not to the State Board of Elections.

Offices created by the United States Constitution are to be regulated by their creating authority and any authority the State may have in regulating those offices must have been provided for in the Constitution. *See Cook v. Gralike,* 531 U.S. 510, 525, 149 L.Ed. 2d 44 (2001); *State ex rel. Chavez v. Evans,* 446 P.2d 445 (N.M. 1968). The Constitution reserves to Congress the power to judge the qualifications of its members and the Constitution sets forth those qualifications. *See, e.g.,* U.S. Const. Art. 1, Section 2 (age, citizenship, inhabitancy); *Powell v. McCormack,* 395 U.S. 486, 520 at n.41 (1969) (listing qualifications appearing in other parts of the Constitution, including Section 3 of the Fourteenth Amendment).

While the State may have the power to regulate the mechanics of the *procedural* requirements for a congressional candidate to file,[1] they hold no power to police a candidate's *qualifications* to file. The Qualifications Clause, Article I, Section 5, specifies that "[e]ach House shall be the judge of the elections, returns *and qualifications* of its own members." U.S. Const. art. I, § 5, cl. 1. (emphasis added). In *Roudebush v. Hartke,* 405 U.S. 15, 25 (1972), the Supreme Court declared that each House of Congress must make its own "independent final judgment" about the qualifications of its members-elect.

The power to judge and enforce the qualifications for membership in the Congress rests exclusively with the Congress. This power is not given to the courts, *Powell,* 395 U.S. at 550, nor is it given to individual States, *U.S. Term Limits,* 514 U.S. at 806 ("The text of the Constitution thus gives the representatives of all the people [i.e., Congress] the final say in judging the qualifications of the representatives of any one State.").

The Supreme Court in *U.S. Term Limits* rejected an argument similar to the State's "we're only prescribing rules for *holding elections*" contention. There, the State of Arkansas had put in place "an amendment to the Arkansas State Constitution that prohibit[ed] the name of an otherwise-eligible candidate for Congress from appearing on the general election ballot if that candidate ha[d] already served three terms in the House of Representatives or two terms in the Senate." *U.S. Term Limits*, 514 U.S. at 783. Defenders of the term-limits measure maintained that it was not a "qualification" but rather a permissible exercise of the state's power under the

---

[1] State Law Procedural Filing Requirements: NCGS § 163-106(a)-(d) (providing that candidates must file a notice of candidacy with the appropriate board of elections); NCGS § 163-106.1 (providing that "No person shall be permitted to file as a candidate in a party primary unless that person has been affiliated with that party for at least 90 days as of the date of that person filing such notice of candidacy."); NCGS § 163-106.2 (providing the time for filing notice of candidacy); NCGS § 163-106.6 (prohibiting dual candidacies); NCGS § 163-107 (requiring a filing fee); NCGS § 163-108 (requiring "the chairman or secretary of [the State] Board shall certify to the Secretary of State the name, address, and party affiliation of each person who has filed with the State Board of Elections").

Elections Clause. The Court noted that its prior Elections Clause cases "were thus constitutional because they regulated election *procedures* and did not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for ballot position." *Id.* at 835 (original emphasis). The Court explained that "[o]ur cases upholding state regulations of election procedures thus provide little support for the contention that a state-imposed ballot access restriction is constitutional when it is undertaken for the twin goals of disadvantaging a particular class of candidates and evading the dictates of the Qualifications Clauses." *Id.;* See Derek T. Muller, *Weaponizing the Ballot,* 48 Fla. St. Univ. L. Rev. 61, 121-22 (2021) (states cannot use "manner" clauses to add qualifications).

More than twenty years earlier, the Supreme Court addressed a similar Qualifications Clause case. In *Roudebush*, the supposed winner of an election for U.S. Senate in Indiana challenged the State's attempt to conduct a recount as unconstitutional. *See* 405 US 15. The Supreme Court held that Indiana's recount procedures did not "usurp" the Senate's authority under Article I, Section 5 because the Senate ultimately would decide which individual would be seated. *Id.* at 25–26; *See* Derek T. Muller, *Scrutinizing Federal Electoral Qualifications,* 90 Indiana L.J. 559, 594–98 (2015).

