IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:22-cv-00050-M

MADISON CAWTHORN,                              )
                                               )
        Plaintiff,                             )
                                               )
v.                                             )                    ORDER
                                               )
DAMON CIRCOSTA, in his official capacity       )
as Chair of the North Carolina State Board of  )
Elections,                                     )
STELLA ANDERSON, in her official capacity      )
as a member of the North Carolina State Board  )
of Elections,                                  )
JEFF CARMON, in his official capacity as a     )
member of the North Carolina State Board of    )
Elections,                                     )
STACY EGGERSIV, in his official capacity as    )
a member of the North Carolina State Board of  )
Elections,                                     )
TOMMY TUCKER, in his official capacity as      )
a member of the North Carolina State Board of  )
Elections,                                     )
KAREN BRINSON BELL, in her official            )
capacity as the Executive Director of the North )
Carolina State Board of Elections,             )
                                               )
        Defendants.                            )
                                               )

        This matter came before the court on the Plaintiff's Motion for Preliminary Injunction [DE 8].

Plaintiff sought an order enjoining the enforcement of a North Carolina statute, N.C. Gen. Stat. § 163-

127.1 – 163-127.6, which permits any qualified voter, who is registered in the same district as the office

of a candidate for "any elective office in the State," to file a "challenge" disputing that the candidate

meets the constitutional or statutory qualifications for the office, including a potential violation of

Section 3 of the Fourteenth Amendment to the Constitution of the United States. Defendants Circosta, Anderson, Carmon, Eggersiv, Tucker, and Bell ("Defendants" or the "Board") countered that Plaintiff lacked standing to seek an injunction, the issues he raised were not ripe for adjudication, the court should have abstained from hearing the case under *Younger v. Harris*, 401 U.S. 37 (1971), and Plaintiff failed to demonstrate the elements necessary to grant a preliminary injunction. The court heard this matter on March 4, 2022, found it has subject-matter jurisdiction to resolve the narrow issue presented, and granted the motion.

This case is not about *what* must be decided—that is, whether an insurrection occurred. Instead, it is about who decides what must be decided – and who decides who decides. It is the Plaintiff's position that Congress decides who decides, but Defendants posit that the North Carolina legislature decides who decides. Because Congress has decided by statute, with two-thirds of both houses concurring, to reserve to Congress the right to decide whether one of its members has engaged in insurrection, the requested injunction was appropriately issued on March 4, 2022.

The basis for the court's decision is explained in full below.

## I. Background

Although the parties each proffered its own "statement of facts," the relevant material facts of this matter were not disputed.

Plaintiff currently serves as a Member of the U.S. House of Representatives for North Carolina's 11th Congressional District. On December 7, 2021, Plaintiff filed a notice of candidacy for North Carolina's 13th Congressional District. On January 10, 2022, a group of voters filed a "challenge" with the State Board of Elections ("Board") pursuant to a North Carolina statute (the "January challengers"), alleging that Plaintiff "does not meet the federal constitutional requirements for a Member of the U.S. House of Representatives and is therefore ineligible to be a candidate for such office." Challenge at ¶ 1,

2

DE 9-2. The next day, January 11, 2022, the Wake County Superior Court in North Carolina issued an indefinite stay on all challenges filed with the Board until a "final resolution" is reached regarding the ongoing litigation challenging North Carolina's recently redrawn legislative and congressional districts ("redistricting litigation"). *See* Stay Order, DE 9-3.

Pursuant to Article 11B of Chapter 163 of the North Carolina General Statutes, a challenge may be brought against any person who files a notice of candidacy under the appropriate statute for any elective office in this State. *See* N.C. Gen. Stat. §§ 163-127.1, -127.2. The challenge must be made by a qualified voter registered in the same district as the office for which the candidate has filed. *Id.* The challenge must be filed with the same board of elections that received the notice of candidacy from the candidate no later than ten business days after the closing of the filing period. *Id.* The challenge must be made in a verified affidavit, based on a reasonable suspicion or belief that the candidate does not meet the constitutional or statutory qualifications for the office. *Id.*

Within two business days of the filing of the challenge the Board must appoint a panel made up of county board members from the counties within the district. N.C. Gen. Stat. § 163-127.3(2). In the case of a multi-county district that covers more than five counties, the panel shall have five members with at least one member from the county receiving the notice of candidacy or petition and at least one member from the county of residency of the challenger. Within five days of the filing of the challenge, the panel must schedule a hearing and issue a written decision no more than twenty business days after the challenge is filed. *Id.* at § 163-127.4(a). Depositions and subpoenas for witnesses or documents are permitted upon request of the parties or the panel. *Id.* The panel may allow evidence to be presented, such as affidavits, documents, or witnesses under oath; the receipt of which shall be subject to the North Carolina Rules of Evidence. *Id.* at § 163-127.4(c). After the hearing, the panel "shall make a written decision on each challenge by separately stating findings of facts, conclusions of law, and an order." *Id.*

3

at § 163-127.4(d). Within two days of the issuance of the written decision, either party has the right to appeal to the Board, which must render an expedited decision based on the entirety of the record. Id. at § 163-127.6(a). Within two days of the Board's issuance of a written decision, either party may appeal to the North Carolina Court of Appeals. *See id.* at § 163-127.6(b).

When a candidate is subject to a challenge under the statute, "[t]he burden of proof shall be upon the candidate, who must show by a preponderance of the evidence of the record as a whole that he or she is qualified to be a candidate for the office." N.C. Gen. Stat. § 163-127.5(a). The statute provides the required showing for a challenge based on residency but does not designate what type of proof the candidate must provide to meet his or her burden of proof for any other type of challenge. *See id.* at § 163-127.6(b). The Board is vested with certain general powers, which include general supervision of the elections in the State; appointing and advising members of the county boards of elections; investigation and administration of election laws; determination of the form and content of ballots; and certifying to the appropriate county boards of elections the names of candidates for district offices. N.C. Gen. Stat. § 163-22. If the Board determines that a challenged candidate does not meet the "qualifications" for office, it may, through its certification authority, remove that candidate's name from the ballot, thereby preventing the candidate from running for office.