In *Chavez*, the Supreme Court of New Mexico also had the opportunity to review a Qualifications Clause issue. There, the State excluded an allegedly unqualified individual from the ballot on the basis of inhabitancy under Article I Section 2 of the United States Constitution. *Chavez*, 446 P.2d at 448. The court ruled that whether the candidate was an "inhabitant" of New Mexico, was not for the State to decide, but rather, was a matter for Congress. *Id.* Accordingly, the court directed the State to certify and include on the ballot for the general election the candidate for the House of Representatives.

Here, the SBE contends that application of N.C.G.S. § 163-127.2 to congressional offices is simply part of its longstanding enforcement of age and residency requirements. State Board Defendants' Response to Plaintiff's Motion for Preliminary Injunction at 25. To be sure, States have authority to exclude from the ballot those candidates for *state* office who do not meet *state* constitutional qualifications, but even that power is limited. *See State ex rel. Lee v. Dunn*, 73 N.C. 595, 604-608 (1875) (holding that the General Assembly could not impose any additional qualification on eligibility for elective office, other than what is provided in the State Constitution).

However, the State cites no authority—nor does any exist—to support its claim that it has power to "police" *congressional* qualifications (nor could it for "residency," as that is not a requirement for congressional office). The State has not identified a single instance in which a challenge under N.C.G.S § 163.127.2 has been applied to dispute a congressional candidate's qualifications for office.[2]

Applying the State's "candidate challenge" statute, N.C.G.S. § 163-127.2, to congressional offices is an unconstitutional encroachment on Congress's power under the Qualifications Clauses (Article I, Section 5). There is no appeal of the SBE's decision to Congress—only to state court.[3] *See* N.C.G.S. § 163-127.6. Under the SBE's argument, the State would have the final and conclusive word on a candidate's qualifications under the U.S. Constitution, thereby usurping a power that only the House can exercise.

---

[2] By its own terms, N.C.G.S. § 163-127.2 appears to apply only to elections for state office. Section 163-127.1 defines "candidate" as anyone running for elective office "in this State," which arguably applies only to state offices and excludes federal offices. Supporting that interpretation is the reference to "residency" in section 163-127.2 as one ground for challenging the candidate's qualifications for office. Article I, Section 2 makes inhabitancy, not residency, a qualification for congressional office.

[3] In *Wise v. Circosta*, 978 F.3d 93 (4th Cir. 2020), the court recognized that the United States Constitution unambiguously excludes the power to regulate federal elections from state courts and executive-branch officials.

If the State can prevent a candidate from running for congressional office based on its judgment that the candidate is not qualified for that office under its own interpretation of the United States Constitution, the State will frustrate the House of Representatives' ability to make an "independent final judgment" of a candidate's qualifications for office.[4] *See Roudebush,* 405 U.S. at 25–26. By disqualifying a candidate from running for congressional office *ex ante*, the State will ensure that the House of Representatives never independently evaluates such a candidate's qualifications for congressional office.

Once a candidate satisfies the procedural requirements of state election law, the people decide whether to vote for a candidate, and Congress judges whether that candidate is qualified. *See U.S. Term Limits,* 514 U.S. 779. Permitting State officials to block a candidate from the ballot, "the most crucial stage in the election process—the instant before the vote is cast," *Cook,* 531 U.S. at 525, 149 L. Ed. 2d at 57, would undermine the people's power to elect its own representatives.

---

[4] Several constitutional scholars have indicated that the challenge to a candidate's qualifications under N.C.G.S § 163.127.2 is unconstitutional because States do not have the power to adjudicate congressional qualifications. *See* Jonathan H. Adler, "Why Efforts to Throw Rep Cawthorn Off the Ballot Are Likely Unconstitutional," *The Volokh Conspiracy* (February 13, 2022), https://reason.com/volokh/2022/02/13/why-efforts-to-throw-rep-cawthorn-off-the-ballot-are-likely-unconstitutional/; Josh Blackman, "Section 3 Lawsuit Filed Against Candidacy of Rep. Madison Cawthorn," *The Volokh Conspiracy* (January 11, 2022), https://reason.com/volokh/2022/01/11/section-3-lawsuit-filed-against-candidacy-of-rep-madison-cawthorn/; Derek Muller, "Can states exclude from the ballot congressional candidates they deem lack the qualifications for office?", *Election Law Blog* (January 11, 2022), https://electionlawblog.org/?p=126863; Derek Muller, "Who Can Throw Madison Cawthorn Out?", Wall Street J. (Feb. 13, 2022), https://www.wsj.com/articles/who-can-throw-madison-cawthorne-out-unconstitutional-congress-election-results-14th-amendment-qualifications-lawsuit-11644783632?mod=opinion_lead_pos7; Jonathan Turley, "North Carolina Board Asserts Right to Disqualify Madison Cawthorn as an 'Insurrectionist,' Jonathan Turley Blog (Feb. 9, 2022), https://jonathanturley.org/2022/02/09/north-carolina-board-asserts-right-to-disqualify-madison-cawthorn-as-an-insurrectionist/.