Plaintiff filed this action on January 31, 2022, seeking declaratory and injunctive relief prohibiting the Defendants from proceeding to adjudicate the January challenge under the state statute. Plaintiff raised four claims for relief alleging violations of his First and Fourteenth Amendment rights, as well as violations of the U.S. Constitution's Qualifications Clause and the 1872 Amnesty Act.

On February 2, 2022, the Supreme Court of North Carolina heard arguments regarding the redistricting question and on February 4, 2022, the Court ruled that the current congressional and legislative redistricting plans were unconstitutional and ordered the drawing of new maps. On February

4

23, 2022, the state court issued newly drawn maps for state legislative districts in North Carolina, as well as a new map reflecting the congressional districts drawn by an "expert panel." The North Carolina Supreme Court denied all appeals challenging these newly drawn maps. The next day, February 24, 2022, the Board issued a letter to the January challengers informing them that, because they were no longer "qualified, registered voters" in the newly drawn 13th Congressional District, the challenge filed under N.C. Gen. Stat. 163-127.1 et seq. was "no longer valid." Letter, DE 67-1 at 2-3.

Accordingly, this court held a status conference on February 25, 2022, and based on the posture of the case, continued the February 28 hearing on the present motion[1] to March 21, 2022, noting that the court would consider holding an expedited proceeding if circumstances necessitated it. On March 2, 2022, the Board filed a notice informing the court that Plaintiff had withdrawn his January notice of candidacy and filed a notice for the newly drawn 11th Congressional District; two days later, on March 2, 2022, two individuals from that district filed challenges with the Board (the "March challengers") arguing, on the same basis on which the January challengers relied, that Plaintiff was not eligible to run for office. DE 70. The Board advised that an "emergency application [was] currently pending before the U.S. Supreme Court" regarding the redistricting litigation and, thus, the stay on challenges remained in effect; however, the Board informed that it "has a meeting scheduled for Monday, March 7. If the matters before the U.S. Supreme Court are resolved with respect to the Congressional map to be used in the upcoming May 17, 2022 primary, and the challenges filed today are valid for the Eleventh Congressional District at that time (see D.E. 67-1), the State Board intends to take up the challenges at that time pursuant to N.C.G.S. § 163-127.1, et seq." *Id.* at ¶ 6. Based on this information, the court expedited the hearing and heard the present motion on March 4, 2022.

---

[1] On February 21, 2022, the court granted Plaintiff's motion to advance the trial on the merits and consolidate it with the hearing on the motion for preliminary injunction pursuant to Rule 65(a)(2). *See* Order, DE 57.

5

## II.     Legal Standards

### A.     Subject-Matter Jurisdiction

Federal courts are courts of limited jurisdiction, meaning that a federal court is empowered only to consider certain types of claims. *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014). A federal court has subject matter jurisdiction over civil cases "arising under the Constitution, laws, or treaties of the United States," or over civil cases in which the amount in controversy exceeds $75,000, exclusive of interest and costs, and in which diversity of citizenship exists between the parties. 28 U.S.C. §§ 1331, 1332. "Subject matter jurisdiction cannot be forfeited or waived, and can be raised by a party, or by the court sua sponte, at any time prior to final judgment." *In re Kirkland*, 600 F.3d 310, 314–15 (4th Cir. 2010) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). The burden of establishing subject matter jurisdiction is on the party asserting its existence. *See U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347–48 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

### B.     Injunctive Relief

Generally, preliminary injunctions are designed to preserve the status quo and prevent irreparable harm during the pendency of litigation. *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 375 (D. Md. 2019). To prevail, a movant must demonstrate: (1) their suit's likelihood of success on the merits, (2) irreparable harm in the absence of the requested relief, (3) that the balance of equities tip in their favor, and finally (4) that issuing the requested preliminary relief is in the public interest. *Id.* at 376 (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The movant must establish all four elements to prevail and "courts considering whether to impose preliminary injunctions must separately consider each *Winter* factor." *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013).

As noted above, the court granted the Plaintiff's motion to advance the trial on the merits and

6

consolidate it with a hearing on his motion for preliminary injunction. DE 57. A party seeking a permanent injunction must demonstrate "actual success" on the merits, rather than a mere "likelihood of success" required to obtain a preliminary injunction. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020), *cert. granted sub nom. Cochran v. Mayor & City Council of Baltimore*, 141 S. Ct. 1369, 209 L. Ed. 2d 118 (2021), *and cert. dismissed sub nom. Becerra v. Mayor & City Council of Baltimore*, 141 S. Ct. 2170, 209 L. Ed. 2d 747 (2021) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987); *see also Winter*, 555 U.S. at 32 ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.") (quoting *Amoco, supra*). The party must demonstrate (1) "it has suffered an irreparable injury"[2]; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *Id.* (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