To challenge a congressional candidate's qualifications through the SBE is a novel,[5] but unconstitutional attempt to evade the ordinary process for judging and enforcing qualifications under the Qualifications Clause. The Constitution does not empower State agencies or State courts to make final determinations about qualifications for congressional office. Thus, the entire statutory scheme set forth in N.C.G.S. §§ 163-127.1 to 163-127.6 cannot constitutionally be applied to challenge the qualifications of a candidate seeking to serve in Congress.

## II. The State's judgment of a candidates qualifications unconstitutionally adds to congressional qualifications.

Not only does the State seek to encroach upon Congress's power to judge qualifications by enforcing N.C.G.S. § 163-127.2 against congressional candidates, it also *adds* a qualification for congressional office. This is prohibited by both the constitutional text and the Supreme Court's decision in *U.S. Term Limits*.

The State seeks cover from the Qualifications Clause by arguing that it is not judging the qualifications of "elected members" of the House of Representatives, but is only "policing *candidate* qualifications prior to the election." State Board Defendants' Response to Plaintiff's Motion for Preliminary Injunction at 26 (original emphasis). But the constitutional qualifications for Congress are qualifications to *hold* office, not to *run for* office. By imposing separate qualifications to run for office (whether identical to or different from the constitutional qualifications), the State unconstitutionally adds qualifications for service in Congress. *See U.S. Term Limits*, 514 U.S. at 827.

---

[5] The novelty of this challenge lies in its attempt to eliminate, at least in part, the grueling nature of the electoral process by seeking to exclude a candidate before any votes are cast. As offered by Sun Tzu in *The Art of War*, "The supreme art of war is to subdue the enemy without fighting." Sun Tzu, *The Art of War*, 37 (2010). While that might be a valid, and even successful, strategy in game theory, it runs contrary to the Constitution and our democratic process. *See U.S. Term Limits*, 514 U.S. at 793, 131 L. Ed. 2d at 894 ( The "fundamental principle of our representative democracy" is "that the people should choose whom they please to govern them.") (internal citations omitted).

The Supreme Court has recognized that Congress's power to judge qualifications under Article I, Section 5 operates at the time a Member-elect presents a state-issued certification of election and seeks to be seated in Congress. *See Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 614–15 (1929) ("Upon these returns and with this certificate, he presented himself to the Senate, claiming all the rights of membership. Thereby the jurisdiction of the Senate to determine the rightfulness of the claim was invoked and its power to adjudicate such right immediately attached by virtue of section 5 of article 1 of the Constitution."). The Congressional Research Service describes the procedure:

> A person who is elected to Congress . . . , and appears in Congress with valid credentials from the proper officials in the state, is a "Member-elect" (or Senator-designate). The individual becomes a member of Congress when sworn in and seated by the House or Senate. The presentation of "credentials"—a certificate of election or appointment from a governor and Secretary of State (that is, the official "return")—is considered to be *prima facie* evidence that the person holding those credentials is entitled to the seat, subject to the final determination of the House or Senate. If the House or Senate finds that a Member-elect does not meet the constitutional qualifications (or has not been "duly elected" by the people of his or her district or state), then the House or Senate, as appropriate, may "exclude" that person from the respective body by a simple majority vote. An "exclusion" is a decision to refuse to seat a Member-elect.