---

[2] The court notes that, although at least one court has mentioned these factors apply to "any type of case," *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007), the first factor applies only when a party alleges a *continuing* injury; otherwise, there would be no reason to enjoin permanently the conduct causing the injury if it has happened and will not happen again. *See, e.g., Millennium Funding, Inc. v. Doe*, No. 121CV282RDATCB, 2021 WL 5217018, at *13 (E.D. Va. Oct. 15, 2021) ("permanent injunctive relief is appropriate" where "Plaintiff 42 has demonstrated that it has suffered—and will continue to suffer—irreparable harm"); *Palmetto Conservation Found. v. Smith*, 642 F. Supp. 2d 518, 531 (D.S.C. 2009) ("The Foundation has suffered and will continue to suffer irreparable harm if the [permanent] injunction is not issued"); *Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766, 795 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010) ("RHI has suffered and will continue to suffer irreparable harm in the absence of a permanent injunction."). Here, as discussed below, the Plaintiff has demonstrated a concrete threat of *future* injury; therefore, for a permanent injunction to issue, Plaintiff must show he "will have suffered an irreparable injury" in the absence of an injunction. *See Loving v. I.R.S.*, 917 F. Supp. 2d 67, 80–81 (D.D.C. 2013), *aff'd*, 742 F.3d 1013 (D.C. Cir. 2014) (noting a "future threat of injury" and imposing a permanent injunction prohibiting the IRS from enforcing a registration scheme against tax-return preparers where such scheme is "impermissible" and would force plaintiffs to close their tax businesses if forced to comply with the scheme).

7

## III. Analysis

Plaintiff alleged he had standing to raise his constitutional challenges in this case and that abstention under *Younger* is not applicable. Compl., DE 1. Further, Plaintiff argued that he would imminently suffer a concrete, particularized injury and that the operation of the state statute under the circumstances presented would infringe his rights under the First and Fourteenth Amendments and violate Article 1, Section 5 of the U.S. Constitution and the 1872 Amnesty Act. *Id.*; Memo., DE 9. Defendants countered that the Plaintiff failed to state an Article III injury-in-fact, the issue was not ripe for adjudication, the court should have abstained in favor of allowing the state challenge to proceed, and Plaintiff failed to demonstrate violations of the U.S. Constitution and/or federal law. Here, the court first addresses the jurisdictional questions before proceeding to the merits of this action.

### A.   Standing

A federal court's jurisdiction is limited by Article III of the United States Constitution to "cases" and "controversies." U.S. Const. art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017) (internal brackets, quotation marks and citations omitted). "To establish standing, a plaintiff must show: (1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 14 F.4th 276, 281 (4th Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014)).[3] An injury in fact must be "concrete"—that is, "real, and not abstract." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204, 210 L. Ed. 2d 568 (2021) (quoting *Spokeo, Inc. v.*

---

[3] Defendants do not contest the Plaintiff's ability to demonstrate the second and third requirements for standing; therefore, the court's analysis is confined to whether Plaintiff establishes an injury in fact.

8

*Robins*, 578 U.S. 330, 340 (2016)). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks and citation omitted).

The Fourth Circuit "—along with several other circuits—has held that 'standing requirements are somewhat relaxed in First Amendment cases,' particularly regarding the injury-in-fact requirement." *Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019), *as amended* (Jan. 9, 2019) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)).[4] Here, Plaintiff alleges (1) he has a First Amendment right to run for political office, (2) a North Carolina statute permitting challenges to his candidacy pursuant to an inapplicable section of the U.S. Constitution infringes on that right, and (3) he seeks declaratory and injunctive relief. Therefore, Plaintiff "must establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287–88 (4th Cir. 2018) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

The Supreme Court has recognized that an Article III injury may be sufficient for standing purposes by the *threatened* enforcement of a law. *Susan B. Anthony List*, 573 U.S. at 158-59. "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id.* at 158 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.")). The Supreme Court has "permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent"; specifically, the Court has "held that a plaintiff satisfies the injury-

---

[4] Although its ultimate conclusion on the present motion is not based on Plaintiff's first claim for relief alleging an infringement of his First Amendment rights, the court finds that Plaintiff "presents a non-frivolous legal challenge, alleging an injury to [his] protected right [of] free speech" and, thus, "[f]or purposes of standing, [this court] must assume the [Plaintiff's] claim has legal validity." *Cooksey*, 721 F.3d at 239 (citations omitted); *see also id.* (courts must refrain from "put[ting] the merits cart before the standing horse").

9

in-fact requirement where he alleges [1] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [2] there exists a credible threat of prosecution thereunder." *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

Regarding the second part of the *Babbitt* standard, "there is a credible threat of future enforcement so long as the threat is not 'imaginary or wholly speculative,' 'chimerical,' or 'wholly conjectural.'" *Kenny*, 885 F.3d at 287–88[5] (citing *Babbitt*, 442 U.S. at 302, *Steffel*, 415 U.S. at 459, and *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)). "[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." *Id.* at 288 (quoting *Susan B. Anthony List*, 573 U.S. at 164). Threat of prosecution is especially credible when defendants have not "disavowed enforcement" if plaintiffs engage in similar conduct in the future. *Id.*; *see also Susan B. Anthony List*, 573 U.S. at 166. Furthermore, there is a presumption that a "non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat." *Kenny*, 885 F.3d at 288 (quoting *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)). "This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights." *Id.*

In *Kenny*, the Fourth Circuit addressed what a plaintiff seeking prospective declaratory relief under the First Amendment must allege to establish a future injury-in-fact adequate to confer Article III standing. *See id.* at 284. In that case, four elementary and secondary school students and one organization lodged First Amendment challenges to two South Carolina disorderly conduct statutes. *Id.*

---

[5] The Fourth Circuit recognizes "*two* ways that plaintiffs' allegations of a fear and risk of future arrest can satisfy the injury-in-fact requirement for prospective relief." *Id.* at 288 (emphasis added). In addition to the *Babbitt* standard cited by the Supreme Court in *Susan B. Anthony List*, the Fourth Circuit cites *Cooksey*, 721 F.3d at 235, for the proposition that "there is an ongoing injury in fact if plaintiffs make a 'sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id.* The parties do not argue, and the court finds inapplicable, the *Cooksey* method for establishing an ongoing injury in fact in this case.

at 284-85. Citing the *Babbitt* standard, the Fourth Circuit found the plaintiffs satisfied the first prong because they "attend school" and "attending school inevitably involves expressive conduct" that implicated the disorderly conduct statutes. *Id.* at 288. As to the second prong, the court held that the plaintiffs alleged a credible threat of enforcement "because these three plaintiffs regularly attend schools where they allege there may be future encounters with school resource officers or other law enforcement; they have been prosecuted under the laws in the past; and the defendants have not disavowed enforcement if plaintiffs engage in similar conduct in the future." *Id.* at 289.