Jack Maskell, *Qualifications of Members of Congress,* Cong. Research Svc. 5 (January 15, 2015), https://sgp.fas.org/crs/misc/R41946.pdf (footnotes omitted).[6]

Since enforcing congressional qualifications under Article I, Section 5 occurs at the time the Member-elect presents to be seated in Congress, the State's attempt to impose any qualification for office—even an existing constitutional qualification—*prior to* and *separate from* that time

---

[6] Congressional precedents typically show that "age" and "citizenship" qualifications become relevant when the Member-elect presents to the House or Senate to take the oath of office and be seated. *Id.* at 11-12. While the "inhabitancy" qualification specifically requires that status to be present at the time of election, U.S. Constitution, Article 1, Section 2 (requiring one to be an "inhabitant" of the state "when elected"), these precedents also suggest that judgment about whether a Member-elect has met this qualification occurs at the time of presentment to take office. *See* Maskell, *supra,* at 15-18.

operates as State imposition of an additional qualification, such as the term-limits deemed unconstitutional in *United States Term Limits*. Professor Derek Muller explains:

> Consider the age example, and let's begin with President Joe Biden. In 1972, Biden first ran for Senate at the age of 29. He was not eligible to serve in the Senate. But, after Election Day—after he was elected—he turned 30. He presented his credentials to the Senate several weeks after Election Day and was seated.
>
> If Delaware had excluded Biden from the ballot on the basis that Biden was "ineligible" as of Election Day—or, really, at the ballot access deadline weeks before Election Day—it would have impermissibly added a qualification to a candidate seeking federal office.
>
> The same is true for inhabitancy rules. Article I conditions that no person can serve as a Representative "who shall not, when elected, be an inhabitant of that state in which he shall be chosen." A state has no power to evaluate inhabitancy *before* Election Day, because it would add a qualification to a candidate seeking federal office.

Derek Muller, "Adding Qualifications for Congressional Candidates and a Section 3 Puzzle," *Election Law Blog* (Feb. 7, 2022), https://electionlawblog.org/?p=127486.

Other state and federal courts have addressed the issue of States attempting to add additional qualifications for congressional candidates and have uniformly held them to be unconstitutional. *See Dillon v. Fiorina*, 340 F.Supp. 729, 731 (D.N.M. 1972) (ruling state laws that ultimately created a two-year residency requirement to run for United States Senate were unconstitutional as an impermissible added qualification); *Stack v. Adams*, 315 F.Supp. 1295, 1297 (N.D. Fla. 1970) (holding that a current county sheriff could not be found disqualified to run for the House of Representatives under a dual office holding state statute, because it would be considered an additional qualification not provided by the Constitution for election to Congress); *Chavez*, 446 P.2d at 448-49 (explained *supra*). Ultimately, courts have held that "[t]he constitutional qualifications for membership in the lower house of Congress exclude all other qualifications, and state law can neither add to nor subtract from them." *Chavez*, 446 P.2d at 448.

For the State to deny ballot access to a candidate before he presents to Congress for judgment of his qualifications and seating, would unconstitutionally add a qualification to a candidate for federal office.

### III. The SBE has no power to judge whether a candidate is qualified for Congress under Section 3 of the Fourteenth Amendment.

Section 3 of the Fourteenth Amendment was designed to exclude many ex-Confederates from office unless a supermajority of Congress granted a waiver. It provides in relevant part:

> No person shall be a Senator or Representative in Congress . . . who, having previously taken an oath, as a member of Congress . . . to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same . . . . But Congress may by a vote of two-thirds of each House, remove such a disability.

U.S. Const. Amend. XIV, Section 3. Section 3 does not expressly provide a procedure for its implementation, and there is nothing to suggest that a state agency has the power to bar a person from running for congressional office based on its judgment that the person is disqualified by this provision.

Furthermore, Congress has not enacted enabling legislation for Section 3 of the Fourteenth Amendment. Section 5 of the Fourteenth Amendment provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. Amend. XIV, Section 5. That includes legislation providing for the enforcement of Section 3.[7] Following the repeal of the Klu Klux Klan Act in 1872, "Congress has not since exercised its authority under Section 5 of the Fourteenth Amendment to enact legislation" providing for the enforcement of

---

[7] Congress enacted such legislation in Section 14 of Klu Klux Klan Act in 1870, which directed the United States attorney in each district where a person potentially subject to Section 3 held office to file a *quo warranto* action for removal of the office-holder. Congressional Research Service, *The Insurrection Bar to Office: Section 3 of the Fourteenth Amendment* 4 (January 29, 2021), https://crsreports.congress.gov/product/pdf/LSB/LSB10569. But Section 14 exempted members of Congress, and Congress subsequently enacted the Amnesty Act in 1872 by a two-thirds vote, which removed the disqualification. *Id.* at 2, 4.