In *Maryland Shall Issue, Inc. v. Hogan*, the Fourth Circuit described circumstances under which the Supreme Court has found Article III standing in pre-enforcement challenges to the constitutionality of certain laws:

> In *Susan B. Anthony List*, the Supreme Court identified four decisions—*Steffel v. Thompson*, 415 U.S. 452, 94 S. Ct. 1209, 39 L.Ed.2d 505 (1974), *Babbitt*, 442 U.S. at 298, 99 S. Ct. 2301, *American Booksellers Association*, 484 U.S. 383, 108 S. Ct. 636, 98 L.Ed.2d 782, and *Holder*, 561 U.S. at 1, 130 S. Ct. 2705—that illustrate "circumstances under which plaintiffs may bring a preenforcement challenge consistent with Article III." 573 U.S. at 159, 134 S. Ct. 2334. In the earliest example, *Steffel*, in which "police officers threatened to arrest petitioner and his companion for distributing handbills protesting the Vietnam War," the Supreme Court found a credible threat of enforcement. *Id.* at 159, 134 S. Ct. 2334. Because the petitioner "had been warned to stop handbilling and threatened with prosecution if he disobeyed [and] his companion's prosecution showed that his 'concern with arrest' was not 'chimerical,'" the Court allowed a preenforcement challenge to proceed. *Id.* Later, in *Babbitt*, the Supreme Court held that the petitioners had standing to bring a preenforcement challenge because they had "actively engaged in" the proscribed conduct in the past, alleged an intention to continue that conduct in the future, and showed that this plan made prosecution "inevitable." *Id.* at 160, 134 S. Ct. 2334.
>
> Likewise, the Supreme Court recognized a preenforcement challenge was permissible in *American Booksellers Association* because the booksellers had already published books that were covered by the challenged statute and alleged that "costly compliance measures would be necessary to avoid prosecution for displaying such books." *Id.* Lastly, the Supreme Court found a credible threat of prosecution in *Holder* where plaintiffs challenged a law that criminalized knowingly providing material support or resources to a foreign terrorist organization. *Id.* at 160–61, 134 S. Ct. 2334. There, "[t]he plaintiffs ... had provided support to groups designated as terrorist organizations prior to the law's enactment and would provide similar support in the future. The Government had charged 150 persons with violating the law and declined to disavow prosecution if the plaintiffs

11

resumed their support of the designated organizations." *Id.* at 161, 134 S. Ct. 2334.

971 F.3d 199, 217–18 (4th Cir. 2020), *as amended* (Aug. 31, 2020).

The court has found that, even absent any "relaxed" standard, the Plaintiff demonstrated an injury-in-fact sufficient to satisfy Article III. It is undisputed that on February 28, 2022, Plaintiff filed a notice of candidacy in North Carolina's 11th congressional district and, two days later, voters in that district filed challenges pursuant to N.C. Gen. Stat. §§ 163-127.1, et seq., seeking a decision finding him unqualified for the office. Under the statute, once a challenge is filed, the Board must appoint a panel that schedules a hearing, permits limited discovery, hears the matter, and renders a decision within twenty business days after the filing. If the panel finds the candidate unqualified under the statute, it may remove him or her from candidacy. On March 2 and March 4, 2022, the Board asserted its statutory authority to determine the Plaintiff's "constitutional" qualifications, including under Section 3 of the Fourteenth Amendment, and indicated its intent to enforce the statute and proceed on the challenges as early as March 7, 2022, if the U.S. Supreme Court ruled on the emergency application. Thus, on March 4, 2022, Plaintiff faced a "future injury in fact" that was "certainly impending, or there was a substantial risk that the harm would occur." *See Susan B. Anthony List*, 573 U.S. at 158.

Moreover, under *Babbitt*, Plaintiff established the first prong by showing he sought candidacy in the U.S. House of Representatives for the upcoming election, which implicates the First Amendment's freedom of association, including "the rights to run for office, have one's name on the ballot, and present one's views to the electorate." *Washington v. Finlay*, 664 F.2d 913, 927–28 (4th Cir. 1981); *cf. Williams v. Rhodes*, 393 U.S. 23, 31 (1968) ("The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot . . ."). If the challenges were successful under the statute, Plaintiff would be prohibited from running for election to the U.S. House of Representatives in North Carolina.

12

Plaintiff also demonstrated the second prong of the *Babbitt* standard. Plaintiff filed his notice of candidacy, he was subject to the challenge statute, challenges actually had been lodged against him, and he was compelled to prepare a defense to the challenges pursuant to a statute that shifts the burden of persuasion onto the Plaintiff. While the challenges filed against Plaintiff were stayed as of March 4, 2022, pending resolution of the redistricting question, the Board was prepared that day to proceed on them as early as March 7, 2022. Moreover, although it could have determined not to enforce the statute—which is directed primarily toward "residency" defects—under the circumstances alleged in the challenges against Plaintiff, the Board did not "disavow enforcement" of the challenges; instead, the Board declared at the hearing its statutory authority to determine Plaintiff's qualifications under Section 3 of the Fourteenth Amendment and asserted in its brief,

> The administrative process for candidate challenges before the State Board, county boards of elections, and designated panels is well-established. In the fifteen years since the enactment of the candidate challenge statutes, the State Board has considered and ruled upon numerous challenges, typically in the form of appeals from the initial hearing panel.