Section 3. Congressional Research Service, *The Insurrection Bar to Office: Section 3 of the Fourteenth Amendment* 4 (January 29, 2021), https://crsreports.congress.gov/product/pdf/LSB/LSB10569.

Section 3 is not self-executing; its application "can only be provided for by [C]ongress." *In re Griffin*, 11 F. Cas. 7, 26 (C.C.D. Va. 1869). Absent implementing legislation, Congress, and Congress alone, has addressed Section 3 as a constitutional qualification for holding office.[8] There is no other constitutional provision or federal statute authorizing a State to evaluate a congressional candidate's qualifications under Section 3. Accordingly, the SBE lacks the power to forbid any congressional candidate from running for congressional office based on its own interpretation and enforcement of Section 3 for the same reasons it cannot enforce nor add other constitutionally-enumerated congressional qualifications: it would violate the Qualifications Clause.

Even if a candidate could be potentially disqualified under Section 3, this is something that Congress *itself* can adjudicate and, at its discretion, change. Section 3 provides that "Congress may by a vote of two-thirds of each House, remove such a disability." The SBE thus cannot condition ballot access on whether a candidate would allegedly be disqualified by Section 3 because it cannot know whether Congress would choose to seat such a candidate or would remove any potential disqualification under Section 3. By doing so, the SBE again would be adding a qualification. *See* Muller, "Adding Qualifications for Congressional Candidates and a Section 3 Puzzle," *supra*. The dispute about whether a candidate is subject to Section 3 is not a question for State election officials or judges to decide ahead of an election. It's a question for the voters on Election Day, and for Congress after the election.

---

[8] Congress last used Section 3 in 1919 to refuse to seat Victor Berger, a socialist accused of giving aid and comfort to Germany in World War I. Congressional Research Service, *supra,* at 2. Berger eventually was seated in a subsequent Congress after the Supreme Court overturned his conviction for espionage. *Id.*

## CONCLUSION

For the foregoing reasons, the NCGOP respectfully urges the Court to rule on the merits that the role of judging the qualifications of a congressional candidate rests solely with the House of Representatives under Article I Section 5 of the United States Constitution.

Respectfully submitted the 22nd of February, 2022.

Philip R. Thomas
State Bar No. 53751
philip.thomas@ncgop.org
1506 Hillsborough St.
Raleigh, NC 27605
Telephone: 919-828-6423

Kevin J. Cline
State Bar No. 57854
kevin@kevinclinelaw.com
Kevin Cline Law, PLLC
P.O. Box 143
300 Fayetteville St.
Raleigh, NC 27601
Telephone: 919-504-1821

*Attorneys for Amici the North Carolina Republican Party*

# CERTIFICATE OF SERVICE

I, Philip R. Thomas, hereby certify that I manually filed the foregoing brief with the Clerk of the Court this 22nd day of February, 2022. I also certify that the following counsel of record, who have consented to electronic service, will be served the foregoing brief via email:

Philip R. Thomas
State Bar No. 53751
philip.thomas@ncgop.org
1506 Hillsborough St.
Raleigh, NC 27605
Telephone: 919-828-6423

JOSHUA H. STEIN/s/
Attorney General

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
tsteed@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25713
mcbabb@ncdoj.gov

Stephanie A. Brennan
Special Deputy Attorney General
N.C. State Bar No. 35955
sbrennan@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar No. 24668
amajmundar@ncdoj.gov

Post Office Box 629
Raleigh, NC 27602
Phone: (919) 716-6900

/s/ Josh Howard
Gammon, Howard & Zeszotarski, PLLC
The Water Tower Building
115 1/2 West Morgan Street
Raleigh, NC 27601
jhoward@ghz-law.com
Phone: (919) 521-5878
Fax: (919) 882-1898
State Bar No. 26902

/s/ James Bopp, Jr.
Ind. Bar No. 2838-84*
Melena S. Siebert,
Ind. Bar No. 35061-15*
THE BOPP LAW FIRM
1 South 6th Street
Terre Haute, Indiana 47807
Telephone: (812) 232-2434
Facsimile: (812) 235-3685
jboppjr@aol.com
msiebert@bopplaw.com
*Attorneys for Plaintiff*
*Special Appearance Filed

Fax: (919) 716-6763

*Counsel for Defendants*