> In the past four years alone, the State Board has decided 12 candidate challenge appeals, involving all types of races, including candidates for the judiciary, state legislature, sheriffs, and county and municipal offices. In contrast with post-election protests, these pre-election challenges serve the critical purpose of ensuring that only qualified candidates appear on the ballot and are voted on by the electorate, while promoting public confidence in the electoral system.

Resp., DE 45 at 5.

Relevant to this case, the Fourth Circuit has construed *Susan B. Anthony List* to conclude that "a threatened administrative inquiry will not be treated as an ongoing First Amendment injury sufficient to confer standing unless the administrative process itself imposes some significant burden, independent of any ultimate sanction." *Abbott v. Pastides*, 900 F.3d 160, 179 (4th Cir. 2018) (citing *Susan B. Anthony List*, 573 U.S. at 165). In *Abbott*, the court was asked to determine, *inter alia*, whether the plaintiff students demonstrated a credible threat that the defendant university's "harassment policy" (titled,

"STAF 6.24") would be enforced against their future speech. *Id.* at 163. The court concluded that the plaintiffs failed to make such showing where, following the plaintiffs' "free speech event," the university received complaints under STAF 6.24 and met with the plaintiffs regarding the complaints, but determined *not* to proceed with an investigation or any sanction under the policy. *Id.* at 177 ("University officials, after concluding their inquiry into the Free Speech Event, did nothing to threaten the plaintiffs with future discipline under STAF 6.24."). The *Abbott* court also found that any threat of future "meetings" with university officials was not sufficient to "chill" the students' First Amendment rights and, thus, did not suffice as a "credible threat of enforcement" sufficient to confer Article III standing. *Id.* at 178-79.

In coming to this conclusion, the *Abbott* court cited *Susan B. Anthony List* saying, "the [Supreme] Court recognized that the state's administrative process for investigating complaints itself imposed a 'substantial' burden virtually indistinguishable from a sanction:

> [T]he practical effect of the [state] scheme is to permit a private complainant to gain a campaign advantage without ever having to prove the falsity of a statement. Complainants may time their submissions to achieve maximum disruption of their political opponents .... [T]he target of a false statement complaint may be forced to divert significant time and resources to hire legal counsel and respond to discovery requests in the crucial days leading up to an election. And where, as here, a Commission panel issues a preelection probable-cause finding, such a determination itself may be viewed by the electorate as a sanction by the State."

*Id.* at 178 (quoting 573 U.S. at 165-66). The Supreme Court concluded that this "substantial" threat of administrative proceedings, combined with a threat of criminal prosecution, sufficed to create Article III standing. *Susan B. Anthony List*, 573 U.S. at 166.

This court found the circumstances presented here more closely analogous to those in *Susan B. Anthony List* than in *Abbott*. Unlike in *Abbott*, Plaintiff here was not only subject to the challenge statute, he was also the subject of current challenges, which, according to the Board, ***would*** advance through a quasi-judicial proceeding when the stay lifted. Further, while there was no threat of criminal prosecution

14

in this case, the challengers alleged that Plaintiff, a sitting member of the U.S. House of Representatives, engaged in "insurrection or rebellion" against the United States in violation of Section Three of the Fourteenth Amendment to the U.S. Constitution. These challenges have been widely publicized, not only in North Carolina, but also in the national news, and may be viewed by the electorate in a negative light before any determination is made. *See Susan B. Anthony List*, 573 U.S. at 165-66.

In addition, the "credibility of the threat is bolstered by the fact that . . . the universe of potential [challengers] is not restricted to state officials who are constrained by explicit guidelines or ethical obligations[; thus], there is a real risk of [challenges] from, for example, political opponents." *See id.* at 164. Like the statute in *Susan B. Anthony List*, the practical effect of the challenge statute here has been to allow private persons to gain a campaign advantage (whether intended or not), without having to prove that the Plaintiff engaged in insurrection, by lodging the challenge prior to the election thereby "achiev[ing] maximum disruption of their political opponent[ ] while calculating that an ultimate decision on the merits [may] be deferred until after the relevant election" and "forc[ing] [Plaintiff] to divert significant time and resources to hire legal counsel and respond to discovery requests in the crucial days leading up to an election." *See id.* at 165. Moreover, as recognized herein and stated by the Board, challenge proceedings "are not a rare occurrence." *Id.* at 164; *see also supra* at 11. Finally, the challenge statute contains a burden shift and Plaintiff would be required to assume the burden of proving a negative. The court concludes that "the administrative process [here] imposes [a] significant burden, independent of any ultimate sanction," *see Abbott*, 900 F.3d at 179, and, therefore, Plaintiff demonstrated standing to seek injunctive relief as alleged in the operative pleading and present motion.

B. Ripeness

"Like standing, ripeness is an issue of subject matter jurisdiction." *Fusaro v. Howard*, 472 F. Supp. 3d 234, 260 (D. Md. 2020), *aff'd*, 19 F.4th 357 (4th Cir. 2021) (citing *Sansotta v. Town of Nags*

*Head*, 724 F.3d 533, 548 (4th Cir. 2013)). "Whereas standing focuses on who can sue, ripeness 'concerns the appropriate timing of judicial intervention.'" *Id.* (quoting *Cooksey*, 721 F.3d at 240). Traditionally, when analyzing a ripeness question, courts consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Cooksey*, 721 F.3d at 240 (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). Notably, "[t]he doctrines of ripeness and standing have largely blurred in declaratory judgment actions. . . . [T]he Supreme Court [has] recognized that 'standing and ripeness boil down to the same question' of justiciability." *Fusaro*, 472 F. Supp. 3d at 260 (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) and *Susan B. Anthony List*, 573 U.S. at 157 n.5). Moreover, "[t]he requirements for ripeness, like those for standing, are 'relaxed in First Amendment cases.'" *Id.* at 261 (quoting *Cooksey*, 721 F.3d at 240).

Without regard to any "relaxed" standard, the court concluded that Plaintiff's claims were ripe for review. He was "challenged" under the state statute, which is the subject of this litigation. Although proceeding on the state challenges was stayed, the Board indicated its intent to proceed on the challenges as soon as the stay lifted, even as early as March 7, 2022. As stated previously, the issues here were legal in nature based on relevant undisputed facts and, thus, the issues were fit for adjudication. A delay in the court's consideration of whether enforcement of the state statute under the circumstances presented here violates federal law would result in significant hardship to the Plaintiff as described above.

C.    *Younger* Abstention

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *United States v. South Carolina*, 720 F.3d 518, 526 (4th Cir. 2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)). Generally, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Id.* (quoting *Quackenbush v. Allstate Ins. Co.*,

16

517 U.S. 706, 716 (1996)). The Supreme Court has expressed a "limited" exception to this rule in *Younger v. Harris*, 401 U.S. 37, 41 (1971), in which the Court held that federal courts should not "stay or enjoin pending state court proceedings except under special circumstances." Such "special" circumstances include bad faith or harassment. *Id.* at 53-54. The Fourth Circuit instructs that abstention under *Younger* applies when the requested relief would interfere with "'(1) an ongoing state judicial proceeding, instituted prior to any substantial progress in the federal proceeding; that (2) implicates important, substantial, or vital state interests; and (3) provides an adequate opportunity for the plaintiff to raise the federal constitutional claim advanced in the federal lawsuit.'" *South Carolina*, 720 F.3d at 527 (quoting *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 165 (4th Cir. 2008)).[6]

In this case, Plaintiff argued that the challenges were not "ongoing," and the Board was not authorized to determine whether the statute is unconstitutional. Defendants countered that the challenges were "a state judicial proceeding" that commenced before this action and related to North Carolina's vital interest in the oversight of its elections, and while they did not dispute that the Board possessed no authority to adjudicate constitutional challenges, they argued such challenges may be raised if the matter was eventually appealed to the North Carolina appellate courts.

The court concluded that abstention is not appropriate in this case. First, while the court agrees that the state challenges are quasi-judicial in nature and that the January challenge commenced three

---

[6] No party cited the Supreme Court's opinion in *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013), in which the Court reaffirmed the scope of the *Younger* doctrine: "Circumstances fitting within the *Younger* doctrine, we have stressed, are 'exceptional'; they include . . . "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 73 (quoting *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367–368 (1989)). This court has determined the circumstances presented here do not fall under any of these exceptional categories, and notes that although one may attempt to argue that the challenge against Plaintiff may be couched as a "civil enforcement proceeding," the challenge here is not "akin to a criminal prosecution," was not "initiated by 'the State in its sovereign capacity,'" and did not begin with an internal investigation that "culminat[ed] in the filing of a formal complaint or charges." *See id.* at 79-80.

17

weeks before Plaintiff filed this action, the challenges—filed in both January and March—were not "ongoing" and did not progress past their filing with the Board; in fact, the instant action made more substantial progress than the state proceeding. *See South Carolina*, 720 F.3d at 527 ("We have also drawn a distinction between the commencement of 'formal enforcement proceedings,' at which point *Younger* applies, versus the period of time when there is only a 'threat of enforcement,' when *Younger* does not apply.") (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1229 (4th Cir. 1989), *cert. denied*, 495 U.S. 904 (1990)). The *South Carolina* court noted that in *Telco*, "where a state agency had commenced an investigation of a firm, [the court] held that abstention was not appropriate because the state proceedings were in a preliminary stage." *Id.* (citing 885 F.2d at 1228). Here, too, the stayed challenge proceeding was in a "preliminary stage."

Moreover, while the court recognizes the state's interest in overseeing its elections, the present action raised questions not only of the state statute's constitutionality, but also the application and interpretation of a particular section of the federal constitution (Section 3 of the Fourteenth Amendment) and, as discussed below, the application and consideration of federal statutes (1872 and 1898 Amnesty Acts). Thus, this case involved not only the "important" state interest of election oversight, but also the federal interests in interpreting federal law and the U.S. Constitution.

Further, it was unrebutted that the stated "opportunity" provided by the challenge proceeding for the Plaintiff to contest the legality of the statute is limited solely to an instance in which Plaintiff appeals both the panel's and the Board's findings of his disqualification. This case is distinguishable from the opinion in Defendants' cited case, *Beam v. Tatum*, 299 F. App'x 243 (4th Cir. 2008), in which the plaintiff filed an action in federal court *after* (1) he complained to the North Carolina Department of Motor Vehicles that he protested the receipt of two "civil penalties" from an enforcement officer, (2) the department responded after undergoing an "administrative review" affirming the imposition of the

18

penalties, and (3) the department notified the plaintiff of his right to appeal to a North Carolina court. *Id.* at 244-45. In this case, the only actions taken by the Board in the state proceeding was accepting the challenges filed against Plaintiff and seeking a stay of those and other challenges. Under the circumstances presented here, where no party disputed that candidacy deadlines and the election itself are fast approaching, the court found the "opportunity" afforded under N.C. Gen. Stat. §§ 163-127.1 et seq. inadequate. The Plaintiff "need not live under a cloud of 'prolonged uncertainty' as to [his] rights." *See South Carolina*, 720 F.3d at 528.

Accordingly, abstention under *Younger* was not appropriate in this case. *See id.* ("we hold that *Younger* abstention is inapplicable where, as here, state proceedings have not begun against the federal plaintiffs and the plaintiffs seek injunctive relief to protect their constitutional rights.").

D.    Permanent Injunction

The court now explains its ruling that Plaintiff successfully demonstrated the state statute, as applied, would violate federal law and cause irreparable harm if not enjoined, monetary damages would were inadequate to compensate for the harm, balancing the parties' interests established that an injunction was warranted, and the public interest was not disserved by a permanent injunction. Where, as here, a straight interpretation of the statutory text answers the question presented, this court will not reach the constitutional questions when it is not necessary to do so.[7]

1.    *Statutory Violation*

The state challengers sought the Plaintiff's disqualification based on Section 3 of the Fourteenth Amendment to the United States Constitution:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any

---

[7] In light of its anticipated ruling, the court restricted the parties from making further factual development at the hearing. Should the court's statutory interpretation prove incorrect, it will of course engage in the factual development necessary and give these arguments full consideration.

19

State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3. By basing their challenges on this section, the challengers asked the Board, through authority granted by N.C. Gen. Stat. §§ 163-127.1, et seq., to determine whether Plaintiff was disqualified as a candidate for having "engaged in insurrection" against the United States. *See* DE 70-1.

The North Carolina statute cannot grant such authority, however, because Congress removed the disability stated in Section 3 for all members of Congress. The Amnesty Act of 1872 provides that "***all political disabilities imposed*** by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed ***from all persons whomsoever***, except Senators and Representatives of the thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the United States, heads of departments, and foreign ministers of the United States." Amnesty Act of 1872, Pub. L. No. 42-193, 17 Stat. 142 (emphasis added). In 1898, Congress removed the disabilities from the excepted persons: "the disability imposed by section three of the Fourteenth Amendment to the Constitution of the United States ***heretofore incurred*** is hereby removed." Amnesty Act of 1898, ch. 389, 30 Stat. 432 (emphasis added). The plain language of these statutes, first removing the disability from "all persons whomsoever" *except* those listed in the statute and, second, removing the disability from the excepted persons, demonstrates that the disability set forth in Section 3 can apply to no current member of Congress.

The Board contended that "the Amnesty Act of 1872 was a one-time only waiver of Section 3 of the Fourteenth Amendment that applies only to former Confederates." Resp., DE 45 at 28.[8] The court

_____

[8] At the hearing, the Board proffered additional arguments concerning the legislative history of the 1872 Act, ostensibly supporting its position that the 1872 Act applied only retroactively to persons who engaged in insurrection or rebellion during the Civil War. The court notes that "'[w]here, as here, the

disagreed; consideration of the plain language in Section 3 and the 1872 Act reveals that Congress has removed Section 3's disability from "all persons whomsoever," which includes current members of Congress like the Plaintiff. *See N.L.R.B. v. Enter. Leasing Co. Se., LLC*, 722 F.3d 609, 633 (4th Cir. 2013) ("When interpreting the text of the Constitution, we begin with the presumption that every word in the Constitution has independent meaning, 'that no word was unnecessarily used, or needlessly added'" and "we must bear in mind in our evaluation of the constitutional provisions at issue that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'") (quoting *Wright v. United States*, 302 U.S. 583, 588 (1938) and *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008)). Section 3 disqualifies from Congress or federal office a member or officer who has taken an oath to support the Constitution and who "shall have engaged" in insurrection or rebellion. This language reflects the "future perfect tense," which describes an action that will be completed between now and some point in the future. The ratifiers of the Constitution could have limited Section 3 by simply disqualifying members or officers "who had engaged" in insurrection or rebellion but did not do so. The court found that the language used in Section 3 reflects the ratifiers' intent that disqualification be available for members or officers who had or will have taken the oath, then at some point in the future, engaged in insurrection or rebellion.

The 1872 Act, by its plain language, removed "*all political disabilities* imposed by the third section of the fourteenth article of amendments of the Constitution of the United States *from all persons whomsoever*" (emphasis added). *See United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)

---

resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history *if the statutory language is unclear*.'" *Toibb v. Radloff*, 501 U.S. 157, 162 (1991) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 (1984)) (emphasis added). As stated above, the court found the language of the 1872 Act to be clear and unambiguous and, thus, consideration of the legislative history was unnecessary and improper. Furthermore, the court finds these late-arriving arguments unpersuasive.

21

("When engaging in statutory interpretation, we 'first and foremost strive to implement congressional intent by examining the plain language of the statute.'") (quoting *United States v. Passaro*, 577 F.3d 207, 213 (4th Cir. 2009)). The Act excepts certain persons, but it was undisputed that Plaintiff did not fall within those exceptions (and, of course, the exceptions were removed by the 1898 Act). Again, Congress could have limited the Act to remove Section 3's disabilities from "persons currently subject to the disabilities" or "persons against whom the disabilities were lodged" at the time (i.e., the "Confederates") but did not do so. By the plain language of Section 3 and the 1872 Act, Congress removed *all* of Section 3's disabilities from *all* persons whomsoever who were not explicitly excepted. *See id.* ("We remain mindful that in 'interpreting the plain language of a statute, we give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended' the statute's language 'to bear some different import.'") (quoting *Stephens ex rel. R.E. v. Astrue*, 565 F.3d 131 (4th Cir. 2009)).

The Board insisted that the 1872 Act is limited in scope as "established by the action of the U.S. House of Representatives itself, when in 1920 it applied Section 3 to refuse to seat one of its own members, Victor Berger." Resp., DE 45 at 28. The Board conceded that the House committee in the Berger proceeding examined Section 3 "in light of the Amnesty Act of *1898*" and concluded that Congress had no "authority to immunize future acts from enforcement of Section 3." *Id.* (emphasis added). The Berger proceeding, described in Cannon's Precedents of the House of Representatives, Volume VI, 53-63,[9] reflects that the House committee rejected Berger's argument that "section 3 has been entirely repealed by an act of Congress passed in 1898." *Id.* at 55. The committee ruled that "Congress has no power whatever to repeal a provision of the Constitution by a mere statute" and

---

[9] https://www.govinfo.gov/content/pkg/GPO-HPREC-CANNONS-V6/pdf/GPO-HPREC-CANNONS-V6.pdf, last visited February 17, 2022.

interpreted the 1898 Act to find that "Congress in the very nature of things would not have the power to remove any future disabilities," which "was plainly recognized when the words 'heretofore incurred' were placed in the act itself." *Id.* The court's findings in this case are not inconsistent with those by the Berger committee, particularly because the committee did not consider the 1872 Act; the court agrees with the Berger committee that the 1898 Act, due to its "heretofore incurred" language, removed disabilities only as to those persons excepted previously under the 1872 Act. The Board's unsupported statement that "the same is true for the act under which the Plaintiff begs protection, the Amnesty Act of 1878 [sic]" was neither binding nor persuasive.

Plaintiff has demonstrated that the Board intended to apply N.C. Gen. Stat. §§ 163-127.1, et seq., so that it might determine Plaintiff's qualifications as a candidate pursuant to Section 3 of the Fourteenth Amendment. This claimed power has been rendered ineffective by the 1872 Act. Subjecting Plaintiff to such a proceeding would violate federal law.

2. *Irreparable Harm & Inadequate Remedies at Law*

In addition, Plaintiff showed that, if the challenges had proceeded before the Board, he would have suffered an irreparable injury in the absence of an injunction. Absent a permanent injunction, the Board would have proceeded to seat a panel to adjudicate whether Plaintiff should be disqualified as a candidate for election to the U.S. House of Representatives pursuant to Section 3 of the Fourteenth Amendment and placed on him the burden to prove he should not be disqualified. Plaintiff has and would have been required to prepare a defense to this widely publicized—and unlawful—quasi-judicial proceeding in which he was accused of insurrection against the United States by political opponents while at the same time attempting to campaign for office in the U.S. House of Representatives.

Moreover, Plaintiff demonstrated that remedies available at law, such as monetary damages, were inadequate to compensate for the threatened injury. In this case, Plaintiff did not seek money damages,

and the court found that money cannot adequately compensate Plaintiff if he were forced to defend an "insurrection" allegation in a highly publicized unlawful proceeding as a result of which he may be prohibited from running for office. As set forth above, the challenges were neither withdrawn nor rendered moot by other state proceedings, and the Board intended to proceed on the challenges pursuant to N.C. Gen. Stat. §§ 163.127.1, et seq., as soon as the Supreme Court ruled on the emergency application and the stay lifted. Thus, Plaintiff established that he will have suffered irreparable injury in the absence of the requested injunction for which remedies at law are inadequate.

### 3. *Balance of Hardships*

Further, the Plaintiff established that the balance of hardships weighed in his favor. The court recognizes the Board's interest in overseeing elections pursuant to its authority under state law and the Elections Clause of the U.S. Constitution, which provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators." U.S. Const. art. I, § 4, cl. 1. The Supreme Court instructs that the "Elections Clause gives States authority 'to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.'" *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). While the Board's interest is important, any "hardship" or impact on this interest as a result of the injunction is minimal, since the injunction simply prohibits the Board from proceeding on the challenges filed against Plaintiff seeking his disqualification pursuant to Section 3 of the Fourteenth Amendment. The Board is not prohibited from determining any North Carolina candidate's qualifications based on other valid grounds.

On the other hand, the Plaintiff would suffer hardship if forced to participate in an unlawful

24

proceeding and defend himself against allegations of insurrection against the United States at the same time he is attempting to campaign for election to the U.S. House of Representatives. The balance of these equities favors granting injunctive relief, particularly where the Fourth Circuit's "precedent counsels that a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (quoting *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013)) (internal quotation marks omitted). The permanent injunction imposed here confers the same benefit.

4.     *Public Interest*

It cannot be contested that the public has significant interests in the operation of full and fair democratic elections and lawful judicial and quasi-judicial proceedings. The public interest is served when the Board is permitted to maintain its ability to enforce the elections laws adopted by the North Carolina legislature and act on the authority vested in the legislature by state and federal law and state and federal constitutions. The public interest is also served when candidates are not forced to assume burdens from which they have been explicitly exempted. Plaintiff's rights are significantly harmed if he must assume such burdens pursuant to a provision from which he is explicitly protected by federal law. The court found the public interest in the orderly and lawful administration of elections in this state would not be disserved by the narrow injunction imposed in this case prohibiting an unlawful proceeding that may have interfered with a full and fair election process.

**IV.     Conclusion**

Plaintiff demonstrated a violation of the 1872 Act as alleged in Count Four, irreparable harm for which remedies at law are inadequate, hardship that outweighs any harm the Defendants may suffer from the requested injunction, and a showing that the public interest will not be disserved by the requested

25

injunction; thus, Plaintiff's motion for injunctive relief was granted. The court explicitly avoided ruling on whether the Board may determine the qualifications of political candidates under its authority granted by state statute, the state constitution, and Article I, Section 4, Clause 1 of the U.S. Constitution as to the "time, place, and manner of holding elections." The court ruled simply that the Board may not proceed under N.C. Gen. Stat. §§ 163-127.1, et seq., with the challenges lodged against the Plaintiff based on Section 3 of the Fourteenth Amendment to the U.S. Constitution.

SO ORDERED this 10th day of March, 2022.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE